UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY, RUBBIE McCOY, WILLIAM YOUNG, on behalf of themselves and all others similarly situated, and MICHIGAN LEGAL SERVICES,<br><br>Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,<br><br>Defendants. | INDEX NO.<br><br>CLASS ACTION COMPLAINT<br>(Trial by Jury Demanded)<br><br><br>12-CIV-7667-HB<br>ECF CASE |

Plaintiffs bring this Class Action Complaint ("Complaint") against the Defendants,

Morgan Stanley entities identified herein ("Morgan Stanley"), on behalf of themselves and all

other similarly situated African Americans in the Detroit, Michigan metropolitan area (the

"Class").

## NATURE OF THE ACTION

1.       The members of the Class allege that Morgan Stanley has discriminated against

them on the basis of their race.  Morgan Stanley deployed policies and practices that enabled the

origination of exceedingly high-cost and high-risk residential mortgage loans for the purpose of

purchasing, pooling, and securitizing those loans at a profit.  Morgan Stanley's aggressive

development of these loan pools disproportionately impacted members of the Class, who were

more likely to receive these categorically harmful loans than white borrowers. As a result, the

members of the Class faced a greater risk of default and foreclosure.

1

2.      Between 2004 and 2007, Morgan Stanley ramped up its syndication of mortgage-backed securities, becoming the principal financer for New Century Mortgage Company ("New Century"). The now-bankrupt New Century was among the most notoriously predatory of the subprime lenders operating at that time. Morgan Stanley purchased the lion's share of the loans New Century sold to Wall Street firms during this period. Morgan Stanley, in turn, packaged and securitized the New Century loans, syndicating the resulting securities for sale to investors, and receiving significant fees in the process.

3.      Morgan Stanley went well beyond the role of a passive consumer or conventional securitizer in its relationship with New Century. Morgan Stanley provided crucial funding to New Century that facilitated New Century's ability to make mortgage loans. Morgan Stanley effectively dictated the types of loans that New Century issued, requiring as a condition of the companies' lucrative business relationship that a large percentage of New Century's loans have certain dangerous characteristics. What made these loans especially hazardous for borrowers was the combination of multiple high-risk features. Though profitable for Morgan Stanley, these Combined-Risk Loans put borrowers on a path toward default and foreclosure.

4.      Pursuant to this arrangement, New Century – at Morgan Stanley's direction – issued large volumes of Combined-Risk Loans during the relevant time period, including thousands of these loans to borrowers in the metropolitan Detroit area. In order to satisfy Morgan Stanley's demand for loans it could pool and securitize, New Century targeted African-American communities and borrowers in the Detroit area.

5.      Morgan Stanley caused these Combined-Risk Loans to be extended to members of the Class without regard to their economic viability for the homeowners who received them.

Instead, Morgan Stanley's policies were designed solely for the purpose of pooling and securitizing these Combined-Risk Loans for profit.

6.  Morgan Stanley's policies and practices have resulted in considerable racial disparities. They caused New Century borrowers in the metropolitan Detroit region to be significantly more likely to receive Combined-Risk Loans, and thus to suffer the harms associated with such loans, if they were African-American.

7.  The individual named Plaintiffs and the members of the proposed Class they seek to represent in this action are African-American Detroit-area borrowers who received Combined-Risk Loans from New Century as a result of Morgan Stanley's discriminatory policies and practices. Plaintiffs seek, through this action, to obtain injunctive relief preventing Morgan Stanley from engaging in this discriminatory conduct in the future. They also seek to disgorge unjust enrichment Morgan Stanley derived from its discriminatory conduct and to remedy economic harms suffered as a result of the policies challenged in this lawsuit.

8.  Morgan Stanley's discrimination violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA"), the Equal Credit Opportunity Act, 15 U.S.C § 1691 *et seq*. ("ECOA"), and Michigan's Elliot-Larsen Civil Rights Act, MCL § 37.2101 *et seq*. ("ELCRA").

**JURISDICTION AND VENUE**

9.  This Court has original subject matter jurisdiction over the FHA and ECOA claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 3613(a)(1)(A), and 15 U.S.C. § 1691e(f).

10.  This Court has original jurisdiction over the Michigan ELCRA claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a putative class action in which: (a) there are 100 or more members in the Class; (b) at least some members of the proposed Class have different citizenship from at least one Defendant; and (c) the claims of the proposed Class members exceed $5,000,000.00 in the aggregate.

11.     In addition, this Court has supplemental jurisdiction over the Michigan ELCRA claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims alleged herein and are so related to the federal claims as to form part of the same controversy under Article III of the United States Constitution.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants conduct business and can be found in this district, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## PARTIES

13.     Plaintiff Beverly Adkins is an African-American homeowner who resides in Detroit, MI.  She is a United States citizen and citizen of the State of Michigan.

14.     Plaintiff Charmaine Williams is an African-American homeowner who resides in Westland, MI.  She is a United States citizen and citizen of the State of Michigan.

15.     Plaintiff Rebecca Pettway is an African-American homeowner who resides in Detroit, MI.  She is a United States citizen and citizen of the State of Michigan.

16.     Plaintiff Rubbie McCoy is an African-American homeowner who resides in Detroit, MI.  She is a United States citizen and citizen of the State of Michigan.

17.     Plaintiff William Young is an African-American homeowner who resides in Detroit, MI.  He is a United States citizen and citizen of the State of Michigan.

18.     Plaintiff Michigan Legal Services is a nonprofit corporation based in Detroit, MI and incorporated in the State of Michigan.

19.     Defendant Morgan Stanley was, at all relevant times, a Delaware corporation with its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley's business units include its Institutional Securities division, which, among other things, acts as an underwriter of residential mortgage-backed securities, provides warehouse lending to

subprime and other mortgage originators, trades, makes markets and takes proprietary positions in mortgage-backed securities, and structures debt securities and derivatives involving mortgage-related securities. Defendant Morgan Stanley acted through several of its wholly-owned subsidiaries in effecting the transactions giving rise to this action.

20.     Defendant Morgan Stanley & Co. LLC, is a New York limited liability company, with its principal executive offices at 1585 Broadway, New York, New York 10036.  At all times relevant, Defendant Morgan Stanley & Co. LLC was operating as Morgan Stanley & Co., Inc., and was owned by Morgan Stanley.  Effective May 31, 2011, Morgan Stanley & Co., Inc. converted from a corporation to a limited liability company and changed its name to Morgan Stanley & Co. LLC.  In connection with the conversion, Morgan Stanley & Co. LLC became a wholly-owned subsidiary of Morgan Stanley Domestic Holdings, Inc., a wholly-owned subsidiary of Morgan Stanley Capital Management, LLC, which is a wholly-owned subsidiary of Morgan Stanley.  Morgan Stanley & Co. LLC served as an underwriter for all of the residential-mortgage-backed securities which incorporated New Century mortgages.

21.     Defendant Morgan Stanley ABS Capital I Inc. is a direct, wholly-owned subsidiary of Morgan Stanley and has its executive offices at 1585 Broadway, 2d Floor, New York, New York 10036.  Morgan Stanley ABS Capital I Inc. served as a depositor in all of the residential-mortgage-backed securities which incorporated New Century mortgages.

22.     Defendant Morgan Stanley Mortgage Capital Inc. was a New York corporation until 2007, when it was merged into Morgan Stanley Mortgage Capital Holdings LLC, which is Morgan Stanley Mortgage Capital Inc.'s successor-in-interest.  Morgan Stanley Mortgage Capital Inc. provided warehouse and repurchase financing to mortgage lenders and purchased residential mortgage loans for securitization or resale, or for its own investment.  Morgan Stanley

Mortgage Capital Inc. acquired residential mortgage loans through bulk purchases and also through purchases of single loans through Morgan Stanley Mortgage Capital Inc.'s conduit loan purchase program. Morgan Stanley Mortgage Capital Inc. also conducted underwriting review. Morgan Stanley Mortgage Capital Inc. served as a sponsor of residential-mortgage-backed securities which incorporated New Century mortgages.

23.     Defendant Morgan Stanley Mortgage Capital Holdings LLC, a New York limited liability company, is a successor-in-interest by merger to Morgan Stanley Mortgage Capital Inc. and has its principal executive offices at 1585 Broadway, 2d Floor, New York, New York 10036. Morgan Stanley Mortgage Capital Holdings LLC served as a sponsor of residential-mortgage-backed securities which incorporated New Century mortgages.

24.     Defendants are collectively referred to herein as "Defendants" or "Morgan Stanley." Morgan Stanley continues to transact in securities.

## FACTUAL ALLEGATIONS

### I.     Mortgage Securitization: A General Background.

25.     During the relevant time period, the primary connection between large investment firms like Morgan Stanley and individual home mortgages was through the creation of mortgage-backed securities.    This process, referred to as "securitization," is defined by one leading text as follows:

> [A] process of packaging individual loans and other debt instruments, converting the package into a security or securities, and enhancing their credit status or rating to further their sale to third-party investors. The process converts illiquid individual loans or debt instruments which cannot be sold readily to third-party investors into liquid, marketable securities. These new debt instruments are often termed "asset-backed securities" because each pool is backed by a specific collateral rather than by the general obligation of the issuing corporation or instrumentality. Investors purchase a proportionate share of the assets and the bundle of rights linked to the assets, not a general obligation typical of traditional corporate debt.  The asset-backed security is structured under applicable laws to

6

stand on its own and pass through timely payment of interest and principal to investors.

Leon T. Kendall, *Securitization: A New Era in American Finance*, *in* A PRIMER ON SECURITIZATION 1, 1–2 (Leon T. Kendall & Michael J. Fishman eds., 1996).

26.     Individuals seeking mortgage loans constitute the first link in the securitization chain.  They enter the market by interacting with lenders, such as New Century, who originate mortgage loans.  Borrowers may deal directly with the lender or work with a mortgage broker who serves as an agent of the lender and effectuates the lender's uniform policies.

27.     Investment firms, like Morgan Stanley, then purchase mortgage loans from lenders to be packaged and sold as securities.  Mortgage loans are typically purchased in large pools.  In some instances, a securitization deal (*i.e.*, a package) will consist exclusively of loans originated by one lender, while in other instances it will consist of loans originated by multiple lenders.  As the sponsor of a mortgage-backed security, the investment firm is typically responsible for selecting the type of loan products that will be included in the package, reviewing the lending practices of the originator(s) and the quality of the loan products to be included in the package, and assessing the risks associated with the loans in the package.

28.     The investment firm sponsoring the securitization creates a trust, referred to as a "special purpose entity" or a "special purpose vehicle," and assigns the loans purchased for the security to that trust.  A separate investment firm will sometimes serve as the trustee for the special purpose entity.  These special purpose entities are established pursuant to the Tax Reform Act of 1986, which created a new kind of tax vehicle, a Real Estate Mortgage Investment Conduit ("REMIC").  REMICs allow for the tax-free pass-through of cash flows from home loans to mortgage-backed securities.  When the mortgage loans are purchased from the lender, the special purpose vehicle becomes the mortgage holder, thereby obtaining the right to enforce

the terms of the mortgage, including through foreclosure. The special purpose vehicle will then hire a servicer to perform tasks such as collecting payments and taking enforcement actions against borrowers.

29. When an investment firm sponsors a mortgage-backed security, it typically receives fees in connection with the sale of shares in the security. It receives such fees regardless of how the security performs (*i.e.*, regardless of whether the borrowers whose loans are included in the package continue making payments on their mortgages).

## II. Subprime Lending and Combined-Risk Loans.

30. There is no legal definition of "subprime loan," although the federal government has provided guidance on how to identify subprime loans. For example, the U.S. Department of Housing and Urban Development ("HUD") has published lists of lenders deemed "subprime." Its most recent list was published in 2005. New Century was among the entities listed as a "subprime" lender. Similarly, in 2007 the Treasury Department, Office of the Comptroller of the Currency, Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration jointly promulgated an interagency "Statement on Subprime Mortgage Lending." *See* Dep't of the Treas., et al., *Statement on Subprime Lending*, 72 FED. REG. 37569, 37572 (July 10, 2007). The interagency guidance explains that certain loan features associated with subprime lending placed borrowers at serious risk of delinquency or foreclosure. *Id*. at 37572-73.

31. The Home Mortgage Disclosure Act ("HMDA") requires mortgage lenders to disclose certain information about each mortgage loan originated or purchased in a fiscal year. Pursuant to regulations promulgated by the Federal Reserve Board, since 2004 the HMDA data has included a designation for "high-cost" loans. Identifying certain loans as "high-cost" operates as a proxy for identifying subprime loans. A "high-cost" loan is defined as a first-lien

loan with an annual percentage rate and borrowing costs that exceed by more than 3 percentage points Treasury securities of comparable maturity, or a subordinate lien loan that exceeds the Treasury benchmark by more than five points.

32. Although the distinction between prime and subprime lending ostensibly tracks differences in a borrower's creditworthiness, in fact many lenders and brokers simply tried to maximize the share of loans they originated on subprime terms. One analysis conducted for the *Wall Street Journal* found that, in 2005, 55% of subprime mortgages were given to borrowers with sufficiently high credit scores to qualify for prime loans. *See* Rick Brooks & Ruth Simon, *Subprime Debacle Traps Even Very Credit-Worthy*, WALL STREET JOURNAL, Dec. 3, 2007, at A1.

33. Not all subprime loans are predatory, but nearly all predatory loans are subprime. Most fundamentally, predatory loans place the borrower at an elevated risk of default or foreclosure. The interagency Statement on Subprime Mortgage Lending enumerates certain tactics that may indicate predatory lending. Nonprofit groups have also published widely accepted guidance on the kinds of practices that may constitute predatory lending. *See, e.g.*, NAT'L COMMUNITY REINVESTMENT COAL., THE BROKEN CREDIT SYSTEM: DISCRIMINATION AND UNEQUAL ACCESS TO AFFORDABLE LOANS BY RACE AND AGE 4 (2004). Like the Combined-Risk Loans at issue in this complaint, predatory loans typically combine risky loan features, thereby placing the borrower at an excessive risk of default or foreclosure.

34. For purposes of this Complaint, "Combined-Risk Loans" are loans that meet the definition of high-cost loan under HMDA and also contain two or more of the following high-risk terms: (a) the loan was issued based upon the "stated income," rather than the verified income, of the borrower; (b) the debt-to-income ratio exceeds 55%; (c) the loan-to-value ratio is

at least 90%; (d) the loan has an adjustable interest rate; (e) the loan has "interest only" payment features; (f) the loan has negative loan amortization features; (g) the loan has "balloon" payment features; and/or (h) the loan imposes prepayment penalties.

35.     Individually, these loan features make mortgage loans riskier and costlier to the borrower.  When multiple such features are layered within the same loan, the riskiness and costliness of the loans increase dramatically.

### III.     Morgan Stanley's Discriminatory Policies and Practices.

36.     The racial disparities giving rise to this action were a direct consequence of Morgan Stanley's policies for securitizing New Century loans.  Morgan Stanley's securitization of New Century loans was implemented through at least five interrelated and centralized policies and practices, which are enumerated below.  Further, Morgan Stanley was in a position to implement and direct those policies and practices due to the power it enjoyed as New Century's principal source of financing and as the primary purchaser of its loans.

#### A.     Morgan Stanley Was the Principal Financer to One of the Most Aggressive and Dangerous Predatory Lenders, New Century.

37.     New Century was among the most aggressive subprime lenders in the industry between 2004 and 2007.  Indeed, its intensive focus on subprime loans increased steadily over the relevant period.  In 2004, approximately 44% of New Century's loans were classified as "high-cost" under HMDA.  By 2005, 86% of New Century's loans met the definition of high-cost, and in 2006, 88% of its loans were high-cost.  (Data for 2007 is not available because New Century folded its business before the reporting deadline.)    In 2008, the Office of the Comptroller of the Currency published a document identifying the "Worst Ten in the Worst Ten," *i.e.*, a list of the subprime lenders with the highest number of loans (based on 2005-2007 originations) in foreclosure in the ten metropolitan areas experiencing the highest rates of

foreclosure. New Century ranked at the top of this list. In 2010, the OCC published an updated Worst Ten in the Worst Ten list based on more recent foreclosure data; once again, it identified New Century as the subprime lender responsible for the greatest share of foreclosures in the worst-hit metropolitan areas. New Century declared bankruptcy in March 2007.

38. Morgan Stanley was New Century's principal financer during the relevant time period. In 2005, Morgan Stanley bought and securitized approximately 48% of the loans sold by New Century; it purchased 34% of New Century's loans in 2006, and 41% in 2007. In each of those years, Morgan Stanley purchased a greater proportion of New Century's loans than any other institution.

39. Morgan Stanley securitized some loan packages consisting entirely of loans that were originated by New Century and purchased by Morgan Stanley, as well as loan packages consisting of loans Morgan Stanley purchased from New Century and one or more other lenders.

40. In connection with the securitization of New Century loans and the sale of the corresponding securities, Morgan Stanley received significant fees.

41. Morgan Stanley relied heavily on New Century's origination of Combined-Risk Loans in its efforts to ramp up its trading of mortgage-backed securities. Because its receipt of fees had little or no connection to how the securities performed, and because it saw financial advantages for itself in buying and packaging Combined-Risk Loans in particular, Morgan Stanley focused heavily on increasing the volume of Combined-Risk Loans it purchased. Between 2004 and 2006 – years when it was purchasing more of the loans New Century sold than any other securitizer – Morgan Stanley expanded its subprime underwriting business by 25%. According to a 2007 *New York Times* article, Morgan Stanley agreed to pay above-market prices for loans in return for a steady supply of mortgages. A former New Century executive

told the *Times* that "Morgan would be aggressive and say, 'We want to lock you in for $2 billion a month.'" New Century, in turn, structured its lending practices to meet Morgan Stanley's demand for Combined-Risk Loans. In its 2004 annual report, New Century stated:

> We seek to maximize our premiums on whole loan sales by closely monitoring requirements of institutional purchasers and focusing on originating or purchasing the types of loans that meet those requirements and for which institutional purchasers tend to pay higher premiums. During the year ended December 31, 2004, we sold $14.1 billion of loans to Morgan Stanley and $5.2 billion of loans to DLJ Mortgage Capital, which represented 46.4% and 17.2%, respectively, of total loans sold.

42. Similarly, the examiner's report created in connection with New Century's 2007 bankruptcy describes the preeminence of the secondary mortgage market in shaping the company's lending practices: "Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." Morgan Stanley understood the key role that securitization played in shaping the practices of lenders like New Century. In prospectuses for its securitization deals, Morgan Stanley stated: "All of the mortgage loans in the mortgage pool[s] were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."

**B.** **Morgan Stanley Ensured that New Century Originated Combined-Risk Loans.**

43. During the relevant time period, Morgan Stanley required New Century, as a condition of the companies' lucrative business relationship, to issue large volumes of Combined-Risk Loans. The high-risk features of these loans increased the costs of the loans for borrowers and placed them at greater risk of default, delinquency, and foreclosure.

1. ***Morgan Stanley's Policies of Purchasing New Century Loans with Unreasonably High Debt-to-Income Ratios and Prioritizing "Stated Income" Loans.***

44.     A loan's debt-to-income ratio ("DTI") is a primary bellwether of the borrower's ability to meet the loan's terms.  According to Morgan Stanley's own DTI analysis, 45% of the loans it purchased from New Century had excessive DTI ratios, meaning they were issued to borrowers who could not afford them.  This problem was exacerbated significantly by Morgan Stanley's preference for "stated income" loans – *i.e.*, loans where the borrower provides no verification of her income when submitting the loan application.  This method was routinely and knowingly abused by New Century and its brokers to artificially inflate borrowers' income and thereby decrease the apparent DTIs, making it appear as if borrowers could afford loans that they could not afford given their actual income.  Excessive DTI ratios and the prevalence of "stated income" loans placed New Century borrowers at a significantly increased risk of default and foreclosure.

45.     According to the complaint filed in *Allstate v. Morgan Stanley* ("*Allstate*"), a securities fraud case currently pending in New York Supreme Court, a former Morgan Stanley employee stated that Morgan Stanley was aware of the extraordinarily high DTI levels of loans it purchased for securitization.  This employee also said that Morgan Stanley staff agreed that a DTI of 55% meant that borrower's income was fully allocated to paying debt, after accounting for all of a borrower's normal expenses.  Nevertheless, the same employee stated, Morgan Stanley routinely purchased loans with DTIs of 60% or higher for securitization, a feature of many loans that Morgan Stanley purchased from New Century.

46.     The level of risk associated with high DTIs was exacerbated by the prevalence of adjustable rate mortgages ("ARMs").  For many ARMs, a borrower's interest rates – and thus her monthly debt obligations – increased considerably after the first few years of the loan.  An

appropriate measure of DTI would consider the debt a borrower would face after the initial period, once the mortgage reached its adjusted interest rate. However, New Century's SEC filings stated: "We use a qualifying interest rate that is equal to the initial interest rate on the loan to determine the applicant's ability to repay an adjustable-rate loan. For our interest-only adjustable rate mortgage, or ARM, loans we generally use the initial interest-only payment for determining the borrowers' repayment ability." Thus, the already high apparent DTIs for New Century loans purchased by Morgan Stanley actually understated the loans' true DTIs by failing to take into account the adjusted interest rates applicable to ARMs or the fully amortizing principal and interest payment borrowers inevitably would need to make on loans with interest-only payment options.

47. Moreover, large percentages of the loans that Morgan Stanley purchased from New Century were "stated income" loans. According to Morgan Stanley prospectuses relating to securities composed exclusively of New Century loans, between 2004 and 2007, stated income loans comprised between 30.56% and 47.70% of the New Century loans purchased by Morgan Stanley. For at least three such securities, stated income loans constituted the majority of the loans originated by New Century and packaged by Morgan Stanley.

48. As alleged in an Assurance of Discontinuance filed by the Attorney General of Massachusetts, based on the description of one of Morgan Stanley's own employees, the stated income method employed by New Century was "overused to the point of abuse." To approximate the true DTI levels for the stated income loans, based on borrowers' approximated actual incomes, the Massachusetts Attorney General conducted an analysis that predicted what the pattern of actual incomes among stated income borrowers would be if they followed the pattern of incomes in fully documented loans. Using this method, according to the Assurance of

Discontinuance, a "substantial number" of these borrowers would have DTI ratios exceeding 55% (*i.e.*, that are excessive by Morgan Stanley's own admission).

49.     It was readily apparent to traders at Morgan Stanley that purchasing a large volume of stated income loans encouraged loan applications with systematically inflated income levels.  A former executive director on Morgan Stanley's residential mortgage trading desk candidly described the situation in a radio broadcast in 2008:  "No income no asset loans, that's a liar's loan. We are telling you to lie to us. . .  we're hoping you don't lie. . .  tell us what you make.  Tell us what you have in the bank.  But we're not going to actually verify it? We're setting you up to lie. Something about that transaction feels very wrong. It felt wrong way back when.  And I wish we had never done it."

50.     In some instances, the inflation of borrower income apparently involved outright fraud by the lender or broker.  According to National Public Radio, a former mortgage broker who worked with New Century described one New Century account executive who encouraged brokers to use fraudulent means to complete loan applications with false incomes listed.

**2.** *Morgan Stanley's Policy of Purchasing New Century Loans with Unreasonably High Loan-to-Value Ratios.*

51.     Another basic measure of the riskiness of a mortgage loan is the loan-to-value ratio ("LTV"), which compares the amount of the loan to the subject home's value.  Borrowers with loans that have high LTV ratios generally face a higher probability of delinquency or foreclosure, especially when the ratio approaches or exceeds 100%.  It was Morgan Stanley's stated policy not to securitize loans with LTV ratios greater than 100%.  Nevertheless, in contravention of its own stated policy, Morgan Stanley did regularly purchase and securitize mortgage loans from New Century where the LTV, based on the broker-checked home value, exceeded 100%.

52.     An analysis conducted by the Massachusetts Attorney General reveals that Morgan Stanley packaged securities consisting of New Century loans with extremely high LTV levels.  According to the Assurance of Discontinuance filed by the Massachusetts Attorney General, 31% of the New Century loans securitized by Morgan Stanley in 2006 and 2007 had LTV ratios that were greater than 100%.  Of those loans with an LTV ratio in excess of 100%, 60% of the New Century loans had LTV ratios greater than 105%; and about 19% of those loans had ratios greater than 120%.

53.     Securities fraud litigation brought by the Federal Housing Finance Agency ("FHFA") alleges similarly unsustainable LTV levels.  Based on a loan-level analysis of Morgan Stanley securities composed of New Century loans, the FHFA alleges a pattern of extremely high LTV ratios.  While every Morgan Stanley prospectus reported 0% of loans with an LTV of over 100%, the lowest percentage of such loans for New Century/Morgan Stanley securities was actually 11.96%.  At the same time, according to the FHFA complaint, Morgan Stanley's prospectuses for these securities overstated the percentage of loans with an LTV *below* 80%. The total number of loans for which the reported LTV was inaccurate is striking.  In one security, for example, approximately 44% of loans seriously understated the LTV.  The data also shows that roughly 60-70% of loans in each Morgan Stanley-New Century security had an LTV of over 80%.

54.     Exacerbating the problem, Morgan Stanley purchased New Century loans which Morgan Stanley knew suffered from inflated appraisals, which skewed the LTV levels to appear lower than they actually were.  According to the *Allstate* complaint, one former Morgan Stanley employee explained that Morgan Stanley would not require New Century to conduct a second appraisal on the mortgaged property because Morgan Stanley feared that a second appraisal

would reflect the true, un-inflated value of the property and impede the flow of loans for securitization.

### 3. *Morgan Stanley's Policy of Requiring Loans With Multiple High-Risk Factors.*

55. An unreasonably high DTI or LTV level, standing alone, placed borrowers at higher risk of delinquency and foreclosure. Morgan Stanley exacerbated such risks by requiring that New Century's loans include other Combined-Risk Loan features.

56. Morgan Stanley specifically required that New Century loan pools be comprised largely of loans with risky and costly terms. For example, according to the "Bid Terms" of a 2005 deal between Morgan Stanley and New Century, Morgan Stanley required that 79.54% of the loans have adjustable rates (*i.e.,* that they be ARMs). In 2005, 73.3% of all New Century loans were ARMs (and 29.60% of all originations were interest-only ARMs).

57. New Century issued, and Morgan Stanley purchased, Combined-Risk Loans that New Century itself had expressly identified as potentially abusive. For example, Morgan Stanley required that the majority of loans it purchased from New Century include prepayment penalties, despite the known riskiness of this loan feature. In the 2005 Morgan Stanley-New Century Bid Terms, Morgan Stanley required that no less than 73.11% of loans contain prepayment penalties. Pursuant to Morgan Stanley's requirements, New Century issued large numbers of loans with prepayment penalties.

58. Similarly, in its 2004 annual report to shareholders, New Century stated that, in an effort to avoid abusive lending, it did not make loans containing "balloon" payments (*i.e.*, loans with a major portion due in one lump sum) or negative amortizations (*i.e.*, loans in which the monthly payment level leads the total balance to increase). Yet, within a year, New Century began offering balloon loans and introduced "pay-option loans," allowing borrowers to make

negatively amortizing payments.  New Century stated that it was increasing its origination of these high-risk products in response to "greater demand in the secondary market."

59.     With respect to balloon payment loans, Morgan Stanley knew that such loans placed borrowers in an untenable position.  As Morgan Stanley stated in its securities prospectuses, "[m]ortgage loans with balloon payments involve a greater degree of risk because the ability of a borrower to make a balloon payment typically will depend upon the borrower's ability either to timely refinance the loan or to timely sell the related mortgaged property."  In other words, balloon payment loans were never designed to allow borrowers to make affordable payments to pay off their mortgages.

60.     Despite the known riskiness of these loans, Morgan Stanley purchased and securitized large numbers of New Century mortgage loans with balloon payment features.  Loans with balloon payments regularly made up over 34% of the loans in Morgan Stanley securities comprised of New Century loans.  For the vast majority of these loans, balloon payments added an additional layer of risk on top of adjustable rates and other high-risk and high-cost features.

> **4.**     _**Morgan Stanley's Policy of Providing Lines of Credit that Enabled New Century's High-Risk Lending.**_

61.     Using a variety of credit channels, Morgan Stanley provided New Century with the funds necessary to originate loans with exceedingly high-risk features, which were issued in anticipation of securitization.  This support took several forms:  (a) warehouse lending, pursuant to which New Century borrowed funds from Morgan Stanley secured by home mortgages that would be originated in the future; (b) pre-commitments from Morgan Stanley to purchase loans from New Century; and (c) "wet-funding," whereby Morgan Stanley provided New Century with funds needed to close pending mortgage originations.

62.     Morgan Stanley was New Century's primary source of warehouse funding, providing billions of dollars in credit per year from 2004 through 2007. This relationship was so important to Morgan Stanley that, according to the Massachusetts Attorney General's investigation, Morgan Stanley's traders frequently referred to New Century as a "partner."

63.     From Morgan Stanley's perspective, its warehouse lending relationship with New Century took on special significance. As of February 2007, the quarter-end balance in Morgan Stanley's warehouse loans totaled over $2.6 billion, with over $1.5 billion of that amount earmarked for New Century's use in originating loans. Between November 2003 and February 2007, a period in which Morgan Stanley made over $57 billion in warehouse credit available to subprime lenders, New Century received more than a quarter of those funds.

64.     Morgan Stanley's funding constituted an indispensable element of New Century's business model. The examiner's report completed in connection with New Century's bankruptcy noted the significance of these credit streams: "To finance and carry the mortgage loans New Century originated and purchased, pending their sale or securitization in the secondary mortgage market, [New Century] maintained credit facilities, typically in the form of master repurchase agreements, with multiple warehouse lenders, which were large banking and investment institutions." In its annual statements to shareholders, New Century also identified its "primary sources of cash" for loan origination activities as "warehouse and aggregation credit facilities, [ ] asset backed commercial paper facility, and the proceeds from the sales and securitizations of [ ] loans." Indeed, New Century observed that if access to warehouse financing and sales on the secondary market were constricted, the company "would be forced to suspend or curtail our operations."

65.     Warehouse lines of credit were so critical to New Century's business that it literally could not originate loans without them.  Patricia Lindsay, a former wholesale underwriter at New Century, submitted written testimony to the Congressional Financial Crisis Inquiry Commission, in which she testified that, through the provision of warehouse credit lines, Wall Street investors "made sure we had enough money to close the loans that they were waiting in the wings to buy. . . .  New Century did not have the liquidity to make these loans without the use of warehouse lines of credit.  When New Century's lines were shut down in March of 2007, business stopped."  In her live testimony to the Commission, Ms. Lindsay further emphasized the indispensable role of warehouse lending:  "New Century was not able to originate loans without the use of warehouse credit.  We didn't have our own funds to loan, we were not a banking institution, we did not take deposits.  So we got our money from warehouse lenders.  These warehouse lenders provided us the ability to make these loans, and they were usually provided by the same people who would purchase our loans on Wall Street."

66.     The warehouse lines of credit were indispensable to New Century's ability to originate and close loans in the metropolitan Detroit area in particular.  On March 27, 2007, New Century and its subsidiary Home123 entered a consent cease and desist order with the State of Michigan Office of Financial and Insurance Services, which provided that "[o]n or about March 13, 2007, Respondents substantially lost their ability to fund loans through their warehouse line(s) of credit and, as a result, Respondents were unable to fund their mortgage loans."

67.     Morgan Stanley sometimes committed to buy loans with certain pre-specified features so far in advance that the loans that were the subject of the agreement had not yet been originated.  Under Morgan Stanley's "early purchase" program, it would provide New Century

and other originators with a line of credit before it would purchase loans from them. As a result, New Century was often originating loans for the purpose of fulfilling its commitment to Morgan Stanley.

68.     Morgan Stanley routinely purchased and securitized Combined-Risk Loans because those very loans secured the warehouse lines of credit that Morgan Stanley extended. According to one former Morgan Stanley employee referenced in the *Allstate* complaint, Morgan Stanley provided warehouse lines of credit that essentially locked Morgan Stanley into buying New Century's loans.

69.     Morgan Stanley also provided crucial funding aimed at individual loans that New Century originated. In early March 2007, just before New Century's bankruptcy, Morgan Stanley "wet-funded" New Century loans, in effect providing cash to New Century borrowers at the closing table. Morgan Stanley's wet-funding permitted New Century to close millions of dollars in Combined-Risk Loans in March 2007, even as New Century was hurtling toward bankruptcy.

**5.     *To Ensure the Continued Sale of Combined-Risk Loans, Morgan Stanley Circumvented Standard Underwriting Processes.***

70.     Morgan Stanley ensured that it was purchasing high-cost loans from New Century by actively undermining sound underwriting practices.

71.     For example, Morgan Stanley frequently and knowingly purchased loans that failed due diligence review, the process in which loans purchased for securitization are examined to ensure their compliance with underwriting standards.

72.     According to the *Allstate* complaint, in some instances where Morgan Stanley's due diligence firm, Clayton Holdings, asked to review further documentation on a loan because the information in the loan file did not fit the description provided by the seller, Morgan Stanley

told Clayton Holdings not to perform the more rigorous review because they could rely on the seller's representations and warranties in the loan pool agreement. However, Morgan Stanley knew that any such reliance was misplaced. In a 2007 securities prospectus, Morgan Stanley acknowledged that New Century's financial difficulties "may have adversely affected the application . . . of their underwriting standards in a manner that would have an adverse effect on the default and loss experience of the mortgage loans in the future."

73.     Morgan Stanley was on notice that the loans it was purchasing from New Century deviated substantially from basic underwriting standards, yet it pressed ahead to purchase them and include them in the mortgage-backed securities it assembled. According to a trending report prepared by Clayton Holdings, over one-third of the loans Morgan Stanley evaluated for purchase and securitization from 2006 through mid-2007 failed to meet Morgan Stanley's own underwriting guidelines. Yet Morgan Stanley purchased and securitized over half of the loans that Clayton Holdings determined did not meet Morgan Stanley's own underwriting guidelines.

74.     Indeed, Morgan Stanley acknowledged that its mortgage-backed securities composed of New Century loans were comprised largely of loans that substantially deviated from basic underwriting guidelines. In a prospectus for securities composed of New Century loans, Morgan Stanley cautioned that a "substantial proportion" of securitized mortgage loans constituted "exceptions" to New Century's underwriting guidelines.

75.     Morgan Stanley actively encouraged lending tactics that increased the levels of risk associated with individual loans. The complaint in the *Allstate* litigation refers to a former business analyst at one of New Century's affiliate companies who stated that Morgan Stanley placed at least two employees onsite at New Century full-time when conducting due diligence on loans it would purchase for securitization. That complaint also refers to a former Morgan

Stanley employee who reports that, when a full documentation loan showed that the borrower's income was insufficient, Morgan Stanley would shred the documentation and tell the originator to get a new, "stated income" loan that made the loan appear more reasonable (*i.e.*, less risky).

## IV. As a Direct Result of Morgan Stanley's Policies, New Century Originated Large Volumes of Combined-Risk Loans.

76.    In response to Morgan Stanley's policies and practices described herein, New Century needed to maximize the volume of Combined-Risk Loans it originated to meet Morgan Stanley's requirements and demand and to maximize the overall volume of loans it originated, regardless of the levels of risk imposed on borrowers.  Patricia Lindsay, the former New Century wholesale underwriter, submitted written testimony to the Financial Crisis Inquiry Commission stating that the "definition of a good loan changed from, 'One that pays' to 'One that can be sold.'"  Lindsay further testified:

> At the end of the day, we had a system that went into a downward spiral because of layering risk rather than offsetting the risk because there was such a huge demand for the products.  Our loans were sold before we even made them, which put more pressure on the production groups to get loans closed.  Wall Street packaged and sold the Residential Mortgage Backed Securities to unsophisticated bond buyers/investors.  By unsophisticated, I mean they did not understand the true risk of the underlying loan product.

77.    Not coincidentally, the time period during which Morgan Stanley ramped up its business with New Century occurred in tandem with a spike in the riskiness of New Century's loan products.  The bankruptcy examiner's report anatomizing New Century's collapse in 2007 noted that, between 2004 and late 2006, "non-traditional mortgage loan products, such as interest-only loans and 40-year-amortizing loans, became a larger part of New Century's loan mix" and during that period interest-only ARMs jumped from representing 19% of all New Century loans originated to nearly 30%.  Similarly, between 2003 and 2006, the share of New Century originations composed of 80/20 loans (*i.e.,* loans in which the borrower receives a pair

of loans that in combination equal the value of the home and allows the borrower to put no money down) rose steadily. According to the bankruptcy examiner's report, "New Century continued in 2004 and 2005 to concentrate originations in the layered risk products that presented the greatest risks, particularly the Stated Income and 80/20 products."

78. During this same period, New Century structured its business practices in a way that did not depend on the loans it originated being economically viable for borrowers. As the bankruptcy examiner found, "data available to New Century Senior Management in September 2005 indicated that the 80/20 loan product was, in the words of one employee, 'performing worse than the other [New Century] products.' . . . [B]ut the volume of growth of the 80/20 product continued." While 80/20 products represented 9.10% of New Century's originations at the end of 2003, that proportion grew to 23.54% a year later and 35.24% by the end of 2005.

79. The Combined-Risk Loan products that New Century emphasized during this period, pursuant to Morgan Stanley's requirements and encouragement, predictably exposed borrowers to elevated and spiraling risk that put many on a path to foreclosure. The bankruptcy examiner's report quotes one New Century employee presciently describing this dynamic in 2005:

> The most common subprime product is a loan that is fixed for 2 or 3 years and then becomes adjustable. The initial rate is far below the fully-indexed rate, but the loan is underwritten to the start payment. At month 25 the borrower faces a major payment shock, even if the underlying index has not changed. This forces the borrower into a refinance, likely with another subprime lender or broker. The borrower pays another 4 or 5 points (out of their equity), and rolls into another 2/28 loan, thereby buying 2 more years of life, but essentially perpetuating a cycle of repeated refinance and loss of equity to greedy lenders.

> Inevitably, the borrower lacks enough equity to continue this cycle (absent rapidly rising property values) and ends up having to sell the house or face foreclosure.

80.     New Century acknowledged that the focus on ever-increasing volumes of Combined-Risk Loans compromised its ability to adhere to applicable regulatory requirements. In a 2004 statement to investors, the company stated:  "[we] may [ ] be forced to expand our operations at a pace that does not allow us to attract a sufficient number of employees with the capability to ensure we are in compliance with the numerous complex regulations applicable to our business as well as to enable us to provide high quality customer service."  The following year, Morgan Stanley increased its funding for New Century loan originations by one billion dollars.

81.     New Century aggressively sought, as a matter of company policy, to originate Combined-Risk Loans in order to meet Morgan Stanley's demand.  To that end, New Century aggressively targeted African-American borrowers and communities as targets for the Combined-Risk Loans.  New Century specifically targeted certain metropolitan areas for these loans, with the metro Detroit area being one of its primary targets.

82.     New Century's efforts were aided by its use of a computerized system for defining the range of loan products that a New Century loan officer or broker could offer to any prospective borrower.  Specifically, New Century used a proprietary online underwriting system called FastQual.  The system was developed by New Century during the 2002 fiscal year, and, on information and belief, was used at all times relevant to this Complaint.  According to New Century's securities disclosures, FastQual "provide[d] all loan products for which the borrower qualifies."  In other words, once a broker entered a prospective borrower's information into FastQual, the system generated a menu of the New Century loan products available for that borrower, including loans with Combined-Risk terms.  It thereby circumscribed the range of loans that the borrower might receive, superseding the discretion of the loan officer or broker to

define the list of possible loan products.  To the extent that borrowers received loans with terms characteristic of Combined-Risk Loans, those terms originated in the company's centralized FastQual system.

83.     New Century also centralized its efforts to originate loans responsive to Morgan Stanley's demands by providing training programs, directed to mortgage brokers originating New Century loans, that inculcated tactics and strategies associated with Combined-Risk Loans. For example, in or around 2003, New Century organized an event called "Close More University" in several cities.  At Close More University events, New Century presented speakers who addressed topics related to its lending business, including instruction on how to achieve success as a mortgage broker. Video footage of one such tutorial has been posted on the Internet and is available on www.youtube.com.

84.     In the Close More University presentation, New Century instructed its affiliated brokers on several tactics associated with originating Combined-Risk Loans.  Among other things, the New Century presentation included the following instructions:

- "Qualify borrowers. There's all kinds of ways to qualify borrowers and you need to know all of them to be a top producer. Stated, no stated, personal bank statement, business bank statement, alt doc, VOD, no ratio, no employment stated, no income, no asset. When you can qualify borrowers with all kinds of loan programs there will always be business in any kind of rate environment and in any conditions."

- "New Century has programs with no money down, less-than-perfect credit, stated income, unusual circumstances, *and all of them at once on one deal.*"  (Emphasis added.)

85.     New Century's policies also encouraged fraud.  Specifically, the mix of high-risk loan products that New Century specialized in – with its emphasis on, *inter alia*, stated income applications and 100% financed loans – enabled loan originations grounded in fraud.  In her

written testimony to the Financial Crisis Inquiry Committee, former New Century underwriter Patricia Lindsay explained this connection:

> People who may not have committed fraud before did so by making material misrepresentations to buy a property. The 100% financing products on purchase money transactions provided a vehicle for people to enter into buying a property without putting forth any money. The stated income product eliminated the ability to prove fraud without supporting documentation. When previous products required some supporting documentation in order to get a higher LTV, it was easier to identify the fraud and stop it. Straw buyers were recruited for their credit scores specifically to avoid having to provide income documentation. And they would also claim that the property was to be owner occupied, as 100% financing was not offered on non-owner occupied properties.

**V.      The Combined-Risk Loans Resulting From Morgan Stanley's Policies and Practices Placed Borrowers at Elevated Risk of Foreclosure, Particularly in the Detroit Area.**

86.      The characteristics of the New Century loans packaged and securitized by Morgan Stanley reflect New Century's successful efforts to produce loans that met Morgan Stanley's demands.  Measured against the outcome for borrowers – *i.e.*, rates of foreclosure – those loans exposed borrowers to the excessive levels of risk that define Combined-Risk lending.

87.      Prevailing rates of foreclosure – both before and during the recent collapse of the housing market – provide a useful reference point.  Between 1950 and 1997, foreclosure rates on conventional loans typically remained below 1%, even as foreclosures increased dramatically during the 1980s.  Peter J. Elmer & Steven A. Seelig, *The Rising Long-Term Trend of Single Family Mortgage Foreclosure Rates* 1, 21 (Fed. Deposit Ins. Corp., Working paper No. 98-2). Moreover, foreclosure rates on FHA-insured loans, categorized by their low down payments, low closing costs, and easy credit qualifying, generally remained well below 2% during the same time period.  *Id.*  Even during the unprecedented housing market collapse associated with the subprime bubble, white borrowers who took out loans during the years leading up to the collapse have faced a foreclosure rate of about 4.5%, while African-American and Latino borrowers have experienced foreclosure rates above 8%.

88.     Foreclosure rates for the Morgan Stanley-New Century loans were significantly higher than prevailing foreclosure rates in the market.  Although loan-level data for all loans originated by New Century and securitized by Morgan Stanley is not publicly available, data for a subset of those loans is publicly available.  Those records are maintained in the Columbia Collateral File.  The Columbia Collateral File is a database of information about mortgage-backed securities operated by Wells Fargo Bank, N.A. in connection with various securities administered by the Corporate Trust Services group of Wells Fargo Bank, N.A.  The Columbia Collateral File can be accessed via the Internet at www.ctslink.com.

89.     The Columbia Collateral File contains loan-level information for seven Morgan Stanley securities that consist exclusively of New Century loans.  Those securities have the following loan pool identifiers:  MS07-NC2-1, MS07-NC2-2, MS07-NC2-3, MS07-NC2-4, MS07-NC4-1, MS07-NC4-2, MS07-NC4-3, MS07-NC4-4.  On information and belief, this is the entire universe of publicly-available, non-proprietary loan-level data for securities that were packaged by Morgan Stanley and comprised of New Century loans.

90.     The data in the Columbia Collateral File contains information about the characteristics of individual loans, including, *inter alia*, the borrower's FICO score, the reported LTV ratio, whether the loan application involved documentation of borrower income, and whether the loan had gone into foreclosure as of December 31, 2008.  It does not, however, contain information about borrower race/ethnicity or census tract.  It is possible to augment the data in the Columbia Collateral File with that information by merging the Columbia Collateral File with data assembled pursuant to the HMDA.  By matching overlapping data fields, it is possible to determine the loan in the HMDA data corresponding with each loan in the Columbia

Collateral File. While that merge process does not identify matches for 100% of the loans in the Columbia Collateral File, it is possible to match approximately 60% of the loan files.

91.     Once the Columbia Collateral File is merged with HMDA data and further filtered to include only first-lien loans associated with owner-occupied single family dwellings, it is possible to analyze over 3,500 loans originated by New Century and securitized by Morgan Stanley. Approximately 90% of those loans were originated in the fourth quarter of 2006. Because that period represented a high point in terms of New Century's overall lending volume, as well as in the volume of loans New Century sold to Morgan Stanley, it provides a useful snapshot of the kinds of New Century loans that Morgan Stanley purchased during the relevant time period.

92.     Analysis of this sample of Morgan Stanley-New Century loans shows rates of foreclosure that far exceeded both historical norms and the more recent foreclosure rates stemming from subprime lending. For all of these Morgan Stanley-New Century loans in the sample, the foreclosure rate as of December 31, 2008 was 20.2%. In at least four metro areas, the foreclosure rate for these loans as of December 31, 2008 was over 30%, and the rate was over 20% in ten metro areas.

93.     The probability of foreclosure was even more pronounced for these Morgan Stanley-New Century loans in cities that were the focus of New Century's lending, especially Detroit. Indeed, loans in these Morgan Stanley-New Century pools that were originated in the Detroit area had exceptionally high foreclosure rates: Detroit borrowers represented in these securities had a foreclosure rate of 35.7%. At the metro level, this rate was second only to Oakland, California, where borrowers represented in the Morgan Stanley-New Century pools had a foreclosure rate of 42.2%.

94.     These astronomically high rates of foreclosure followed naturally from the characteristics of these loans.  For borrowers in Detroit, loans in these Morgan Stanley-New Century securities had an average LTV ratio of 98.1%; 80% of the loans originated in Detroit included adjustable rates, while almost 40% were stated income loans.  Each of these loan features, standing alone, signifies a high level of risk.  In combination, they create the kind of risk-layering, required and encouraged by Morgan Stanley, that placed borrowers at extreme peril.

95.     It is important to note that the available data only indicates foreclosures that had occurred by December 31, 2008.  Because the data does not account for foreclosures that have occurred since that time, the data *understates* rates of foreclosure associated with the loans in these Morgan Stanley-New Century securities pools.  The actual rate of foreclosure for these loans, through the present, is likely significantly higher.

96.     The data also reflects significant racial disparities in the foreclosure rates of these Morgan Stanley-New Century loans.  Among all borrowers represented in the sample, the rate of foreclosure among African Americans was 28.57% greater than the rate of foreclosure among white borrowers.  Racial disparities with respect to New Century loans are discussed further below.

VI.     **Morgan Stanley's Policies and Practices Had a Disparate Impact on African-American Borrowers Because African-American Borrowers Were Disproportionately Likely to Receive Combined-Risk Loans.**

A.      **History of Discrimination in Residential Lending.**

1.      *"Redlining."*

97.     The historical roots of contemporary disparities in access to credit can be traced to the 1930s, when the federal government developed a rating system purporting to assess risks associated with lending in specific neighborhoods.  On rating system maps, integrated or

predominately African-American neighborhoods were marked in red. Loans were virtually never made to households located in the "red" neighborhoods. This neighborhood-based discrimination in access to credit took hold more broadly over the coming decades. As a result, the phrase "redlining" came to describe practices that allocated access to credit according to the racial composition of neighborhoods or other geographic spaces. For decades, redlining occurred without any meaningful legal constraint. Since 1968, however, redlining has been prohibited by the Fair Housing Act.

98.     Despite the illegality of redlining, credit opportunities remained scarce in communities of color throughout the 1970s and 1980s.

    2.     *"Reverse Redlining."*

99.     Redlining, and the disparities in access to credit it created, set the stage for new forms of discriminatory lending that became common in the 1990s and crested in the years leading up to the 2008 financial crisis.

100.     Longstanding discrimination in access to credit made minority neighborhoods especially attractive to subprime lenders. In neighborhoods and communities that had been excluded from traditional lending opportunities, few institutions existed that offered more favorable "prime" loan products. As a result, subprime lenders faced little or no competition in those communities. This gave rise to a phenomenon that has become known as "reverse redlining." Reverse redlining describes the practice of targeting borrowers in predominately minority communities for loans with less favorable terms than those available in predominately white communities.

101.     The prominence of reverse redlining can be seen in the disproportionate share of subprime or high-cost loans channeled to African-American and Latino borrowers. A joint report from HUD and the U.S. Department of Treasury issued in 2000 found that "borrowers in

black neighborhoods [were] five times as likely to refinance in the subprime market than borrowers in white neighborhoods," even when controlling for income. Indeed, that report found that "borrowers in *upper-income* black neighborhoods were twice as likely as homeowners in *low-income* white neighborhoods to refinance with a subprime loan." Similarly, research from the Harvard Joint Center for Housing Studies shows that, in 1998, subprime lenders issued 14.1% of home purchase loans and 42.3% of refinance loans originated in predominately minority neighborhoods, compared to 3.8% of new home purchase loans and 8.8% of refinance loans originated in predominately white neighborhoods. *See* JOINT CTR. FOR HOUS. STUDIES OF HARVARD UNIV., THE STATE OF THE NATION'S HOUSING 2000, at Table A-11 (June 10, 2000). And a 2003 study found that, in nine of the ten cities it examined, rates of subprime lending for refinance loans were tied to the proportion of African Americans living in a neighborhood, even after controlling for credit risk and housing stock characteristics. *See* THE BROKEN CREDIT SYSTEM, *supra,* at 37.

102.    This trend continued as the prevalence of subprime loans grew. A study released in 2006 found that, within the subprime market, "borrowers of color . . . were more than 30% more likely to receive a higher [interest] rate loan than white borrowers, even after accounting for differences in risk." DEBBIE GRUENSTEIN BOCIAN ET AL., CTR. FOR RESPONSIBLE LENDING, UNFAIR LENDING: THE EFFECT OF RACE AND ETHNICITY ON THE PRICE OF SUBPRIME MORTGAGES 3 (2006). Another study found that African Americans and Latinos were much more likely to receive subprime loans, and that "the disparities were especially pronounced for borrowers with higher credit scores." DEBBIE GRUENSTEIN BOCIAN ET AL., CTR. FOR RESPONSIBLE LENDING, LOST GROUND, 2011: DISPARITIES IN MORTGAGE LENDING AND FORECLOSURES 5 (2011). That study also found, more generally, that "borrowers in minority groups were much more likely to

receive loans with product features associated with higher rates of foreclosures," *i.e.*, loans with higher interest rates or with risky terms. *Id.* at 21. These high disparities persisted even after controlling for credit score. *Id.*

103. Reverse redlining has resulted in significant racial disparities in rates of foreclosures. One recent study found that, nationally, "African Americans and Latinos are, respectively, 47% and 45% more likely to be facing foreclosure than whites." DEBBIE GRUENSTEIN BOCIAN ET AL., CTR. FOR RESPONSIBLE LENDING, FORECLOSURES BY RACE AND ETHNICITY: THE DEMOGRAPHICS OF A CRISIS 10 (2010). These disparities persist within income categories. *Id.* at 9-10.

104. Empirical research demonstrates that these outcomes result from reverse redlining, which led subprime lenders to channel the riskiest loans to minority communities. Researchers at Princeton University, for example, studied the statistical links between neighborhood racial composition, subprime lending, and foreclosure rates, and found "strong empirical support for the hypothesis that residential segregation constitutes an important contributing cause of the current foreclosure crisis, that segregation's effect is independent of other economic causes of the crisis, and that segregation's explanatory power exceeds that of other factors hitherto identified as key causes (e.g., overbuilding, excessive subprime lending, housing price inflation, and lenders' failure to adequately evaluate borrowers' creditworthiness)." Jacob S. Rugh & Douglas S. Massey, *Racial Segregation and the American Foreclosure Crisis*, 75 AM. SOCIOLOGICAL REVIEW 629, 644 (2010). "Simply put, the greater the degree of Hispanic and especially black segregation a metropolitan area exhibits, the higher the number and rate of foreclosures it experiences." *Id.*

**B.** **The Economics of Mortgage Finance Created the Incentive Structure that Led Lenders to Channel Combined-Risk Loans to Minority Communities and Borrowers.**

105.    The history of housing segregation and credit discrimination created the conditions in which reverse redlining could flourish.  For a lender seeking to originate a large volume of high-risk loans, those conditions generated clear economic incentives.  Loans with high levels of risk were inherently more difficult to market in communities with well-established credit economies, because few borrowers would select a Combined-Risk Loan if they also had access to better loan products.  Combined-Risk lending thus required unscrupulous lenders to exploit preexisting disparities in access to credit, a strategy that in many parts of the country led naturally to reverse redlining.

106.    Economic incentives to engage in reverse redlining were especially pronounced for lenders who intended to sell most of the loans they originated to investment firms, like Morgan Stanley, to be packaged in mortgage-backed securities.  In contrast to traditional lending – in which banks held onto mortgages, bearing the risk and reward of payment obligations for the life of the loan – securitization allowed lenders to quickly dispose of the loans they originated.  *See* William Apgar & Allegra Calder, *The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending*, *in* THE GEOGRAPHY OF OPPORTUNITY: RACE AND HOUSING CHOICE IN METROPOLITAN AMERICA 101, 104 (Xavier de Souza Briggs, ed., 2005). This process allowed lenders to rapidly replenish their funds, enabling a cycle of origination, sale, and securitization.  Because these loans could be quickly sold, lenders had incentives to maximize the volume of loans produced without regard to the levels of risk they entailed.  For these reasons, as noted by researchers at Princeton University, "[t]he invention of securitized mortgages . . . changed the calculus of mortgage lending and made minority households very desirable as clients."  Rugh & Massey, *supra,* at 631.

34

107.    These economic forces gave rise to what many scholars and economists have characterized as a "dual mortgage market."  In this dual mortgage market, different communities were offered "a different mix of products and by different types of lenders" and subprime lenders "disproportionately target[ed] minority, especially African-American, borrowers and communities, resulting in a noticeable lack of prime loans among even the highest-income minority borrowers."  Apgar & Calder, *supra,* at 102.

C.    <u>**Residential Segregation and Lending Discrimination in Metropolitan Detroit.**</u>

108.    By the time the subprime lending boom began in the 1990s, longstanding housing patterns and lending discrimination left communities in the city of Detroit highly vulnerable to reverse redlining.  Decades of discriminatory housing and lending practices had given rise to intensive residential segregation.  African-American communities, facing a dearth of conventional lending opportunities, could be readily targeted for Combined-Risk Loans.

109.    African Americans began moving to the city of Detroit in large numbers by the 1940s.  By the end of that decade, racially segregated neighborhoods began to solidify: the majority of African-American Detroiters lived in "a densely populated, sixty-square-block section of the city's Lower East Side."  THOMAS J. SUGRUE, THE ORIGINS OF THE URBAN CRISIS: RACE AND INEQUALITY IN POSTWAR DETROIT 23-24 (2d ed. 2005).

110.    Residential segregation in the city of Detroit resulted from private and public policies and practices denying equal housing opportunity to African Americans.  For example, in 1947, only 47,000 of the 545,000 housing units in Detroit were available to African Americans. *See* HOUSING AND HOME FINANCE AGENCY, THE HOUSING OF NEGRO VETERANS:  THEIR HOUSING PLANS AND LIVING ARRANGEMENTS IN 32 AREAS, at Table 8B (1948).  This disparity arose, in part, from explicit redlining:  during the period when the Home Owners' Loan Corporation ("HOLC") marked "undesirable" communities in red, all of Detroit's African-

American communities were so designated, thus classifying them as unsuitable for federal

housing and loan subsidies. Sugrue, *supra*, at 38, 43-44. Appraisers and brokers provided more

favorable loan terms to homes in areas with white-only racially restrictive covenants. *Id.* at 44.

These covenants severely restricted housing opportunities for African Americans in Detroit. Of

the 186,000 single-family homes constructed in Detroit in the 1940s, only 1,500 were available

to black buyers. *Id.* According to one leading scholar, "HOLC appraisals of Detroit

neighborhoods became self-fulfilling prophesies in the hands of real estate brokers. A web of

interlocking real estate interests — brokers, speculators, developers, and banks — built on the

base of racial animosity to perpetuate racial divisions in the housing market." *Id.* at 46.

111.    In the following decades, these patterns intensified, driven in part by

"blockbusting" practices in which unscrupulous real estate agents intentionally sparked panic by

white residents when African Americans began moving into their neighborhoods. During the

1980s, as segregation rates began to slowly decline nationally, the rate of segregation in the

Detroit region increased by 2.6 percentage points. JOHN R. LOGAN & BRIAN STULTS, PROJECT

US2010, THE PERSISTENCE OF SEGREGATION IN THE METROPOLIS: NEW FINDINGS FROM THE 2010

CENSUS 6 (2011).

112.    By 1990, Detroit was the most racially-segregated major metropolitan area in the

United States. Reynolds Farley, et al., *Detroit Divided*, THE MULTI-CITY STUDY OF URBAN

INEQUALITY 161 (2000). While African Americans made up 22% of the greater metropolitan

area in 1990, the typical African American lived in a neighborhood where 83% of residents were

also African American. *Id.* at 162-63. Similarly, an average white resident lived in a

neighborhood where 92% of the other residents were white. *Id.* While federal fair housing laws

yielded modest declines in racial segregation in many cities, Detroit was the only major

metropolitan area where racial segregation was just as extensive in 1990 as it was ten years earlier.  *Id.*

113.    This baseline of residential segregation led directly to the patterns of subprime lending that appeared over the last decade.  In 2000, African Americans composed 82% of the population in the city of Detroit.  Robert Mark Silverman, *Redlining in a Majority Black City?: Mortgage Lending and the Racial Composition of Detroit Neighborhoods*, 29 W.J. BLACK STUDIES 531, 533 (2005).  As a majority-minority city where African Americans have historically faced a dearth of credit opportunities, "Detroit is a critical case study for the importance of race in mortgage lending."  *Id.*  Analysis of 2000 HMDA and U.S. Census data demonstrate that patterns of segregation correlated with the availability of conventional credit.  On average, the African-American population was larger in census tracts where loan-denial rates outstripped loan originations.  *Id.* at 534-35.  While other factors (such as educational attainment and the relative age of housing stock) are significant to the analysis, "race is the strongest predictor of mortgage outcomes."  *Id.* at 537.

114.    These dynamics led to a strong correlation in Detroit between race and subprime loans.  Whereas Detroit previously lagged behind larger metropolitan areas such as Chicago and Los Angeles in overall volume of subprime loans originated, by 2004 it was second nationally in "subprime market penetration."  Philip Ashton, *CRA's "Blind Spots": Community Reinvestment and Concentrated Subprime Lending in Detroit*, 32 J. URBAN AFFAIRS 579, 586-87 (2010).  "Detroit emerged as the largest of 30 metro areas with the highest subprime lending rates occurring alongside high rates of mortgage denials to minority applicants."  *Id.* at 587.  Moreover, subprime lenders had higher odds of lending to African-American borrowers relative

to white borrowers in Detroit, even though African-American buyers accounted for only 32% of homes purchased in Wayne County between 2004 and 2007. *Id.* at 601.

> **D. New Century's Lending in the Detroit Region Reveals Stark Racial Disparities.**

115. HMDA requires mortgage lenders to disclose certain information about each mortgage loan originated or purchased in a fiscal year. Among other information, lenders must disclose information about the race and ethnicity of the borrowers, as well as certain information about the characteristics of each loan (*e.g.*, loan amount and lien status) and the census tract in which the home associated with each mortgage loan is located. At all times relevant to this Complaint, New Century was subject to the requirements of HMDA.

116. Pursuant to regulations promulgated by the Federal Reserve Board, since 2004 the HMDA data has included a designation for "high-cost" loans. Analysis of the HMDA data makes it possible to detect discriminatory lending patterns, including reverse redlining practices in which lenders focus on minority neighborhoods to originate high-cost loans. The presence of significant disparities in the race of borrowers, or the racial compositions of neighborhoods, receiving high-cost loans is probative of reverse redlining. In order to accurately discern these dynamics in Detroit, it is necessary to examine the nine counties composing the Detroit metropolitan area: Genesee, Lapeer, Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne (collectively, the "Detroit region").

117. Although New Century's overall business in the Detroit region emphasized high-cost loans, its focus on high-cost lending to the African-American community in the region was stark. While white borrowers received 3.7 times as many high-cost loans (4,416) as non-high-cost loans (1,190), black borrowers received nearly *ten times* more high-cost loans (4,291) than non-high-cost loans (435). African-American borrowers constituted 21.8% of New Century's

non-high-cost business in the Detroit region (receiving 435 of the 1,994 of non-high-cost loans) but made up 44.3% of New Century's high-cost volume in the region (4,291 of 9,679 high-cost loans).

118.    Similar patterns emerge when one focuses on the racial composition of a borrower's neighborhood.  For non-high-cost loans issued by New Century in the Detroit region, the median minority population of a borrower's census tract was 10%.  By contrast, for high-cost loans, the median minority percentage of a borrower's census tract was 35.2%.

119.    New Century's concentration on African-American neighborhoods in the Detroit region outpaced the larger mortgage market significantly.  About 40% of New Century's high-cost loans in the Detroit region went to neighborhoods that were 70% or more minority.  This concentration is more than five times greater than the overall share of loans originated by all lenders in those same neighborhoods.  Conversely, for the entire Detroit region, 57% of all loans went to borrowers in census tracts that were at least 90% white, but only 33% of New Century's high-cost loans were originated in those neighborhoods.  While New Century originated 32.4% of its high-cost loans in census tracts that were at least 90% minority, only 5.36% of all loans originated in the Detroit region were issued in those neighborhoods.  In other words, a high-cost loan originated by New Century was more than six times as likely to be in a 90%-plus minority neighborhood than the average loan originated in the Detroit region.  This concentration was also disproportionate to overall residency patterns:  only 14.1% of the Detroit region lives in 90%-plus census tracts, which means that the 32.4% share of New Century's high-cost business in those neighborhoods is more than double what the population patterns would predict.

120.    New Century's concentration on minority neighborhoods also surpassed other high-cost lenders in the Detroit region.  The share of New Century's high-cost business in 90%-

plus minority neighborhoods was 2.3 times greater than the share of high-cost business in such neighborhoods for all lenders: 32.4% of New Century's high-cost loans were in census tracts with at least 90% minority residents, whereas only 13.99% of all high-cost loans were originated in those neighborhoods. Similarly, among all lenders, 49% of high-cost loans made to African Americans went to neighborhoods that were at least 90% minority, but for New Century, 62% of its high-cost loans to African-American borrowers went to such neighborhoods.

121. Racial disparities in New Century's lending patterns in the Detroit region remain visible even when statistically controlling for certain factors related to creditworthiness. Controlling for income, loan amount, and other loan features reported pursuant to HMDA, an African-American borrower was 70% more likely than a white borrower to obtain a high-cost loan from New Century.

122. The data also provides useful information regarding the interaction between a borrower's race and the racial composition of her neighborhood. For example, the data shows that for New Century's loans in the Detroit region, an African-American borrower in a minority neighborhood had a 21% greater chance of receiving a high-cost loan than a similarly-situated white borrower in a white neighborhood.

**VII.    The Named Plaintiffs.**

    **A.    Beverly Adkins**

123. Plaintiff Beverly Adkins is an African-American homeowner who resides in Detroit.

124. Ms. Adkins was subject to Morgan Stanley's discriminatory policies and practices identified herein. Ms. Adkins received a Combined-Risk Loan from New Century pursuant to Morgan Stanley's discriminatory policies and practices identified herein.

125.     Ms. Adkins was harmed by Morgan Stanley's discriminatory policies and practices identified herein, including by being subjected to excessive fees and costs and excessive risk of default and foreclosure.

126.     At the time of her New Century transaction at issue, Beverly Adkins resided with her husband Leroy Adkins, now deceased, at 9625 McKinney Street, Detroit, Michigan 48224, a home they owned.

127.     In 2004, the Adkinses sought to refinance their existing home loan.

128.     The Adkinses first learned of New Century when they received advertisements sent to their home, to which they responded.

129.     On April 28, 2004, the Adkinses refinanced their existing home loan by obtaining a Combined-Risk Loan from New Century.

130.     The Adkinses' loan (Loan No. 0001528902) was a 30-year, adjustable rate loan. The loan amount was $104,400.00. According to the Adjustable Rate Rider to their mortgage, the loan had a two-year fixed interest rate of 8.4000%, after which, on June 1, 2006 and every six months thereafter, the interest rate would reset, adjusting by a maximum increase or decrease of 1.500 percentage points from the previous effective rate and rounded to the nearest 0.125%. According to the Adjustable Rate Rider Addendum, the loan had a minimum interest rate of 8.4000% and a maximum interest rate of 15.4000%.  The interest rate at each reset date was to be calculated by adding a spread of 5.3000% to the six-month U.S. dollar LIBOR, as of the first business day of the month immediately preceding the reset month.

131.     The index rate and spread contained in the Adkinses' mortgage documents would have yielded a fully-indexed rate of 6.50% at the time the loan was originated.

132.     According to the Prepayment Rider to the Adkinses' mortgage, any prepayments made during the first two years of the loan, which within any 12-month period reached a cumulative amount in excess of 20% of the original principal amount, would be subject to a prepayment penalty. The prepayment penalty assessed would be 1% of the amount paid in excess of 20% of the original principal amount.

133.     According to their Settlement Statement, the Adkinses' paid $5,675 in closing costs and fees in connection with their New Century loan, including fees for processing and underwriting paid to New Century and the New Century-authorized broker totaling $1,410.40, an origination fee of $3,900, and a $275 appraisal fee. These costs and fees were about 5.44% of the total value of the Adkinses' mortgage. Their Settlement Statement also noted that New Century paid a yield spread premium or broker fee of $3,132 to its broker.

134.     An appraisal conducted when the loan was originated valued the Adkinses' house at $116,000. Accordingly, the loan-to-value ratio of the mortgage loan was 90%. As of 2006, Wayne County appraised the home for tax purposes at $35,736. Using this appraisal, the loan-to-value ratio of the Adkinses' loan would be almost 300%.

135.     Initial payments on the Adkinses' loan began at $795.36, and the payments increased over the life of the loan.

136.     Their New Century loan required the Adkinses to pay for six months of homeowner's insurance. The cost of this insurance policy was financed through the home loan, and therefore subject to financing costs. The loan also required the Adkinses to continue carrying the insurance policy beyond that initial six month period. Consequently, after the first six months, the Adkinses' monthly payments increased as the cost of insurance was added to the monthly mortgage payment.

137.    The Adkinses continued to make payments on their loan until at least December 1, 2009.

138.    At least as recently as July 17, 2012, Mrs. Adkins has continued to receive monthly account statements seeking payment on the loan.

139.    The City of Detroit is foreclosing on Mrs. Adkins' home due to delinquent property taxes.

140.    Mrs. Adkins did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on her and other African-American borrowers in Detroit, in violation of federal and state law. This information only became apparent after consultation with attorneys, in 2012, leading up to the filing of this action.

**B.      Charmaine Williams**

141.    Plaintiff Charmaine Williams is an African-American homeowner residing in Westland, MI.

142.    Ms. Williams was subject to Morgan Stanley's discriminatory policies and practices identified herein. Ms. Williams received a Combined-Risk Loan from New Century pursuant to Morgan Stanley's discriminatory policies and practices identified herein.

143.    Ms. Williams was harmed by Morgan Stanley's discriminatory policies and practices identified herein, including by being subjected to excessive fees and costs and excessive risk of default and foreclosure.

144.    At the time of her first New Century transaction at issue, Ms. Williams resided at 11615 Rossiter Street, Detroit, Michigan 48224, a home she owned.

145.    On May 9, 2003, Ms. Williams refinanced her existing home loan by obtaining a Combined-Risk Loan from New Century.

146.     Ms. Williams' first New Century loan (Loan No. 0000902234) was a 30-year, adjustable rate loan. The loan amount was $82,450.00. According to the Adjustable Rate Rider to her mortgage, the loan had a two-year fixed interest rate of 8.9000%, after which, on June 1, 2005 and every six months thereafter, the interest rate would reset, adjusting by a maximum increase or decrease of 1.500 percentage points from the previous effective rate and rounded to the nearest 0.125%. According to the Adjustable Rate Rider Addendum, the loan had a minimum interest rate of 8.9000% and a maximum interest rate of 15.9000%.

147.     According to the Prepayment Rider to Ms. Williams' mortgage, any prepayments made during the first two years of the loan, which within any 12-month period reached a cumulative amount in excess of 20% of the original principal amount, would be subject to a prepayment penalty. The prepayment penalty assessed would be 1% of the amount paid in excess of 20% of the original principal amount.

148.     The loan-to-value ratio of the mortgage loan was approximately 91.60% at the time the loan was originated, with the home's value appraised at approximately $90,000.

149.     On or around January 4, 2005, New Century sent Ms. Williams a letter captioned "NOTICE OF INTENT TO FORECLOSE."  The letter referenced missed payments due on and after December 1, 2004, and requested payment of $1649.58 in certified funds to cure the delinquency. The letter warned that failure to cure the delinquency within 30 days could result in acceleration of the debt and the sale of the property.

150.     After Ms. Williams received the notice of intent to foreclose, a New Century employee called her and suggested that she refinance her mortgage loan.

151.     On April 22, 2005, under the threat of this Notice of Intent to Foreclose letter, Ms. Williams took out a second refinance loan from New Century (Loan No. 1001615997) with

a principal balance of $99,900.00.  This refinance increased the loan-to-value ratio for her loan to at least 111%.

152.     Ms. Williams' second loan from New Century was a Combined-Risk Loan as defined in this Complaint.

153.     This second loan was not beneficial to Ms. Williams, as it resulted in an increased interest rate, with the introductory rate rising by 0.59 percentage points and a corresponding increase in both the minimum and maximum rates that could be applied over the life of the loan. The margin to be added to the LIBOR index rate remained at 5.75%.

154.     In addition to closing fees and points associated with originating her 2005 New Century loan, Ms. Williams was subjected to a prepayment penalty due to the payoff of her 2003 New Century loan within two years of its origination.  Had the refinance occurred one month later, the two-year prepayment penalty period on her first loan would have expired.  However, Ms. Williams was informed by New Century that she had a limited time to refinance, and that dictated the timing of her decision to apply for a new loan. By refinancing within that period, Ms. Williams was subject to a prepayment penalty of at least $648.11.

155.     As a result of the second refinance, Ms. Williams' fully-amortizing monthly principal and interest payment increased by $145.61 to $803.10 per month.

156.     The second New Century loan also had a more onerous prepayment penalty than the 2003 loan, removing the protection for 20% of the original principal balance (meaning any subsequent refinances within two years would be more expensive).

157.     Ms. Williams later received a loan modification, but the required monthly principal and interest payment was still higher than the monthly payment she had owed before the 2005 refinance.

158. Ms. Williams' most recent loan payment was made in or about June 2011.

159. The City of Detroit foreclosed on Ms. Williams' property in 2011 due to delinquent property taxes, and Ms. Williams expects the house to be sold at a sheriff's auction.

160. Ms. Williams did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on her and other African-American borrowers in Detroit, in violation of federal and state law. This information only became apparent after consultation with attorneys, in 2012, leading up to the filing of this action.

### C. Rebecca Pettway

161. Plaintiff Rebecca Pettway is an African-American homeowner who resides at 15400 Lindsay Street, Detroit, Michigan 48227.

162. Ms. Pettway was subject to Morgan Stanley's discriminatory policies and practices identified herein. Ms. Pettway received a Combined-Risk Loan from New Century pursuant to Morgan Stanley's discriminatory policies and practices identified herein.

163. Ms. Pettway was harmed by Morgan Stanley's discriminatory policies and practices identified herein, including by being subjected to excessive fees and costs and excessive risk of default and foreclosure.

164. On May 13, 2004, Ms. Pettway received from New Century a Combined-Risk Loan as defined in this Complaint.

165. Ms. Pettway's New Century loan (Loan No. 0001557094) was a 30-year, adjustable rate loan. The loan amount was $84,000.00. According to the Adjustable Rate Rider to her mortgage, the loan had a two-year fixed interest rate of 8.7500%, after which, on June 1, 2006 and every six months thereafter, the interest rate would reset, adjusting by a maximum increase or decrease of 1.500 percentage points from the previous effective rate and rounded to the nearest 0.125%. According to the Adjustable Rate Rider Addendum, the loan had a minimum

interest rate of 8.7500% and a maximum interest rate of 15.7500%. The initial rate of Ms. Pettway's New Century loan was 1.25% higher than the effective rate on her prior loan.

166. Although Ms. Pettway's mortgage loan amount was $84,000, and only about $45,000 of that went to pay off her existing mortgage, she received only about $30,000. The remainder of the loan amount, about $9,000, went to closing costs and fees.

167. The interest rate at each reset date was to be calculated by adding a spread of 6.7000% to the six-month U.S. dollar LIBOR, as of the first business day of the month immediately preceding the reset month.

168. The index rate and spread contained in Ms. Pettway's mortgage documents would have yielded a fully-indexed rate of 8.125% at the time the loan was originated.

169. According to the Prepayment Rider to Ms. Pettway's mortgage, any prepayments made during the first two years of the loan, which within any 12-month period reached a cumulative amount in excess of 20% of the original principal amount, would be subject to a prepayment penalty. The prepayment penalty assessed would be 1% of the amount paid in excess of 20% of the original principal amount.

170. The loan-to-appraised-value ratio of the mortgage loan was approximately 56% at the time the loan was originated, based on an appraisal done by the brokerage company's appraiser which valued the home at $150,000. Ms. Pettway had another home appraisal conducted in 2006 or 2007 for purposes of determining property taxes, and that appraisal valued the home between $60,000 and $70,000.

171. Although the New Century-authorized broker told Ms. Pettway she could get a loan with a monthly payment of $700 to $800 that would include taxes and insurance, she ultimately had to make monthly payments of approximately $900, not including insurance.

172.    The interest rate on Ms. Pettway's New Century loan increased steadily and substantially, which caused the monthly payments to rise to an unaffordable level. Ms. Pettway declared bankruptcy in 2005. Foreclosure proceedings were instituted against her in 2009. In 2010, Pettway's bankruptcy was dismissed due to default. She re-filed for bankruptcy on March 3, 2010. Foreclosure proceedings were stayed as the result of Ms. Pettway's bankruptcy proceedings, but she continues to face the threat of foreclosure.

173.    Ms. Pettway's most recent loan payment was made in 2009.

174.    Ms. Pettway's mortgage was assigned by New Century to the Morgan Stanley ABS Capital I Inc. Trust 2004-HE7, Mortgage Pass-Through Certificates, Series 2004-HE7. The assignment of the mortgage was registered with the Wayne County Register of Deeds on January 4, 2010.

175.    Ms. Pettway did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on her and other African-American borrowers in Detroit, in violation of federal and state law. This information only became apparent after consultation with attorneys, in 2012, leading up to the filing of this action.

**D.      Rubbie McCoy**

176.    Plaintiff Rubbie McCoy is an African-American homeowner who resides at 2688 Columbus Street, Detroit, MI 48206.

177.    Ms. McCoy was subject to Morgan Stanley's discriminatory policies and practices identified herein. Ms. McCoy received a Combined-Risk Loan from New Century pursuant to Morgan Stanley's discriminatory policies and practices identified herein.

178.    Ms. McCoy was harmed by Morgan Stanley's discriminatory policies and practices identified herein, including by being subjected to excessive fees and costs and excessive risk of default and foreclosure.

179.    Ms. McCoy rented her house until her landlord sought to sell it to her in 2006. Ms. McCoy first learned of New Century when her landlord put her in touch with a representative from a New Century-approved broker.  The broker told Ms. McCoy she had to buy the house within 30 days or else she and her six children would be forced to leave.  The broker repeatedly pressured her to purchase the house or face eviction.  On or about July 31, 2006, Ms. McCoy purchased her home using a $79,200.00 loan from New Century.

180.    Ms. McCoy's loan from New Century was a Combined-Risk Loan as defined in this Complaint.

181.    The broker inflated Ms. McCoy's income on her loan application by listing her part-time employment as full-time employment, increasing her child support benefits from $30 per week to $100 per week, and including her daughter's father's disability payments as part of Ms. McCoy's earnings.

182.    Ms. McCoy's New Century loan (Loan No. 1009117966) was a 30-year, adjustable rate loan, with a disclosed APR of 12.144%. According to the Adjustable Rate Rider on her mortgage, the loan had a three-year fixed interest rate of 10.750%, after which, on August 1, 2009 and every six months thereafter, the interest rate would reset, adjusting by a maximum increase or decrease of 1.500 percentage points from the previous effective rate and rounded to the nearest 0.125%.  The loan had a minimum interest rate of 10.750% and a maximum interest rate of 17.750%.

183.    The interest rate at each reset date was to be calculated by adding a spread of 6.300% to the six-month U.S. dollar LIBOR, as of the first business day of the month immediately preceding the reset month.

184.     According to the Prepayment Rider to Ms. McCoy's mortgage, any prepayments made during the first three years of the loan are assessed a fee equaling 1% of the prepayment amount.

185.     According to the Settlement Statement, Ms. McCoy paid $3,665 in costs and fees in connection with her New Century loan, including fees for processing and underwriting totaling $1,125, an origination fee of $1,751, an appraisal fee of $400 appraisal fee, an $825 in processing fees, a $300 underwriting fee, and a $300 document preparation fee.  The settlement fees were about 4.63% of the total value of Ms. McCoy's mortgage. The Settlement Statement also noted that New Century paid a yield spread premium or broker fee of $1,584.00.

186.     Ms. McCoy was required to pay for one year of homeowner's insurance and six months of property taxes at the time the loan originated.  The cost of these tax and insurance payments was financed through the loan, and therefore subject to financing costs.  Consequently, after the first six months, Ms. McCoy's monthly payments increased as the cost of taxes were added to the monthly mortgage payment, and at the end of the first year her monthly payments increased again as the cost of insurance was added.

187.     According to the Uniform Residential Appraisal Report provided by the appraiser hired by the New Century-approved broker, the home was valued at $89,000 as of May 12, 2006. This appraisal included several misrepresentations about the condition of the home, and incorrectly stated that, because the home was not in need of any updates or repairs, it could not be compared to other homes recently sold in the immediate neighborhood; instead, the appraisal was based on the value of recent home sales selected from other areas.

188.     At the initial appraisal value of $89,000, the loan-to-value ratio for

Ms. McCoy's loan was 89%.  However, since the appraisal inflated the home's value, the actual

loan-to-value ratio of her loan was substantially higher.

189.     Initial payments on Ms. McCoy's New Century loan began at $739.32, and the

payments increased over the life of the loan. The initial monthly payment amount represented

approximately 58.2% of her true estimated average gross monthly income of $1,270 a

month.  Ms. McCoy was provided with a form purporting to require her signature as

acknowledgement that "if [her] gross monthly income [was] less than $2,100.00, it may be

difficult for [her] to afford the monthly payments."

190.     Ms. McCoy's most recent loan payment was made in or around May 2011.

191.     Ms. McCoy did not know, and could not have known, that Morgan Stanley's

policies and practices caused a disparate impact on her and other African-American borrowers in

Detroit, in violation of federal and state law. This information only became apparent after

consultation with attorneys, in 2012, leading up to the filing of this action.

**E.     William Young**

192.     Plaintiff William Young is an African-American homeowner who resides at 9215

Whitcomb Street, Detroit, MI 48228.

193.     Mr. Young was subject to Morgan Stanley's discriminatory policies and practices

identified herein.  Mr. Young received a Combined-Risk Loan from New Century pursuant to

Morgan Stanley's discriminatory policies and practices identified herein.

194.     Mr. Young was harmed by Morgan Stanley's discriminatory policies and

practices identified herein, including by being subjected to excessive fees and costs and

excessive risk of default and foreclosure.

195.     Mr. Young first learned of New Century in or around November 2005, when he sought to purchase a home for himself and his wife. The broker told Mr. Young that his FICO score was not high enough to be offered a loan, but that the broker would "pull some strings."  The broker told Mr. Young that he could fix his income to seem as though he had enough earnings to afford the home.  On his loan application, the broker reported Young's gross monthly income and value of assets as greater than they actually were.

196.     On or about November 3, 2005, Mr. Young purchased his home using a $99,000.00 Combined-Risk Loan from New Century.

197.     Mr. Young's loan from New Century was a Combined-Risk Loan as defined in this Complaint.  Mr. Young's New Century loan (Loan No. 1004213229) was a 30-year, adjustable rate loan, with a disclosed APR of 10.781%. According to the Adjustable Rate Balloon Note on his mortgage, the loan had a two-year fixed interest rate of 9.225%, after which, on December 1, 2007 and every six months thereafter, the interest rate would reset, adjusting by a maximum increase or decrease of 1.500 percentage points from the previous effective rate and rounded to the nearest 0.125%.  The loan had a minimum interest rate of 9.225% and a maximum interest rate of 16.225%.

198.     The interest rate at each reset date was to be calculated by adding a spread of 5.950% to the six-month U.S. dollar LIBOR, as of the first business day of the month immediately preceding the reset month.

199.     According to the Prepayment Rider to Mr. Young's mortgage, any prepayments made during the first two years of the loan are assessed a fee equaling 1% of the prepayment amount.

200.     According to the Settlement Statement, Mr. Young paid $6,144.00 in costs and fees in connection with the loan, including fees for processing and underwriting paid to New Century and the New Century-authorized broker totaling $1,660.00, an attorney's fee of $100.00, and a mortgage broker fee of $750.00. The settlement fees were about 6.2% of the total value of Mr. Young's mortgage according to the Settlement Statement.  The Settlement Statement also noted that New Century paid a yield spread premium or broker fee of $1,980.00.

201.     Initial payments on Mr. Young's New Century loan began at $780.84, and the payments increased over the life of the loan. At the time the New Century loan was executed, Mr. Young's initial payments were at least 42% of his estimated gross monthly income.

202.     The loan required Mr. Young to pay six months of city and county taxes, and one year's worth of insurance, prior to or at closing.  Consequently, after the first six months, Mr. Young's monthly payment increased when he was required to pay taxes, and increased again after one year when he was required to cover monthly insurance premiums.

203.     Mr. Young has continued to make mortgage payments.  His most recent payment was submitted in May 2012. At least as recently as July 2012, Mr. Young has received demands seeking payment on the loan, including back-payments and accumulated charges and fees.

204.     Mr. Young did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on him and other African-American borrowers in Detroit, in violation of federal and state law. This information only became apparent after consultation with attorneys, in 2012, leading up to the filing of this action.

## VIII.   **Organizational Plaintiff**

205.     Michigan Legal Services ("MLS") is a nonprofit legal services corporation dedicated to eliminating systemic causes of poverty in the areas of housing, health, public

benefits, and community economic development. MLS has been serving low-income communities across the state for nearly thirty years. The majority of its clients are African-American residents of Detroit. For the past decade, MLS has focused its efforts in the metropolitan Detroit area, where the organization is based, in a concerted effort to support and help stabilize the City of Detroit.

206.     MLS engages in impact-oriented litigation, legislative and administrative advocacy, and client community education.

207.     MLS's mission has been and will continue to be frustrated by Morgan Stanley's discriminatory policies and practices identified herein, and MLS has been harmed by Morgan Stanley's policies and practices identified herein. Because MLS has had to focus on clients facing foreclosure in Detroit, it has diverted scarce resources away from other, pressing anti-poverty work and allocated significant resources and attention towards the effects of the housing crisis.

208.     Over the last decade, MLS has redoubled its efforts on behalf of low-income Detroit residents facing foreclosure. This reallocation of MLS's scarce resources is a direct consequence of the unprecedented surge of foreclosures in the last several years. Because of the clientele MLS has historically served, its clients in foreclosure-related matters are overwhelmingly African-American residents of Detroit who received subprime loans.

209.     MLS's work on foreclosure prevention stems from its ongoing advocacy on behalf of low-income residents of the Detroit metro area. While loans to low-income borrowers account for 8.1% of loans originated in the Detroit Metropolitan Area between 2004 and 2008, these loans account for 30.3% of the area's foreclosures. *See* DEBBIE GRUENSTEIN BOCIAN ET AL., CTR. FOR RESPONSIBLE LENDING, *Lost Ground 2011: Disparities in Mortgage Lending and*

*Foreclosures* Table 2.1, App. 2 (2011). Thus, over the past 10 years, MLS has devoted significant time, labor, and other resources towards the legal needs of people at risk of, or facing, foreclosure in Detroit so that, currently, virtually all its work centers on mortgage and tax foreclosure. For example, MLS runs two programs that specifically address the needs of people in Detroit who are facing homelessness and/or the loss of their homes:  first, MLS runs a pilot anti-homelessness project in collaboration with three other agencies to address the urgent legal needs of this destitute population; second, it operates a program through the United Community Housing Coalition to provide direct representation in, *inter alia*, tax foreclosure and land contract forfeiture cases.

210.    Before the subprime lending boom and resulting foreclosure crisis, MLS did not spend significant resources on issues relating to predatory lending or foreclosure prevention. From 1990 to 2000, MLS's work was focused on issues pertaining to public benefits, such as access to medical care, and some advocacy on homesteading programs. MLS engaged in virtually no legal or advocacy work on predatory lending, mortgage redlining, or foreclosure prevention during that time.

211.    In 2003, MLS engaged in a tri-county predatory lending project, coordinated by the Detroit Chapter of the NAACP. In conjunction with the lending project, MLS participated in a task force directed at reviewing educational efforts and remedial legislation at the local, state, and federal level to address predatory lending practices at that time. That year MLS also commenced the Tax Foreclosure Prevention Project to address 1,800 tax foreclosures conducted pursuant to new state statutory amendments designed to expedite the property tax foreclosure process.

212.     Also in 2003, MLS started to coordinate and host community workshops on foreclosure. At each workshop, the number of audience members escalated dramatically, and so, in response to this obvious and growing need for foreclosure education and assistance, MLS significantly reallocated its services and resources towards foreclosure-related services.

213.     Between 2005 to 2008, MLS shifted more than 50% of its resources into tax and mortgage foreclosure prevention advocacy and legal services. This concentration of resources reflected the accelerating foreclosure crisis in Detroit. The shift in resources at MLS has mirrored the rate of foreclosure in the Detroit region.  In October 2006, *The Detroit News* reported that in four Detroit metro area counties (Oakland, Macomb, Livingston, and Wayne) foreclosures had increased by 137% in the first eight months of the year, as compared to the same period in 2005.  Tom Watkins, *There's Pain and Gain in Foreclosure Surge*, THE DETROIT NEWS, October 5, 2006. That year, MLS began working with the Chicago-based National Training & Information Center (NTIC) in a mortgage foreclosure prevention project directed at certain servicing agents active in Detroit.  MLS also created outreach and educational materials for victims of predatory lending schemes and tax and mortgage foreclosure; conducted numerous community trainings; and increased its intake for foreclosure counseling and litigation.

214.     By the first quarter of 2007, continuing a trend started in 2006, Detroit had the highest foreclosure rate of any of the top 100 metropolitan areas in the United States. *See* Press Release, RealtyTrac, More Than 430,000 Foreclosures Filings Reported in Q1, (April 25, 2007), *available at* http://www.realtytrac.com/content/press-releases/more-than-430000-foreclosure-filings-reported-in-q1-2007-2551?accnt=64847.  With a reported 16,351 foreclosure filings during the quarter, Detroit had a foreclosure rate five times the national average with one filing for every 51 households.  *Id.*  By mid-2007, the Detroit Metropolitan Area's foreclosure rate of

one foreclosure filing for every 29 households was the second highest in the country. Top Metro Foreclosure Rates, ForeclosurePulse (Aug. 15, 2007, 12:46 PM), http://www.foreclosurepulse.com. That same year, while MLS's collaborative work with NTIC expanded, MLS also successfully prevented the tax foreclosure and auction of nearly 6,700 Detroit occupied homes. The number of occupied homes in Detroit facing foreclosure has not slowed, however. By January 2011, the number of occupied houses in Detroit facing tax foreclosure had multiplied to 11,000, yet MLS (and its partner organization, the United Community Housing Coalition) remains the only nonprofit legal organization providing tax and mortgage foreclosure services.

215. In 2007, MLS requested a grant from the State Bar of Michigan to assist in their foreclosure work. The Bar agreed to provide $90,000 over a two-year period to fund one staff attorney so long as MLS covered the attorney's benefits and coordinated with the Ford Foundation, which assisted in funding the attorney in 2008.

216. By 2008, nearly 60% of MLS resources were focused on predatory lending and foreclosure-related work. As part of that advocacy, MLS was actively participating in three subcommittees formed by a state-wide foreclosure prevention network managed by the Community Economic Development Advocates of Michigan. The committees were designed to address foreclosure counseling, neighborhood impact, and foreclosure policy issues. Scarce staff time has been dedicated to participating on these committees.

217. From 2009 through 2010, MLS collaborated with community organizations and private attorneys representing consumers and with the lending industry to develop a program to retain occupancy of foreclosed properties. This advocacy led to the creation of two additional projects designed to enable former homeowners to continue in occupancy following foreclosure

and the expiration of the redemption period. MLS also began representing tenants of foreclosed mortgagors (in addition to homeowners) in efforts to enforce tenants' rights under the newly enacted federal Protecting Tenants At Foreclosure Act of 2009. In addition, MLS was actively involved in lobbying efforts to defeat state proposals to abbreviate redemption periods. Also in 2009, MLS hired additional staff to operate a new Mortgage Foreclosure Prevention Project in tandem with a state-wide coordinated legal services and housing counseling effort.

218.    Between 2009 and 2011, approximately 75% of MLS's resources went to foreclosure-related work. As of 2011, through its joint Mortgage Foreclosure and Tax Foreclosure Prevention Projects, MLS and UCHC are handling nearly half of the foreclosure litigation on behalf of homeowners in the state.

219.    MLS continues to devote significant resources and many uncompensated hours to defending the rights of low-income minority homeowners and tenants in Detroit because of the ongoing effects of the foreclosure crisis.

220.    Although MLS provides services to individuals affected by the lending practices of many lenders, New Century's predatory loans account for a disproportionate share of the foreclosures in Detroit. According to a study conducted by the Office of the Comptroller of the Currency in 2008, based on 2005-2007 originations, New Century was the lender with the third-highest number of foreclosure starts (1894) in the Detroit metro area. That number has surely increased significantly in the four years since that study was conducted.

**TOLLING OF THE STATUTE OF LIMITATIONS DUE TO INHERENT UNKNOWABILITY, CONCEALMENT, AND CONTINUING VIOLATIONS**

221.    Plaintiffs and the Class did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on them and other African-American borrowers in Detroit, in violation of federal and state law. This information, which requires an

examination of data in the aggregate, only became apparent after consultation with attorneys, in 2012, leading up to the filing of this action.

222.    Further, any applicable statutes of limitation have been tolled by Morgan Stanley's knowing and active concealment of the facts as alleged herein.  Plaintiffs and members of the Class have been kept ignorant of vital information essential to the pursuit of these claims, including Morgan Stanley's role in creating the policies under which their loans were originated and Morgan Stanley's failure to disclose its deviation from its true underwriting standards, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true nature of Morgan Stanley's conduct.

223.    Morgan Stanley is and has been under a continuing duty to disclose to the Plaintiffs and the Class the true character, quality, and nature of its polices, practices and conduct alleged herein.  Because of its knowing, affirmative, and/or active concealment of this information, Morgan Stanley is estopped from relying on any statutes of limitation in its defense of this action.

224.    In addition, the allegations in this Complaint present continuing violations of the statutes providing causes of action in this lawsuit.  Accordingly, no applicable statute of limitation would begin to run until the termination of each act of discrimination, including each act undertaken pursuant to, in furtherance of, or as a consequence of Defendant's discrimination.

## CLASS ACTION ALLEGATIONS

225.    The Named Plaintiffs bring this action on their own behalf and on behalf of a class of all other persons similarly situated (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure.

226.    Specifically, Plaintiffs seek to certify a class for purposes of determining liability (including the determination of whether the challenged practices caused an unjustified adverse

impact), as well as crafting appropriate injunctive and declaratory relief, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4).

227.    Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) seeking disgorgement and other equitable relief on behalf of the Class.

228.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a) and (b).

229.    Plaintiffs seek certification of the following Class: "All African-American individuals who, between 2004 and 2007, resided in the Detroit region (as defined herein) and received Combined-Risk Loans from New Century."

      a.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

      b.    Excluded from the Class are:

        i.    Morgan Stanley and any entities in which Morgan Stanley has a controlling interest;

        ii.    Any entities in which Morgan Stanley's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Morgan Stanley;

        iii.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and

        iv.    Any attorneys representing the Plaintiffs or the Class.

230. Numerosity—Fed. R. Civ. P. 23(a)(1). The exact number or identification of the Class members is presently unknown. On information and belief the Class includes more than 5,000 individuals. The identity of the Class members is ascertainable and can be determined based on available records.

231. Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3). The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a. whether Morgan Stanley's policies with respect to purchasing New Century loans for securitization included requirements for loans with high-risk features, including but not limited to high debt-to-income ratios, high loan-to-value ratios, stated income loans, adjustable-rate loans, loans with negatively amortizing terms, and risk-layering;

b. whether Morgan Stanley's securitization policies and practices required or caused New Century to focus its lending business on Combined-Risk Loans;

c. whether Morgan Stanley's mortgage securitization policies and practices had an adverse disparate impact on African-American borrowers in the Detroit region by inducing New Century to target African-American borrowers and communities in the Detroit region for Combined-Risk Loans;

d. whether Morgan Stanley is a creditor for purposes of the ECOA when it engages in mortgage securitization;

e. whether Morgan Stanley's policies and practices were justified by business necessity or legitimate business interest;

f. whether there is a less discriminatory alternative to those policies and practices;

g.     whether equitable remedies including injunctive relief and disgorgement are warranted and the nature of such relief.

232.     <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class members were subject to, and affected by, Morgan Stanley's policies and practices alleged herein.

233.     <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>.  Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs are represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, including but not limited to civil rights, fair housing, consumer, ECOA, and mortgage-lending cases.  Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the members of the Class.

234.     <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

235.     Class Certification is appropriate under Federal Rules of Civil Procedure 23(b)(2)/(c)(4) because Morgan Stanley has acted or refused to act on grounds generally

applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class.

## COUNT ONE

## RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT
### (42 U.S.C. §§ 3601-3619)

236.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

237.     Under the Fair Housing Act, it is unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." 42 U.S.C. § 3605(a). A residential real estate transaction is defined to include, *inter alia*, the "purchasing of loans . . . secured by residential real estate." *Id.* at § 3605(b)(1).

238.     Federal regulations promulgated under the Fair Housing Act confirm that discriminatory policies and practices in connection with the purchase and securitization of mortgage loans are unlawful under 42 U.S.C. § 3605. *See* 24 C.F.R. § 100.125 (2010).

239.     At all relevant times, Morgan Stanley was, and continues to be, an entity "engaging in residential real estate-related transactions" under 42 U.S.C. § 3605.

240.     A covered entity violates 42 U.S.C. § 3605 when its policies or practices have an adverse disparate impact on members of a racial group.

241.     Morgan Stanley's policies and practices alleged herein (namely, its policy of orchestrating the sale of Combined-Risk Loans for securitization) had, and continue to have, a disparate impact on African-American borrowers in the Detroit region, including Plaintiffs and the Class. Morgan Stanley's policies led New Century to target African-American communities

and borrowers in order to originate large volumes of the high-risk and high-cost loans that Morgan Stanley was demanding and requiring, and more generally, led New Century to aggressively market Combined-Risk Loans that were disproportionately more likely to be issued to, and harm, African-American borrowers.

242. Morgan Stanley's common practices cannot be justified by business necessity or legitimate business interest, as evidenced by, among other things, Morgan Stanley's ignoring standard underwriting. There were less discriminatory alternatives available to Morgan Stanley than these policies.

243. Morgan Stanley's policies and practices alleged herein constitute discrimination "against any person in making available [real estate-related transactions], or in the terms or conditions of such a transaction, because of race" in violation of 42 U.S.C. § 3605.

244. Plaintiffs and the members of the Class were subject to Morgan Stanley's discriminatory policies and practices alleged herein.

245. Plaintiffs and the members of the Class were harmed by, and continue to be harmed by, Morgan Stanley's discriminatory policies and practices alleged herein, in that, *inter alia*, they have been subjected to excessive fees and costs and default or foreclosure or excessive risk of default, delinquency, and foreclosure of their homes.

246. Morgan Stanley has been unjustly enriched as a result of its discriminatory policies and practices alleged herein, including, but not limited to, through its receipt of fees in connection with the securitization of loans and the sale of the corresponding securities.

247. Morgan Stanley's discriminatory policies and practices alleged herein represent continuing violations of the Fair Housing Act because, *inter alia*: (a) Plaintiffs and members of the Class continue to receive demands for payment under the terms of their Combined-Risk

Loans and remain subject to excessive costs and penalties associated with their Combined-Risk Loans; (b) Plaintiffs and members of the Class have continued making mortgage payments under the terms of their Combined-Risk Loans; and/or (c) Plaintiffs and members of the Class have been, and continue to be, subject to foreclosure proceedings and the increased risk thereof.

248.     Plaintiffs, on behalf of themselves and the Class, request relief as hereinafter described.

## COUNT TWO

### RACE DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT (15 U.S.C. §§ 1691-1691f)

249.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

250.     Under the Equal Credit Opportunity Act ("ECOA"), it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race." 15 U.S.C. § 1691(a).  The ECOA's prohibition against discrimination applies to securitizers of residential mortgage loans.

251.     The ECOA defines the term "creditor" to mean, *inter alia*, "any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  *Id.* at § 1691a(e).

252.     Federal regulations promulgated under the ECOA confirm that the ECOA's definition of "creditor" includes participants in the secondary mortgage market such as Morgan Stanley.  *See* 12 CFR § 202.2(l) ("Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates."); *see*

*also* Official Staff Commentary, 12 C.F.R. pt. 202, Supp. L § 202.2(l) (stating that a creditor may include "a potential purchaser of the obligation who influences the credit decision by indicating whether or not it will purchase the obligation if that transaction is consummated").

253.　At all relevant times, Morgan Stanley was, and continues to be, a "creditor" under 15 U.S.C. § 1691.

254.　A creditor violates 15 U.S.C. § 1691 when its policies and practices have an adverse disparate impact on members of a racial group.

255.　Morgan Stanley's policies and practices alleged herein had, and continue to have, a disparate impact on African-American borrowers, including Plaintiffs and the Class. Morgan Stanley's policies led New Century to target African-American communities and borrowers in order to originate large volumes of the high-risk and high-cost loans that Morgan Stanley was demanding and requiring, and more generally, led New Century to aggressively market Combined-Risk Loans that were disproportionately more likely to be issued to, and harm, African-American borrowers.

256.　Morgan Stanley's common practices cannot be justified by business necessity or legitimate business interest, as evidenced by, among other things, Morgan Stanley's ignoring standard underwriting. There were less discriminatory alternatives available to Morgan Stanley than these policies.

257.　Morgan Stanley's policies and practices alleged herein constitute discrimination "against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race" in violation of 15 U.S.C. § 1691.

258.　Plaintiffs and the members of the Class were subject to Morgan Stanley's discriminatory policies and practices alleged herein.

259.    Plaintiffs and the members of the Class were harmed by, and continue to be harmed by, Morgan Stanley's discriminatory policies and practices alleged herein, in that, *inter alia*, they have been subjected to excessive fees and costs and default and foreclosure or excessive risk of default, delinquency, and foreclosure of their homes.

260.    Morgan Stanley has been unjustly enriched as a result of its discriminatory policies and practices alleged herein, including, but not limited to, through its receipt of fees in connection with the securitization of loans and the sale of the corresponding securities.

261.    Morgan Stanley's discriminatory policies and practices alleged herein represent continuing violations of the ECOA because, *inter alia*: (a) Plaintiffs and members of the Class continue to receive demands for payment under the terms of their Combined-Risk Loans and remain subject to excessive costs and penalties associated with their Combined-Risk Loans; (b) Plaintiffs and members of the Class have continued making mortgage payments under the terms of their Combined-Risk Loans; and/or (c) Plaintiffs and members of the Class have been and continue to be subject to foreclosure proceedings and the increased risk thereof.

262.    Plaintiffs, on behalf of themselves and the Class, request relief as hereinafter described.

**COUNT THREE**

**RACE DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MICH. COMP. LAWS § 37.2101, *ET SEQ.*)**

263.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

264.    Under the Michigan Elliott-Larsen Civil Rights Act, any person or entity "engaging in a real estate transaction . . . shall not on the basis of . . . race . . . [d]iscriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the

furnishing of facilities or services in connection with a real estate transaction." Mich. Comp. Law § 37.2502.

265.    The Michigan Elliott-Larsen Civil Rights Act additionally provides that "[a] person whose business includes engaging in real estate transactions shall not discriminate against a person because of . . . race . . . in the . . . making or purchasing of loans or the provision of other financial assistance secured by residential real estate." Mich. Law Comp. § 37.2504.

266.    Morgan Stanley's policies and practices alleged herein violated, and continue to violate, Mich. Comp. Law §§ 37.2502 and 37.2504 in that they have a disparate discriminatory impact on African-American borrowers, including Plaintiffs and the Class.

267.    Morgan Stanley's policies and practices alleged herein constitute discrimination on the basis of race in violation of Mich. Comp. Law §§ 37.2502 and 37.2504.

268.    Morgan Stanley's policies and practices alleged herein constitute discrimination in the "making or purchasing of loans or the provision of other financial assistance secured by residential real estate" in violation of Mich. Law Comp. § 37.2504.

269.    Plaintiffs and the members of the Class were subject to Morgan Stanley's discriminatory policies and practices alleged herein.

270.    Plaintiffs and the members of the Class were harmed by, and continue to be harmed by, Morgan Stanley's discriminatory policies and practices alleged herein, in that, *inter alia*, they have been subjected to excessive fees and costs and excessive risk of default, delinquency, and foreclosure of their homes.

271.    Morgan Stanley has been unjustly enriched as a result of its discriminatory policies and practices alleged herein, including, but not limited to, through its receipt of fees in connection with the securitization of loans and the sale of the corresponding securities.

272.     Morgan Stanley's discriminatory policies and practices alleged herein represent continuing violations of the Michigan Elliott-Larsen Civil Rights Act because, *inter alia*: (a) Plaintiffs and members of the Class continue to receive demands for payment under the terms of their Combined-Risk Loans and remain subject to excessive costs and penalties associated with their Combined-Risk Loans; (b) Plaintiffs and members of the Class have continued making mortgage payments under the terms of their Combined-Risk Loans; and/or (c) Plaintiffs and members of the Class have been, and continue to be, subject to foreclosure proceedings and the increased risk thereof.

273.     Plaintiffs, on behalf of themselves and the Class, request relief as hereinafter described.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

1.     That the Court determine that it has jurisdiction over this action.

2.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and designate the Plaintiffs as the Class Representatives and their counsel as Class Counsel;

3.     That judgment be entered against Morgan Stanley and in favor of Plaintiffs and the Class on the Causes of Action in this Complaint, for injunctive relief and declaratory relief, and for equitable monetary relief in the nature of disgorgement, in amounts to be determined at trial;

4.     That the Court award damages for the Named Plaintiffs;

5.  That the Court appoint a monitor to ensure that Morgan Stanley complies with the injunction provisions of any decree that the Court orders and an order retaining jurisdiction over this action to ensure that Morgan Stanley complies with such a decree;

6.  That the Court award attorneys' fees and litigation costs;

7.  That the Court award pre-judgment and post-judgment interest, to the extent allowable by law; and

8.  That the Court grant for all other and further relief as this Court may deem necessary and appropriate.

Plaintiffs request a jury on the claims so triable.

Dated this 15th day of October, 2012.

Respectfully submitted by,

DENNIS D. PARKER, ESQ.
LAURENCE M. SCHWARTZTOL, ESQ.
RACHEL E. GOODMAN, ESQ.*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2651

ELIZABETH J. CABRASER, ESQ. (Cal.
SBN 083151, *pro hac vice* pending)
MICHAEL W. SOBOL, ESQ. (Cal. SBN
194857, *pro hac vice* pending)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery St., 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

STUART T. ROSSMAN, ESQ. (BBO
#430640, *pro hac vice* pending)
CHARLES M. DELBAUM, ESQ.* (BBO
#543225)
ARIELLE COHEN, ESQ.*
The National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
Facsimile: (617) 542-8028

RACHEL J. GEMAN, ESQ. (NY Bar No.
RG 0998)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

MICHAEL J. STEINBERG, ESQ. (*pro hac
vice* pending)
KARY L. MOSS, ESQ.
SARAH L. MEHTA, ESQ. (*pro hac vice*
pending)
AMERICAN CIVIL LIBERTIES UNION
FUND OF MICHIGAN
2966 Woodward Ave
Detroit, MI 48201
Telephone: (313) 578-6814
Facsimile: (313) 578-6811

*Not admitted in the Southern District of New York*