**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------x

| | |
|---|---|
| **BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY RUBBIE McCOY, WILLIAM YOUNG,** on behalf of themselves and all others similarly situated, and **MICHIGAN LEGAL SERVICES,** | : : : : : : |
| **Plaintiffs,** | : : |
| - against - | : : |
| **MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,** | : : : : : : : |
| **Defendants.** | : |

**12 CV 7667 (HB)**

<u>**OPINION & ORDER**</u>

--------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiffs are five African-American homeowners and Michigan Legal Services, a nonprofit organization that provides legal services to Michigan's low-income communities (collectively, "Plaintiffs"). Plaintiffs claim that Morgan Stanley's policies and practices caused New Century Mortgage Company to target borrowers in the Detroit, Michigan region[1] for loans that had a disparate impact upon African-Americans. According to Plaintiffs, these policies were racially discriminatory in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA"), the Equal Credit Opportunity Act, 15 U.S.C § 1691 *et seq*. ("ECOA"), and Michigan's Elliot-Larsen Civil Rights Act, MCL § 37.2102 *et seq*. ("ELCRA"). Plaintiffs also seek to represent a similarly-situated class of African-American borrowers in the Detroit region. The above-captioned Defendants (collectively, "Morgan Stanley") bring this motion to dismiss the complaint. For the reasons stated below, Morgan Stanley's motion to dismiss Plaintiffs' FHA claims is DENIED. But Morgan Stanley's motion to dismiss Plaintiffs' ECOA and ELCRA claims is GRANTED.

---

[1] Plaintiffs seek to represent African-Americans residing in nine Detroit counties: Genesee, Lapeer, Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne. (Compl. ¶¶ 116, 229.)

**BACKGROUND**

From 2004 to 2007, "New Century was among the most notoriously predatory of the subprime lenders operating at that time." (Compl. ¶ 2.) Plaintiffs' theory here is that Morgan Stanley discriminated against African Americans when New Century issued predatory loans and that they did so as a result of Morgan Stanley's conduct. That conduct consisted of "five interrelated and centralized policies and practices" to securitize New Century's loans. (*Id.* ¶ 36.) First, Morgan Stanley "routinely purchased loans" with excessive debt-to-income ("DTI") ratios. (*Id.* ¶¶ 44–45.) High DTI ratios indicate that the loan is larger than the borrower can afford. Second, Morgan Stanley "regularly purchase[d] and securitize[d] mortgage loans from New Century where the [loan-to-value ratio] . . . exceeded 100%." (*Id.* ¶ 51.) High loan-to-value ratios, which compare the amount of the loan to the value of the home, are loans where the borrower faces a greater risk of delinquency or foreclosure. Third, Morgan Stanley required New Century to issue loans with adjustable rates and prepayment penalties. Morgan Stanley also "purchased and securitized large numbers of New Century mortgage loans with balloon payment features," exacerbating a borrower's financial risk. (*Id.* ¶ 60.) Fourth, Morgan Stanley provided necessary funding—in the form of warehouse lending, precommittments to purchase loans, and funding for loan closings—to New Century that allowed it to remain in business. Once New Century's funding dried up in 2007, the firm entered bankruptcy. (*Id.* ¶ 69.) Fifth, Morgan Stanley purchased loans that "deviated substantially from basic underwriting standards," going so far as to "encourage[] lending tactics that increased the levels of risk associated with individual loans." (*Id.* ¶¶ 73, 75.) According to Plaintiffs, by creating the conditions under which New Century originated toxic loans, Morgan Stanley caused African-American borrowers to fall prey to those loans at a disproportionate rate, or put another way, to make this homeowner nightmare come true.

As a result of these policies, Plaintiffs allege that they suffered financial harm. Many of the loans New Century issued were predatory and placed borrowers at "an elevated risk of default or foreclosure." (*Id.* ¶ 33.) And according to Plaintiffs, Morgan Stanley had a direct hand in inflicting that harm. Indeed, Morgan Stanley "required New Century, as a condition of the companies' lucrative business relationship, to issue large volumes of Combined-Risk Loans." (*Id.* ¶ 43.) As defined in the complaint, Combined-Risk Loans are "high-cost" loans with at least two of the following risk-enhancing features: "(a) the loan was issued based upon the 'stated

income,' rather than the verified-income, of the borrower; (b) the debt-to-income ratio exceeds 55%; (c) the loan-to-value ratio is at least 90%; (d) the loan has an adjustable interest rate; (e) the loan has 'interest only' payment features; (f) the loan has negative amortization features; (g) the loan has 'balloon' payment features; and/or (h) the loan imposes prepayment penalties." (*Id.* ¶ 34.) While any one of these features is both risky and costly to the borrower, combining those features in the same loan "dramatically" increases the loan's financial hazards. (*Id.* ¶ 35.)

Plaintiffs also spell out how the conduct of this alleged icon of the free enterprise system affected the lives of its African-American borrowers. For example, an analysis of a subset of New Century loans that Morgan Stanley purchased reveals "rates of foreclosure that far exceeded both historical norms and the more recent foreclosure rates stemming from subprime lending." (*Id.* ¶ 92.) Moreover, with regard to these loans, "the rate of foreclosure among African Americans was 28.57% greater than the rate of foreclosure among white borrowers." (*Id.* ¶ 96.) According to the complaint, these disproportionate financial harms were the result of New Century's lending practices and the targeting of African Americans that Morgan Stanley's policies brought about. Indeed, as a result of Morgan Stanley's policies, "a high-cost loan originated by New Century was more than six times as likely to be in a 90%-plus minority neighborhood than the average loan originated in the Detroit region." (*Id.* ¶ 119.) Further, "an African-American borrower in a minority neighborhood had a 21% greater chance of receiving a high-cost loan than a similarly-situated white borrower in a white neighborhood." (*Id.* ¶ 122.) According to Plaintiffs, these statistical allegations demonstrate a disparate impact.

Detroit's recent bankruptcy filing only emphasizes the broader consequences of predatory lending and the foreclosures that inevitably result. Indeed, "[b]y 2012, banks had foreclosed on 100,000 homes [in Detroit], which drove down the city's total real estate value by 30 percent and spurred a mass exodus of nearly a quarter million people." Laura Gottesdiener, *Detroit's Debt Crisis: Everything Must Go*, Rolling Stone, June 20, 2013. The resulting blight stemming from "60,000 parcels of vacant land" and "78,000 vacant structures, of which 38,000 are estimated to be in potentially dangerous condition" has further strained Detroit's already taxed resources. Kevyn D. Orr, *Financial and Operating Plan* 9 (2013). And as residents flee the city, Detroit's shrinking ratepayer base renders its financial outlook even bleaker. *Id.* Given these conditions, it is not difficult to conclude that Detroit's current predicament, at least in part, is an outgrowth of the predatory lending at issue here. *See* Monica Davey & Mary Williams Walsh, *Billions in*

*Debt, Detroit Tumbles Into Insolvency*, N.Y. Times, July 18, 2013, at A1 (listing Detroit's "shrunken tax base but still a huge, 139-square-mile city to maintain" as one factor contributing to the city's financial woes).

## DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6), I must "accept all factual allegations in the complaint as true." *State Univs. Retirement Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404, 406 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)), *see* Fed. R. Civ. P. 12(b)(6).  But while a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the level of detail "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To state a claim, Plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### A.  Article III Standing

I turn first to the threshold issue of Plaintiffs' Article III standing.  To demonstrate constitutional standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  Statutory standing under the FHA is also coextensive with the boundaries of Article III.  *Comer v. Cisneros*, 37 F.3d 775, 788–89 (2d Cir. 1994) ("[T]he sole requirement for standing to sue under [the FHA] is the Art. III minima of injury in fact . . . .'" (second alteration in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982))).

Here, Plaintiffs have suffered a cognizable injury.  As alleged, Morgan Stanley's policies and practices caused New Century to target Plaintiffs for toxic loans.  These loans placed Plaintiffs at "greater risk of default, delinquency, and foreclosure."  (Compl. ¶ 43.)  Here, these high-risk loans as opposed to better loans or even no loan at all caused Plaintiffs a concrete injury.  *See Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) ("[A]n unreasonable exposure to risk may itself cause cognizable injury." (citing *Friends of the Earth, Inc. v. Gaston Copper*

*Recyling, Corp.*, 204 F.3d 149, 160 (4th Cir. 2000))). And regardless of whether Plaintiffs qualified for better loan terms, they are subject to higher mortgage payments and fees over a longer period of time than they would have been had they not been targeted for these toxic loans. The fact that there was a benefit to Plaintiffs, i.e., it allowed the purchase of a home, is not relevant to the constitutional standing inquiry. *See Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("[T]he fact that an injury may be outweighed by other benefits . . . does not negate standing." (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006))). Thus, Plaintiffs have adequately pled injury in fact.

As to traceability, the complaint also passes muster. To satisfy this requirement, "there must be a causal connection between the injury and the conduct complained of." *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 84 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). But "a plaintiff need not allege that 'the defendant's actions [were] the very last step in the chain of causation' to demonstrate that the defendant's actions caused the claimed injury." *Carver v. City of N.Y.*, 621 F.3d 221, 226 (2d Cir. 2010) (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Rather, causation is shown "if the defendants' actions had a 'determinative or coercive effect' on the action that produced the injury." *Id.* (quoting *Bennett*, 520 U.S. at 169). In their complaint, Plaintiffs allege *inter alia* that "Morgan Stanley required New Century, as a condition of the companies' lucrative business relationship, to issue large volumes of Combined-Risk Loans." (Compl. ¶ 43.) Given that Plaintiffs' injuries derive from these high-risk loans, the complaint's allegations clearly meet the traceability requirement. Plaintiffs thus have standing to seek monetary relief based on this past harm.

Finally as to standing, Morgan Stanley challenges whether Plaintiffs' injury is redressable through injunctive relief. Standing to pursue an injunction requires that "the injury alleged . . . be capable of being redressed through injunctive relief at that moment." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 594 (S.D.N.Y. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993)) (internal quotation marks omitted). But the misconduct here centers upon the effect Morgan Stanley's policies had on Plaintiffs via New Century's lending. Yet as the complaint acknowledges, New Century stopped originating loans and filed for bankruptcy in 2007. (Compl. ¶¶ 37, 69.) And nowhere in the complaint do Plaintiffs allege that Morgan Stanley's policies have had a similar effect on other loan originators. Thus, even if Plaintiffs'

allegations demonstrate that they will reenter the housing market, their allegations do not demonstrate that Morgan Stanley's policies pose a threat of future injury. *See White v. First Am. Registry*, 230 F.R.D. 365, 367 (S.D.N.Y. 2005) ("[W]here, as here, a plaintiff challenges an allegedly wrongful policy, he or she must allege credibly a 'realistic threat from the policy.'" (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000))). Accordingly, Plaintiffs lack standing to pursue injunctive relief.

**B.  Statute of Limitations**

Morgan Stanley also challenges the timeliness of Plaintiffs claims. Plaintiffs commenced this action on October 15, 2012. And as noted above, New Century stopped originating loans as of 2007. Without tolling, Plaintiffs' claims would be untimely. *See* 42 U.S.C. § 3613(a)(1)(A) (two-year statute of limitations under FHA from "the occurrence or the termination of an alleged discriminatory housing practice"); Mich. Comp. Laws § 600.5805(10) (three-year period for ELCRA claims); *Cottrell v. Vilsack*, No. 11-1511, 2013 WL 49569, at *7 & n.7 (D.D.C. Jan. 4, 2013) (applying two-year statute of limitations to ECOA claims arising prior to amendment extending limitations period to five years). Thus, Plaintiffs urge that the discovery rule, equitable tolling, and a continuing violations theory govern their claims.

**1.  Discovery Rule**

**a.  The FHA**

I examine first the application of the discovery rule to Plaintiffs' claims. Under the discovery rule, Plaintiffs' claims did not accrue—and the statute did not begin to run—until Plaintiffs "kn[ew] or ha[d] reason to know of the injury that serves as the basis for the action." *Clement v. United Homes, LLC*, No. 10 Civ. 2122, 2012 WL 6720701, at *8 (E.D.N.Y. Dec. 27, 2012) (quoting *Dombrowski v. City of N.Y.*, 116 F.3d 465, *1 (2d Cir. 1997)). While Congress did not expressly adopt a discovery rule for FHA actions, the FHA also does not expressly preclude a discovery rule. And it is well-established that express adoption of the discovery rule is not required for such a rule to apply. *Compare* 28 U.S.C. § 2401(b) (under FTCA, "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues") *with A.C.Q. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) (implying "diligence-discovery rule of accrual" in FTCA claims (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998))). Indeed, the Supreme Court has also recognized that the discovery rule need not be

express.  *Compare* 45 U.S.C. § 56 (under FELA, "[n]o action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued"), *with Urie v. Thompson*, 337 U.S. 163, 170 (1949) (applying discovery rule to FELA actions), *and TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001) (recognizing *Urie*'s continued viability).  Thus, rather than looking only to whether Congress expressly adopted a discovery rule, the discovery rule may apply "by implication from the structure or text of the particular statute."  *TRW Inc.*, 534 U.S. at 28.

With these principles in mind, I find that the discovery rule applies to Plaintiffs' FHA claims.  In that regard, Congress enacted the FHA "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  Further, as the Second Circuit has observed, the FHA "[is] part of a coordinated scheme of federal civil rights laws enacted to end discrimination" and "must be construed expansively to implement that goal."  *Huntington Branch, N.A.A.C.P. V. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988); *see also Hack v. President & Fellow of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000) ("The Supreme Court has repeatedly directed the courts to give a 'generous construction' to the Fair Housing Act."), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S 506 (2002).  There can be little doubt then that unlawful discrimination under the FHA includes practices resulting in a disparate impact—the theory Plaintiffs press here.  *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) ("Plaintiffs who allege violations under . . . the FHA . . . may proceed under any or all of three theories:  disparate treatment, disparate impact, and failure to make reasonable accommodation.").

But the disparate impact of a facially neutral policy may not become immediately apparent upon its adoption.  *See Davidson v. Bd. of Governors of State Colls. & Univs. for W. Ill. Univ.*, 920 F.2d 441, 445 (7th Cir. 1990) (in disparate impact case, "[w]hat prevents [a plaintiff's] suing right off is not that the practice of which he complains has not been adopted as yet . . . but that he does not have enough evidence to determine whether the practice is unlawful").  Giving full effect to the FHA's language and the policy behind the language requires a discovery rule recognizing that Plaintiffs' claim here did not accrue until they knew or had reason to know that Morgan Stanley's policies were discriminatory.

To the extent that Morgan Stanley relies on *TRW Inc.* to foreclose the discovery rule, that reliance is inapposite with regard to the FHA.  In that case, the Supreme Court held that

incorporating a discovery rule into the Fair Credit Reporting Act ("FCRA") would contradict the statutory scheme. *TRW, Inc.*, 534 U.S. at 28–29. And indeed, when *TRW Inc.* was decided, FCRA expressly provided for a limited discovery rule based upon a defendant's concealment of its liability. *Id.* at 28 (citing 15 U.S.C. § 1681p).[2] Given this limited discovery rule, to read a general discovery rule into that statute would render that statute's express language a nullity. *Id.* at 29. But unlike FCRA, the FHA does not speak directly to whether a discovery rule applies. *See* 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . ."). Nor does the FHA provide for any exceptions that would conflict with a discovery rule. Accordingly, I conclude that Plaintiffs' FHA claims are subject to that rule here.

And applying that rule, Plaintiffs' FHA claims are timely. Taking the complaint's factual allegations as true, Plaintiffs "did not know, and could not have known, that Morgan Stanley's policies and practices caused a disparate impact on her and other African-American borrowers in Detroit, in violation of federal and state law." (Compl. ¶¶ 140, 160, 175, 191, 204.) Instead, Plaintiffs assert that only after consultation with attorneys in 2012 was the nature of their injury revealed. (*Id.*) And while certain underlying facts related to this action were made publicly available over time, whether this public knowledge may be imputed to Plaintiffs to render their claims "discovered" is a question of fact that is inappropriate to resolve on a motion to dismiss. *See Phillips v. Better Homes Depot, Inc.*, No. 02 Civ. 1168, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003) ("There is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systematic fashion."); *cf. Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 49 (S.D.N.Y. 2001) (whether plaintiffs exercised "reasonable diligence" for purposes of discovery rule is question of fact). Accordingly, Plaintiffs' allegations are sufficient and their FHA claims are not time-barred.

### b. ECOA

But Plaintiffs' ECOA claims suffer a different fate. Like the FHA, ECOA also does not speak directly to the discovery rule. But unlike the FHA, ECOA does embrace exceptions to its limitations period allowing for a limited discovery rule that the FHA does not. *See* 15 U.S.C. § 1691e(f)(1)–(2). Thus, to imply a general discovery rule for ECOA claims "would in practical

---

[2] The statute of limitations for FCRA actions has been revised since *TRW, Inc.* was decided. *See* 15 U.S.C. § 1681p.

effect render [those] exception[s] entirely superfluous in all but the most unusual circumstances." *TRW Inc.*, 534 U.S. at 28.  ECOA's text thus does not support a discovery rule.

### c. ELCRA

Finally, Michigan law is clear that the discovery rule does not apply to Plaintiffs' ELCRA claims.  Indeed, Michigan courts have expressly rejected a broad discovery rule.  *See* Mich. Comp. Laws § 600.5805(10); *Trentadue v. Buckler Automatic Lawn Sprinkler Co.*, 738 N.W.2d 664, 670 (Mich. 2007) (rejecting implication of discovery rule).  Accordingly, the discovery rule will not save Plaintiffs' ELCRA claims here.

### 2. Continuing Violations

Plaintiffs also urge that their ECOA and ELCRA claims are timely under a continuing violations theory.  But this theory does not apply to Plaintiffs' ELCRA claims. *See Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 658 (Mich. 2005) ("Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as 'continuing violations.'").

This leaves application of a continuing violations theory to Plaintiffs' ECOA claims.  But here, Plaintiffs' ECOA claims also founder.  Plaintiffs point to *Lewis v. City of Chicago* in support of their claims, but that case serves only to confirm that Plaintiffs' theory lacks merit.  In *Lewis*, the Supreme Court held that new claims may arise "[i]f petitioners could prove that the [defendant] 'use[d]' the 'practice' that 'causes a disparate impact.'"  *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 130 S. Ct. 2191, 2199 (2010) (third alteration in original).  In other words, even for disparate impact claims, Plaintiffs "must show a present violation within the limitations period."  *Id.* (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)) (internal quotation marks omitted).  But here, the policy that Plaintiffs seek to challenge is Morgan Stanley's policy that purportedly caused New Century to issue discriminatory loans.  That policy ended at least as of 2007—when New Century stopped issuing loans entirely.

That Plaintiffs continue to suffer the effects of their toxic loans, while unfortunate, does not suffice to revive their claims on the basis of a continuing violation where implementation of the challenged policy has long ceased.  *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 158 n.12 (2d Cir. 2012) ("*Lewis*, however, makes clear that a disparate impact claim requires plaintiffs to plead and prove that defendants, within the limitations period, *used* an employment practice that had a disparate impact.  In other words, the *cause*—not merely the effect—must

occur within the limitations period." (internal citation omitted)); *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999) ("[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act.").  Under these circumstances, Plaintiffs have not alleged a "present violation" within the limitations period.

> ### 3.  Equitable Tolling

Plaintiffs next urge that their claims are timely pursuant to equitable tolling.  Equitable tolling recognizes that "where the court finds that 'extraordinary circumstances' prevented the party from timely performing a required act, and that the party 'acted with reasonable diligence through the period he sought to toll,'" a plaintiff may assert an otherwise untimely claim. *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 286 (S.D.N.Y. 2011) (quoting *Williams v. Aries Fin., LLC*, No. 09 Civ. 1816, 2009 WL 3851675, at *6 (E.D.N.Y. Nov. 18, 2009)).  One way to meet this standard is to demonstrate that "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id.* (quoting *Coveal v. Consumer Home Mortg., Inc.*, No. 04 Civ. 4755, 2005 WL 704835, at *4 (E.D.N.Y. Mar. 29, 2005)).  Not this case.  Here, Plaintiffs' allegations of concealment are entirely conclusory. Indeed, Plaintiffs allege only that Morgan Stanley "knowing[ly] and active[ly] conceal[ed] . . . the facts" of the complaint and that "Plaintiffs and members of the Class have been kept ignorant of vital information."  (Compl. ¶¶ 222.)  Plaintiffs also claim in similarly vague terms that Morgan Stanley violated a "continuing duty to disclose" its discriminatory policies to Plaintiffs. (Compl. ¶ 223.)  These allegations cannot support equitable estoppel under either ECOA or ELCRA.  *See Singh v. Wells*, 445 F. App'x 373, 378 (2d Cir. 2011) ("Generalized or conclusory allegations of fraudulent concealment are insufficient to toll a statute of limitations.").  Plaintiffs allege other theories but they fail to clear the high hurdle required for equitable estoppel and thus equitable estoppel is unavailable on these allegations.

## C.  Disparate Impact Under the FHA

Thus, only Plaintiffs' FHA claims are timely.  Accordingly, I now turn to the merits of Plaintiffs' FHA allegations.  The FHA makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race."  42 U.S.C. § 3605(a).  And under the statute, "[r]esidential real estate-related transaction" includes "[t]he making or purchasing of loans or providing other

financial assistance . . . (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate."  § 3605(b)(1)(A)–(B).

Plaintiffs here have successfully alleged a disparate impact under the FHA.  A claim will survive a motion to dismiss so long as that claim is "facially plausible and . . . give[s] fair notice to the defendants of the basis for the claim." *Barbosa v. Continuum Health Partners, Inc.,* 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010).  Further, while the elements of a prima facie case of discrimination are relevant as to whether Plaintiffs have pled a plausible claim, Plaintiffs need not satisfy the prima facie case's requirements at the pleading stage.  *Shallow v. Scofield*, No. 11 Civ. 6028, 2012 WL 4327388, at *3 (S.D.N.Y. Sept. 21, 2012).  Nevertheless, a prima facie case under the FHA on a disparate impact theory requires only that Plaintiffs allege "that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation." *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003).

Plaintiffs here have met their pleading burden.  First, they have identified the policy that they allege has a disproportionate impact on minorities.  That policy consisted of Morgan Stanley (1) routinely purchasing both stated income loans and loans with unreasonably high debt-to-income ratios, (2) routinely purchasing loans with unreasonably high loan-to-value ratios, (3) requiring that New Century's loans include adjustable rates and prepayment penalties as well as purchasing loans with other high-risk features, (4) providing necessary funding to New Century, and (5) purchasing loans that deviated from basic underwriting standards.  Plaintiffs go on to state that these policies resulted in "New Century aggressively target[ing] African-American borrowers and communities . . . for the Combined-Risk Loans."  (Compl. ¶ 81.)  Indeed, Plaintiffs allege in detail the effect that New Century's lending had upon the African-American community in the Detroit area.  (Compl. ¶¶ 115–122).  That lending, according to Plaintiffs, was a direct result of Morgan Stanley's policies.  And while Plaintiffs do not allege that they qualified for better loans, they allege discrimination based only upon the receipt of these predatory, toxic loans that placed them at high financial risk.  These risks exist regardless of Plaintiffs' qualifications.  On a motion to dismiss, these allegations are sufficient to demonstrate a disparate impact.

Morgan Stanley argues that the FHA does not reach Plaintiffs' theory here.  But as an entity "engage[d] in residential real estate-related transactions," Morgan Stanley—as a loan

purchaser and mortgage securitizer—falls within the scope of the FHA.  42 U.S.C. § 3605(a).
And as such, the FHA prohibits Morgan Stanley both from discriminating in "making available"
real-estate related transactions as well as discriminating "in the terms or conditions of such a
transaction."  § 3605(a); *see also* 24 C.F.R. § 100.125 ("It shall be unlawful for any . . . entity
engaged in the purchasing of loans or other debts or securities . . . to impose different terms or
conditions for such purchases, because of race . . . .").  To give the FHA full effect, this language
is to be given a "generous construction."  *Hack*, 237 F.3d at 87.

        As explained above, Morgan Stanley's policies themselves resulted in Plaintiffs suffering
a disparate impact.  Indeed, Morgan Stanley's policies set the terms and conditions on which it
would purchase loans from New Century.  For example, "Morgan Stanley placed at least two
employees onsite at New Century full-time when conducting due diligence on loans it would
purchase for securitization."  (Compl. ¶ 75.)  When a "full documentation loan" indicated that a
borrower could not afford a particular loan, "Morgan Stanley would shred the documentation and
tell the originator to get a new, 'stated income' loan."  (*Id.*)  This stated income loan would
appear less risky and permit the borrower to qualify, but would do nothing to change the fact that
the borrower could not afford the loan.

        Thus the terms and conditions governing Morgan Stanley's loan purchases directly
resulted in a disparate impact when they caused New Century to issue toxic loans to Plaintiffs.
While Morgan Stanley disputes whether it could have caused New Century to issue these loans,
that factual inquiry is appropriately reserved for a later stage of this litigation.  At this stage, as
with Morgan Stanley's traceability argument, Plaintiffs' allegations that Morgan Stanley
"required" New Century to issue discriminatory loans are more than sufficient to make
Plaintiffs' claims plausible.  Further, whether Morgan Stanley ultimately purchased all of the
toxic loans that New Century issued is not relevant at the pleading stage.  Instead, Plaintiffs
allege a simpler theory:  Morgan Stanley's policies were the cause of all the toxic loans that New
Century issued.  Nothing more is needed to support Plaintiffs' claims at this stage.

        Similarly, that Plaintiffs focused on the impact of Morgan Stanley's policies on
borrowers in Detroit as opposed to borrowers nationwide is not fatal to their complaint.  Nor are
their statistical allegations related to high-cost loans as opposed to Combined-Risk loans
deficient.  As explained above, Plaintiffs' statistical allegations need not definitively establish
causation at this stage.  Rather, Plaintiffs' allegations, though focused upon high-cost loans in

Detroit, are sufficient to give notice to Morgan Stanley of a plausible claim of disparate impact. Whether those statistics may prove insufficient at a later date is not now a question before this court. *See Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) ("It would be inappropriate to require a plaintiff to produce statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery."). Indeed, Morgan Stanley supports its theory with case law involving different procedural postures, not motions to dismiss. *See, e.g., Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev*, 639 F.3d 1078, 1080 (D.C. Cir. 2011) (preliminary injunction); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (posttrial appeal); *Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999) (summary judgment), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006). Accordingly, I deny Morgan Stanley's motion to dismiss Plaintiffs' FHA claims.

## CONCLUSION

For the foregoing reasons, Morgan Stanley's motion to dismiss is GRANTED as to Plaintiffs' ELCRA and ECOA claims. The motion is DENIED with respect to Plaintiffs' FHA claims. The Clerk of Court is directed to close this motion and remove it from my docket.

**SO ORDERED.**

Date: _7/25/2013_
New York, New York

_____
**HAROLD BAER, JR.**
**United States District Judge**