# Exhibit 1:

# Plaintiffs' Memorandum in Support of Motion for Class Certification

## Previously filed under seal (Docket No. 128)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY, RUBBIE McCOY, WILLIAM YOUNG and MICHIGAN LEGAL SERVICES, on behalf of themselves and all others similar situated,<br><br>    Plaintiffs,<br><br>    -against-<br><br>MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,<br><br>    Defendants. | 1:12-CV-7667-VEC-GWG |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

I. MORGAN STANLEY'S LEVERAGE OVER NEW CENTURY
FUNDAMENTALLY SHAPED NEW CENTURY'S LENDING
PRACTICES ...................................................................................... 2

    A. Morgan Stanley Exercised Unique Leverage and Influence over
New Century's Lending Business............................................... 2

    B. New Century Conformed Its Lending Practices to Morgan
Stanley's Demands...................................................................... 5

II. MORGAN STANLEY ENGAGED IN UNIFORM POLICIES AND
PRACTICES THAT DROVE NEW CENTURY'S ORIGINATION OF
COMBINED-RISK LOANS ............................................................. 10

    A. Morgan Stanley Provided the Funding That Enabled New Century
to Originate Combined-Risk Loans .......................................... 10

    B. Morgan Stanley had a Uniform Policy and Practice of Dictating the
Features of the New Century Loans it Purchased..................... 12

    C. Morgan Stanley Maintained Uniform, Inadequate Due Diligence
Policies that Led it to Purchase High Volumes of Combined-Risk
Loans.......................................................................................... 14

III. THE COMBINED-RISK LOANS ISSUED AS A RESULT OF
MORGAN STANLEY'S POLICIES ARE PREDATORY ................................ 20

IV. MORGAN STANLEY'S POLICIES AND PRACTICES HAD A
DISPARATE IMPACT ON AFRICAN-AMERICAN BORROWERS ............. 20

V. MORGAN STANLEY TOOK NO STEPS TO AVOID ADVERSE
RACIAL IMPACT............................................................................. 21

ARGUMENT........................................................................................................ 22

I. STANDARD FOR CLASS CERTIFICATION .................................................. 22

II. THE PROPOSED CLASS SATISFIES THE CONDITIONS OF RULE
23(a)................................................................................................... 24

    A. The Class Is So Numerous that Joinder Is Impracticable ........................ 24

    B. The Factual and Legal Elements of Class Members' Claims Are
Capable of Common Resolution................................................ 25

        1. Common Factual Questions....................................... 25

        2. Common Legal Questions.......................................... 26

# TABLE OF CONTENTS
(continued)

C.  Plaintiffs' Claims Are Typical of Class Members' Claims ..................... 29

D.  Plaintiffs and Their Attorneys Will Adequately Represent the Interests of the Class .............................................................................. 30

III.  THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(3) .............................................................................................................. 32

A.  Common Questions of Law and Fact Predominate Over Individual Questions .......................................................................................... 32

B.  A Class Action is Superior to Other Methods of Adjudicating the Controversy ..................................................................................... 34

CONCLUSION ................................................................................................................. 35

## TABLE OF AUTHORITIES

Page

### Cases

*2922 Sherman Ave. Tenants' Ass'n. v. District of Columbia*,
  444 F.3d 673 (D.C. Cir. 2006) ................................................... 27

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................. 32

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ............................................ 23, 24, 25, 32

*Brame v. Ray Bills Fin. Corp.*,
  85 F.R.D. 568 (N.D.N.Y. 1979) .............................................. 31

*Commodity Futures Trading Comm'n v. British Commodity Options Corp.*,
  788 F.2d 92 (2d Cir. 1986) ...................................................... 28

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ...................................................... 24

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. 2008) .............................................. 33

*Easterling v. State Dep't of Corr.*,
  278 F.R.D. 41 (D. Conn. 2011) .......................................... 25, 33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ............................................................ 26

*Espinoza v. 953 Assocs. LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) ............................................ 31

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
  316 F.3d 357 (2d Cir. 2003) .................................................... 27

*Floyd v. City of N.Y.*,
  283 F.R.D. 153 (S.D.N.Y. 2012) ............................................ 25

*Goodman v. Genworth Fin. Wealth Mgmt.*,
  No. 09-CV-5603 (JFB) (GRB), 2014 U.S. Dist. LEXIS 52087 (E.D.N.Y. Apr. 15, 2014) ..... 23

*Hack v. President of Yale College*,
  237 F.3d 81 (2d Cir. 2000) ...................................................... 27

*Haddock v. Nationwide Fin. Servs., Inc.*,
  293 F.R.D. 272 (D. Conn. 2013) ............................................ 29

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988)
    *aff'd sub nom. Town of Huntington v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988) . 27

*In re Cablevision Consumer Litig.*,
  No. 10-CV-4992 (JS) (AKT), 2014 U.S. Dist. LEXIS 44983 (E.D.N.Y. Mar. 31, 2014) ....... 34

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ....................................................................................... 29, 30

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ........................................................................................... 23

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) ........................................................................................... 31

*Marisol A. ex rel. Forbes v. Giuliani*,
126 F.3d 372 (2d Cir.1997) ............................................................................................ 24

*Matyasovszky v. Hous. Auth. of Bridgeport*,
226 F.R.D. 35 (D. Conn. 2005) ...................................................................................... 24

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
672 F.3d 482 (7th Cir. 2012)
*cert. denied*, 133 S. Ct. 338 (2012) .......................................................................... 24, 25

*Ramirez v. Greenpoint Mortg. Funding, Inc.*,
268 F.R.D. 627 (N.D. Cal. 2010)............................................................................... 24, 33

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ........................................................................................... 29

*Robinson v. Metro-North Commuter R.R.*,
267 F.3d 147 (2d Cir. 2001) ........................................................................................... 26

*Rodriguez v. Bear Stearns Cos.*,
No. 07-cv-1816 (JCH), 2009 U.S. Dist. LEXIS 31525 (D. Conn. Apr. 14, 2009)................... 27

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) ........................................................................................... 28

*SEC v. Fischbach Corp.*,
133 F.3d 170 (2d Cir. 1997) ........................................................................................... 28

*Steele v. GE Money Bank*,
No. 08 C 1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009)................................ 28

*Stockwell v. City & Cnty. of S.F.*,
749 F.3d 1107 (9th Cir. 2014) ........................................................................................ 23

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972).......................................................................................................... 1

*United States v. City of N.Y.*,
276 F.R.D. 22 (E.D.N.Y. 2011)........................................................................................ 25

*United States v. Inc. Vill. of Island Park*,
888 F. Supp. 419 (E.D.N.Y. 1995) .................................................................................. 28

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)............................................................................................... 23, 25

**TABLE OF AUTHORITIES**
(continued)

Page

*Watson v. Ft. Worth Bank & Trust,*
    487 U.S. 977 (1988) ............................................................... 33

*Zuch v. Hussey,*
    394 F. Supp. 1028 (E.D. Mich. 1975) *aff'd* 547 F.2d 1168 (6th Cir. 1977) ............................ 28

**Statutes**

24 C.F.R. § 100.125(b) .................................................................. 26

24 C.F.R. § 100.500 ..................................................................... 27

42 U.S.C. § 3605(a)-(b) ................................................................. 26

**Rules**

Fed. R. Civ. P. 23(a) .......................................................... 23, 24, 29, 30

Fed. R. Civ. P. 23(a)(1) ................................................................. 24

Fed. R. Civ. P. 23(a)(3) ................................................................. 29

Fed. R. Civ. P. 23(a)(4) ................................................................. 30

Fed. R. Civ. P. 23(b) .................................................................... 23

Fed. R. Civ. P. 23(b)(3)(A)–(D) ........................................................ 34

Fed. R. Civ. P. 23(g) .................................................................... 30

**Other Authorities**

*Investor/Analyst Roundtable – Lunch Meeting – Final*, FAIR DISCLOSURE WIRE, Sept. 7, 2005 . 7

*New Century Financial Corporation at Southern California Investor Conference* – FINAL, FD
    (FAIR DISCLOSURE) WIRE, Aug. 11, 2006) ................................................. 6

H.R. Rep. No. 711, 100th Cong., 2d Session 1988, at 30,
    *reprinted in* 1988 U.S.C.C.A.N. 2173, 2191 ............................................ 26

## INTRODUCTION

This case seeks to hold Morgan Stanley accountable for violating federal civil rights law. Morgan Stanley[1] systematically shaped New Century's abusive lending in the course of purchasing loans to package as mortgage-backed securities.  Exercising unique leverage over New Century, Morgan Stanley steered New Century's lending practices, which emphasized loans with a combination of features that put borrowers at significantly increased risk of default or foreclosure.  Morgan Stanley's policies and practices in procuring these loans were discriminatory in effect: statistical evidence reveals that African American borrowers in Detroit were more likely than Whites to receive the risky loans at issue in this case.  Plaintiffs here proceed as "private attorneys general" under the Fair Housing Act ("FHA"), *see Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972), which applies with full force to banks, like Morgan Stanley, that operated the machinery of mortgage securitization.

Plaintiffs seek to certify a class of African-American borrowers in the Detroit region who received toxic "Combined-Risk Loans"[2] between 2004 and 2007.  This disparate impact case is ideal for class certification because it will turn on whether Morgan Stanley's common, centralized policies and practices caused discriminatory effects and, if so, whether Morgan Stanley can demonstrate bona fide and legitimate justifications for those practices and whether there were less discriminatory alternatives.  Plaintiffs claim that Morgan Stanley's common policies and practices – such as affirmatively requiring certain high-cost loans with a

---

[1] Although several instrumental affiliated Morgan Stanley entities are each named as Defendants in this case, Compl. ¶¶ 19-23, Defendants are referred to collectively as "Morgan Stanley."

[2] The Complaint defines "Combined-Risk Loans" as "loans that meet the definition of high-cost loan under HMDA and also contain two or more of the following high-risk terms: (a) the loan was issued based upon the 'stated income,' rather than the verified income, of the borrower; (b) the debt-to-income ratio exceeds 55%; (c) the loan-to-value ratio is at least 90%; (d) the loan has an adjustable interest rate; (e) the loan has 'interest only' payment features; (f) the loan has negative loan amortization features; (g) the loan has 'balloon' payment features; and/or (h) the loan imposes prepayment penalties." Compl. ¶ 34.

combination of risky features as conditions of its trades with New Century; providing the funding through warehouse lines of credit that enabled New Century to originate the loans; and allowing its business-side personnel to override due diligence decisions and purchase high-risk loans – had a discriminatory disparate impact on African-American borrowers in Detroit.

Few, if any, individualized determinations are necessary.  Morgan Stanley treated the loans in its securitization pipeline as nearly interchangeable building blocks for securitization purposes – notably, it did not examine most of the subprime loans it caused New Century to originate and purchased in bulk.  Further, no individual damages determinations are required for class members because the remedy sought is disgorgement of Morgan Stanley's wrongfully obtained revenues and gains.  Class certification is thus appropriate under Fed. R. Civ. P. 23.

## STATEMENT OF FACTS

I.  **MORGAN STANLEY'S LEVERAGE OVER NEW CENTURY FUNDAMENTALLY SHAPED NEW CENTURY'S LENDING PRACTICES**

A.  **Morgan Stanley Exercised Unique Leverage and Influence over New Century's Lending Business**

Throughout the class period and in the years leading up to the start of the class period, Morgan Stanley and New Century had a uniquely close and interdependent relationship, defined by both the magnitude and the nature of their business.[3]  The special nature of this relationship is evident in Morgan Stanley's predominant role as a purchaser and funder of New Century loans. As a starting point, for each year in the class period, Morgan Stanley purchased the largest share of New Century loans sold on the secondary market.  In 2004, Morgan Stanley purchased 46.4% of the dollar value of loans sold by New Century; the second-largest purchaser acquired 17.2%.

---

[3] At least five different subgroups within Morgan Stanley's Securitized Products Group were responsible for the Morgan Stanley policies and practices detailed in this brief—mortgage finance (the "trading desk"), contract finance, collateral analysis, due diligence, and warehouse lending.  Expert Report of Patricia A. McCoy ("McCoy Report") at 34-35.  Of these, the trading desk, headed by Steven Shapiro, was the "nerve center" of the Morgan Stanley-New Century relationship described herein.  *Id.* at 35.

*See* Ex. 1 [New Century Form 10-K Report] at 73.[4]  Indeed, in a 2004 presentation, Morgan Stanley boasted of being "the #1 purchaser of New Century whole loans" and proclaimed its intention to "expand[]" its relationship with New Century going forward.  Ex. 2 at MS00834838; *see also id.* at MS00834840 ("Morgan Stanley hopes to continue its relationship with New Century in 2005 by maintaining its status as the #1 whole loan purchaser, #1 warehouse lender, and #1 underwriter on a market share basis."); Ex. 3 at MS00834909 ("Morgan Stanley is the largest whole loan purchaser of New Century's production purchasing over 50% of New Century's production . . . since 2001.").  Morgan Stanley maintained its primacy during each subsequent year in the class period.  Declaration of Robert W. Hunter at ¶ 14.  Morgan Stanley was also among New Century's largest warehouse funders, providing billions of dollars' worth of credit with which New Century originated subprime residential mortgage loans.  Ex. 5 at MS02685210 ("New Century has approached Morgan Stanley because we are their number one relationship and they would like to keep us their number one relationship"); Ex. 6 ("We are [New Century's] biggest lender and biggest buyer of loans for over 3 years running.").

The close relationship between the companies manifested itself in Morgan Stanley's deep involvement in New Century's activities.  In 2005, the Morgan Stanley employee with primary responsibility for managing the firm's relationship with New Century, Craig Phillips, wrote in an internal memorandum that New Century's "[e]ntire management team is extremely pleased with the 'partnership' with Morgan Stanley.  While they don't keep specific metrics, we are clearly their largest and most important counterparty."  Ex. 7 at MS00834830; *see also* Ex. 8 at 91:1-14.  The same employee stated in an email to Steven Shapiro, the head of Morgan Stanley's trading desk, that New Century is "extremely open to our advice and involvement in all elements of their operation."  Ex. 9 at MS00834829.  Another internal Morgan Stanley document notes that

---

[4] Exhibits cited herein are attached to the Declaration of Nicole D. Sugnet, filed herewith.

"Morgan Stanley is involved in almost every strategic decision that New Century makes in securitized products."  Ex. 10 at MS00885762; *see also* Ex. 11 at 6 ("Morgan Stanley has been involved in New Century's key strategic decisions since 2001.").  Notably, Morgan Stanley understood its direct impact on the mechanics of New Century's lending business.  *See* Ex. 12 at 4 ("Because Morgan Stanley is such a large purchaser of loans from New Century, New Century has incorporated many of Morgan Stanley's best practices into their origination practices . . . .").

Morgan Stanley Due Diligence staff could frequently be found working on site at New Century's offices.  *See, e.g.*, Ex. 13 at 387:24-399:2; Ex. 14 at 23:21-24:3.  High level staff from Morgan Stanley's Collateral Analysis group and other teams visited regularly.  *See, e.g.,* Ex. 15 at 123:22-129:20; Ex. 16 (email from Craig Phillips describing his visit with New Century).  Some Morgan Stanley employees were so enmeshed with New Century's business that they were provided with New Century email addresses.  *See* Ex. 13 at 399:4-400:17; *see also* Ex. 17 (email sent from Morgan Stanley employee Brad Davis's New Century email address to his Morgan Stanley email address).

When New Century began experiencing financial difficulties, Morgan Stanley attempted to keep New Century out of bankruptcy by issuing new financing to the company, even as other lenders were withdrawing funding.  *See* Ex. 18 [New Century Form 8-K, March 2, 2007] at Item 8.01 (describing an extension from Morgan Stanley to New Century of $265 million in financing and an agreement to refinance the remaining balance of $710 million in loans); Ex. 19 at 166:12-25, 167:21-168:6 (confirming that this nearly one billion dollars in financing was extended by Morgan Stanley, even though Morgan Stanley declared an event of a default on the warehouse line around the same time); Ex. 20 [New Century Form 8-K/A, March 13, 2007] at 3, 6 (detailing various ways in which Morgan Stanley was extending funding, notwithstanding its default

notice). New Century was so dependent on Morgan Stanley's warehouse lines of credit and Morgan Stanley's consistent bulk purchases of loans that, when Morgan Stanley finally pulled the plug and ceased doing business with New Century, New Century's business failed and it was forced to declare bankruptcy. █████████ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ Ex. 21 at 6; *see also* Ex. 22 at 45:10-22; 70:11-71:2.

Because New Century was so dependent on Morgan Stanley, Morgan Stanley expected, and was given, special treatment relative to other Wall Street firms. For example, Morgan Stanley received opportunities to bid on pools of loans without competition. Ex. 23 at 66:23-69:19; Ex. 24 at 174:16-178:21; Ex. 25 ("We are getting an exclusive look at the [New Century] pool to take the loans off the table tomorrow before the bid is shown elsewhere."). Even in competitive situations, Morgan Stanley was sometimes awarded pools of loans by New Century where it was not the highest bidder. *See* Ex. 11 at 6 ("New Century has sold loans to Morgan Stanley even when we were not the higher bid[.] New Century has offered to sell loans to Morgan Stanley in non-competitive offerings[.] New Century has given Morgan Stanley the last look on many competitive offerings[.]").

These facts showing Morgan Stanley's influence and key role in shaping New Century's business are common to all class members.

**B.** **New Century Conformed Its Lending Practices to Morgan Stanley's Demands**

Morgan Stanley's policies and practices were translated directly by New Century into the Combined-Risk Loans that it issued to borrowers. New Century tailored its business to the demands of purchasers on Wall Street, among whom Morgan Stanley exercised principal

influence, *see* Section I.A, *supra*, ████████████████████████████████

████████████████████████ Ex. 28 [New Century Bankruptcy Examiner Interview of Bill

McKay] at 4-5 ████████████████████████████████████████████

     Morgan Stanley's policies and practices harmed Plaintiffs and the class members because

New Century's business model was built entirely to accommodate the demand of its Wall Street

purchasers, especially Morgan Stanley.  New Century originated loans for the purposes of selling

them for securitization; its ability to do business therefore depended entirely on liquidity it

received from the Wall Street banks, principally Morgan Stanley, in the form of loan sales and

warehouse lines of credit.  *See* McCoy Report at 22-26.  New Century made clear that the loan

products it specialized in were measured by a single criterion: fulfilling Wall Street demand.

*See, e.g.*, Ex. 4 at 46:25-47:18, 68:3-70:24; Ex. 22 at 93:4-23.[5]  As New Century's former Chief

Financial Officer, Patti Dodge, stated in a call to investors in 2006, the company's "lending

criteria [were] very much driven by the secondary market buyers of the loans, because our

financing outlet is a buyer wanting to buy those loans."  *See* McCoy Report at 23 (citing *New

Century Financial Corporation at Southern California Investor Conference – FINAL*, FD (FAIR

DISCLOSURE) WIRE, Aug. 11, 2006).  New Century nimbly adjusted its lending practices to meet

secondary market demand for specific loan features.  One New Century official stated to

investors in 2005 that "when we see a secondary market environment where a particular product

is selling stronger than it traditionally does then we can *immediately start to grow that

percentage of our volume* by changing the rates, and being more competitive on that product."

*Id.* (citing *Investor/Analyst Roundtable – Lunch Meeting – Final*, FAIR DISCLOSURE WIRE, Sept.

---

[5]  In addition to the cited depositions, Plaintiffs attempted to obtain the deposition testimony of Kevin Cloyd, who was the head of secondary markets at New Century, *see* Ex. 23 at 100:2-3, 113:2-4.  Mr. Cloyd, however, asserted his Fifth Amendment right in response to every single substantive question put to him, including whether he had ever been contacted by counsel for Defendants, whether he had ever been party to a lawsuit, or where he went to school.  *See, e.g.*, Ex. 27 at 15:8-13, 23:23-25, 38:12-21.

7, 2005) (emphasis added)).

New Century received regular feedback from Morgan Stanley and its investors regarding the loan products Morgan Stanley was interested in purchasing. Ex. 4 at 47:19-52:3; *see also* Ex. 26 (email chain describing an investor of Morgan Stanley securitizations visiting New Century and giving feedback on loan performance). ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████ Ex. 28 at 8.

This feedback, along with Morgan Stanley's influence over New Century, was the primary driver of New Century's specialization in Combined-Risk Loans during the class period. New Century's goal "would be to take that information . . . and try to tailor production to meet market demands." Ex. 4 at 52:1-3. ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ Ex. 28 at 11.
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████ Ex. 29 at 10. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ Ex. 30 at 9. ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex.

31 at 8.

      Its efforts to meet Wall Street demand led New Century to create new and risky loan

products. ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Ex. 28 at 11. ████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ Ex. 32 at 1.  Patricia Lindsay, former Vice President of Risk

Management, confirmed her former testimony given to the Federal Crisis Inquiry Commission

that, after Wall Street began buying loans, the "loan to values increased" and "[d]ifferent

programs came along that hadn't been offered before."  Ex. 22 at 75:20-78:13.  She went on to

explain that New Century began originating more loans with layered, high-risk features and that

New Century "had a system that went into a downward spiral because of layering risk rather than

offsetting risk because there was such a huge demand for the products."  *Id.* at 81:19-85:7. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ Ex.

29 [Lange Interview] at 13.

      Guided by the imperative to originate loans it could sell to Wall Street, with Morgan

Stanley as its primary relationship, *see*, *e.g.*, Ex. 7, New Century implemented these demands

through centralized and automated systems.  As Morgan Stanley was well aware, New Century

used "FastQual," an internet-based system to make loan decisions in 12 seconds or less.  *See* Ex.

33 [New Century ABS investor presentation] ("FastQual is NCEN's proprietary loan submission service. . . . Faste[st] automated underwriting system in the nonprime market[.] 12-second decision[.]  Broker can pre-qualify or obtain loan decision[.]").  Indeed, Morgan Stanley called FastQual a "key success factor" for New Century.  Ex. 11 [internal presentation] at 3.  Morgan Stanley was also aware that New Century went to great lengths to ensure that its affiliated brokers used this automated system, convening sessions of its "CloseMore University" workshops around the country.  *See* Ex. 33 at 18.

Thus, New Century operationalized Morgan Stanley's policies through centralized channels that directly impacted Plaintiffs and the members of the putative class.  Morgan Stanley communicated its demands to New Century's secondary marketing department while New Century tailored its loan products to meet Morgan Stanley's demand and then used centralized and automated procedures to circumscribe the loan products available to borrowers.

Morgan Stanley's objective in orchestrating New Century's origination of massive volumes of loans was to purchase those loans for immediate securitization and profit.  The New Century loans were sold in bulk pools of approximately $1 billion per month to Morgan Stanley.  Ex. 4 at 28:12-16; 31:11-15.  Morgan Stanley would then securitize these pools, typically within 90 days of delivery.  Expert Opinion of Geoffrey A. Oliver ("Oliver Report") at 14.  Morgan Stanley booked profits from the securitizations up front, on the date of the securitization.  Oliver Report at 5; *see also* McCoy Report at 18.  Plaintiffs' expert, Geoffrey A. Oliver, an accountant and consultant to the mortgage industry for over 38 years, has shown that Morgan Stanley's net revenues (revenues less direct expenses) from these securitizations can be calculated using a standardized formula for each securitization, as can Morgan Stanley's net revenues from other aspects of its business with New Century (*e.g.* warehouse funding of New Century loans).  *See*

*generally* Oliver Report.

Morgan Stanley's role in generating the risky loans given to class members, and the benefits it derived from demanding such loans, are common to all class members.

## II.   MORGAN STANLEY ENGAGED IN UNIFORM POLICIES AND PRACTICES THAT DROVE NEW CENTURY'S ORIGINATION OF COMBINED-RISK LOANS

Morgan Stanley employed three common sets of policies and practices that led to New Century's origination of Combined-Risk Loans: (1) providing the funding through warehouse lines of credit that enabled New Century to originate the Combined-Risk Loans; (2) requiring the loans that New Century originated for possible sale to have specific Combined-Risk Loan characteristics; and (3) purchasing through a bulk channel pools of loans that were given inadequate or *no* compliance review for immediate securitization.  Because these policies and practices are common, the case will hinge on common questions and classwide proof.

### A.   Morgan Stanley Provided the Funding That Enabled New Century to Originate Combined-Risk Loans.

Morgan Stanley was New Century's most important provider of warehouse credit, which equipped New Century with the funds to originate Combined-Risk Loans.  *See* Ex. 2 at MS00834840 (noting that Morgan Stanley has been New Century's "#1 warehouse lender").  From Morgan Stanley's perspective, the warehouse line existed to expand the number of New Century loans available for the trading desk to purchase and securitize.  Ex. 6 (email from Andrew Neuberger recommending approval of New Century's request for a new sublimit on warehouse line for delinquent New Century loans because, *inter alia*, "[the Securitized Products Group] will continue to be awarded by this client for being flexible and helping them during this turbulent time in the market"); Ex. 19 at 144:7-13 (Andrew Neuberger testifying that Morgan Stanley believed the warehouse line to be one of the factors New Century considered in deciding

whether to sell loans to Morgan Stanley); Ex. 23 at 294:23-295:17 (Steven Shapiro testifying that the warehouse line was helpful to Morgan Stanley in securing loans for purchase).  Morgan Stanley also "wet funded" New Century loans—*i.e.* provided the funds needed to "fund new production on the day of the origination"—despite the higher known risk of that process, because, among other things, "increased warehouse balances lead to increases in principal purchase opportunities."  Ex. 34 [SPG Warehouse Lending Group Manual] at MS01239815. Expanding the size of the warehouse line was considered to be "an important step in maintaining Morgan Stanley's dominant market share with the account."  Ex. 3 at MS00834909; McCoy Report at 22.  As a result, Morgan Stanley's warehouse line grew from $400 million in 2001 (Ex. 2 at MS00834839) to $3 billion in 2007 (Ex. 35 at MS01246883).

Morgan Stanley's warehouse practices facilitated the origination of Combined-Risk Loans.  Morgan Stanley shaped New Century's lending by determining what types of loans it would accept as collateral to secure the warehouse line.  *See* Ex. 19 at 144:22-145:2, 145:23-146:3 (Andrew Neuberger testifying that the trading desk was involved in determining what loans were acceptable as collateral); Ex. 36 at 192:20-193:5 (Deborah Goodman testifying that "it would not be unusual for myself or Andy to ask either . . . Steven Shapiro, or Frank Telesca to give us some guidance" on sublimits).  For example, when the warehouse group asked Steven Shapiro whether loans with forty-year terms, including those with adjustable rates, were "ok to put on the line," Shapiro responded in the affirmative, and noted that Morgan Stanley has been "pushing" originators toward 40/30 balloon loans over forty-year loans without balloons.  Ex. 37 [emails between Andrew Neuberger and Steven Shapiro].  Morgan Stanley also funded loans with up to 100% LTVs.  Ex. 38 [Repurchase Agreement] at MS00372763.  And, Morgan Stanley funded No Income No Asset ("NINA") loans.  Ex. 39 [Amendment to Repurchase Agreement re:

NINA loans]; *see also* Ex. 40 (email chain showing the trading desk was okay with funding NINA loans).

The potential for funding unduly risky loans was compounded by the minimal due diligence on loans on the warehouse line.  *See* Ex. 41 [SPG Warehouse Lending Group Manual] at 15 (showing 5% credit and compliance sample size for warehouse line); Ex. 42 (Andy Neuberger approving decreased 3.26% sample size).  At one point, Morgan Stanley's own assessment showed that, in a group of 792 New Century loans that had undergone due diligence review and remained on the warehouse line, 444 of them had credit or compliance issues.  Ex. 43 [New Century Credit/Compliance Summary Results] at MS01260579.

Morgan Stanley's policies and practices in warehouse funding New Century loans are common to all class members.

### B.      Morgan Stanley had a Uniform Policy and Practice of Dictating the Features of the New Century Loans it Purchased

Morgan Stanley's policies and practices directly shaped the characteristics of the loans ultimately received by New Century borrowers.  Between 90 and 100% of Morgan Stanley's whole loan purchases from New Century were the result of "forward sales," meaning that Morgan Stanley would set the purchase price and features for loans to be originated in the future. Ex. 4 at 23:13-27:9.  There were two types of forward sales: "open bids" and "reverse inquiries." *Id.* at 28:17-29:12.  In open bids, Morgan Stanley would bid on an "indicative" (*i.e.*, hypothetical) pool of loans.  *Id.* at 37:25-38:22, 43:17-44:4; Ex. 23 at 50:21-65:12; Ex. 24 at 71:20-72:4; Ex. 44 at 43:13-44:16.  In reverse inquiries, Morgan Stanley would call New Century "and say we have a demand for X-amount of product for this particular point in time, and here's what we would be willing to pay."  Ex. 4 at 29:6-12; *see also* Ex. 24 at 51:12-16; 58:3-9.  In either scenario, Morgan Stanley would memorialize the characteristics of the loans it

required New Century to deliver in the future in a "bid terms" agreement.  Ex. 45 at 35:19-36:2, 78:17-80:20, 104:14-22; Ex. 23 at 333:13-335:15; Ex. 14 at 72:11-15; Ex. 4 at 31:21-32:1.

Morgan Stanley's bid terms had a direct effect on the types of loans New Century would originate because, in these forward sale transactions, the bid terms were agreed upon a month or more in advance of the date when loans were to be delivered, meaning that loans often were originated *after* the bid terms were set.  Ex. 23 at 50:21-65:12.  Once the bid terms were agreed upon, New Century was contractually required to generate loans with the specified features.  *Id.* For example, the bid terms might specify that at least 75% of loans have prepayment penalties and that at least 85% of loans have adjustable rates.  *See, e.g.,* Ex. 46 [March 2006 Bid Terms]. The content of the bid terms remained largely constant over time.  *See* Hunter Decl. ¶¶ 20-21 (the average minimum percentage of ARM loans required was 76.37%, while the average minimum prepayment penalties required was 73.3%); *see also* Ex. 4 at 52:4-10; Ex. 44 at 55:2-61:22; 66:10-21.

Some features of the Combined-Risk Loans issued by New Century were a direct result of requirements imposed by Morgan Stanley in bid terms and forward trades.  This is true of features that directly created profit for Morgan Stanley, such as prepayment penalties, high interest rates and adjustable interest rates.  *See* McCoy Report at 31-33.  Morgan Stanley's bid terms required loan pools with the types of loans that Morgan Stanley could securitize and market to investors and that would generate cash flow to the "residual interest" that Morgan Stanley held on the securitizations.  Ex. 44 at 46:20-47:7; 48:3-12; 147:19-151:1.  Adjustable interest rate loans were desirable because they allowed investors to benefit from future increases in interest rates.  *Id.* at 48:13-49:10; 126:2-127:16; Ex. 23 at 79:22-80:22.  Morgan Stanley preferred loan pools with high percentages of prepayment penalties, because such penalties

deterred borrowers from refinancing in response to lower interest rates, ensured predictable prepayment speeds, and provided cash flows to the residuals Morgan Stanley retained.  Ex. 44 at 137:5-141:1; 147:19-151:1; Ex. 23 at 328:12-329:24; Ex. 24 at 229:8-17; Ex. 47 (Frank Telesca describing a pool with 80% pre-payment penalties as opposed to the 77% required by the bid terms as being "better").  A high "average coupon" rate—*i.e.* the combined average interest rates of the loans in a loan pool—generate higher interest payments that flow to both the investors and the residual interests Morgan Stanley held.  Ex. 44 at 121:21-124:2; 147:19-148:14; Ex. 23 at 75:12-77:6; Ex. 24 at 58:3-60:24; Ex. 48 (email from Vanessa Vanacker complaining that "[w]e never agreed to the same price for a much lower WAC [weighted average coupon].").

Plaintiffs' expert Patricia McCoy, the Connecticut Mutual Professor of Law and Director of the Insurance Law Center at the University of Connecticut School of Law and a specialist in financial services and banking regulation, explains that this business model "resulted in perverse financial incentives at Morgan Stanley, to the detriment of the named plaintiffs and the Class." McCoy Report at 19 (citations omitted).  These perverse incentives included maximizing the number of loans it could securitize and maximizing the cash flow to the securitizations through risky loan features.  *Id.*  Since Morgan Stanley booked profits upfront at the time of securitization, it ultimately did not care about the credit quality of the loans.  *Id.*

Morgan Stanley's policies and practices of dictating the features of the New Century loans it purchased prior to the loans' originations were common to all class members.

### C.    Morgan Stanley Maintained Uniform, Inadequate Due Diligence Policies that Led it to Purchase High Volumes of Combined-Risk Loans.

Morgan Stanley purchased high volumes of Combined-Risk Loans by using minimal due diligence procedures and by giving its trading desk authority to systematically overrule the minimal strictures imposed by those procedures.

During the class period, Morgan Stanley was on notice that the loans it purchased from New Century had exceedingly high default rates. *See* McCoy Report at 37-42; *see also* Ex. 49 (email from Robert Travis to Steven Shapiro reporting several risk factors and concluding "there is not a lot of 'common sense' being used when approving these loans"); Ex. 50 (internal message exchange describing New Century foreclosure rates as "off the charts bad"); Ex. 51 (email discussing unreliable Detroit appraisal and noting "ncen is writing more crap"). Accordingly, had Morgan Stanley wanted to avoid purchasing Combined-Risk Loans, it would have ramped up its due diligence procedures. *See* McCoy Report at 42. Instead, it did the opposite. Indeed, even to the extent that its inadequate review flagged the flagrant problems with the New Century loans – due diligence personnel referred to "uncured violations . . . exposing us to class action litigation" (Ex. 52), "bad loans" (Ex. 53), and "scaaaarrrryyyyy loans" (Ex. 54) – no safeguards were added. If anything, Morgan Stanley relaxed compliance requirements to increase "pull-through rate" (the number of loans purchased). *See* Ex. 14 at 266:12-267:8, 277:9-278:14*;* Ex. 55 (email regarding speaking with New Century "on the best process to maximize the pull-through despite the [] problem tape deliveries this month.").[6]

Morgan Stanley maintained due diligence procedures that were facially inadequate, leading directly to the rampant and predictable purchase of Combined-Risk Loans. While Morgan Stanley examined each and every loan it bought through prime channels using its own underwriting, Morgan Stanley had no underwriting procedures for its subprime loans, which it purchased in bulk with minimal review and with particularly scant review for New Century. Ex. 14 at 167:11-168:8. Instead of comprehensively reviewing the loans, Morgan Stanley sampled the subprime loans for so-called credit and compliance suitability based on random and

---

[6] For example, in 2006, the due diligence grading system was changed to add additional grades, effectively allowing loans that previously would have been deemed ineligible for purchase to instead be made eligible. Ex. 14 at 190:4-9, 208:22-25. Morgan Stanley had the ability to change the grades, without limitation. *Id.* at 208:4-212:3.

adverse sampling, but even this process had a number of flaws. Indeed, at the beginning of the class period, Morgan Stanley significantly reduced the sample size for review of New Century loans, from 30-35% down to 25%, and the sample remained near 25% throughout the class period. *See, e.g.*, Ex. 56 at 130:17-131:20; Ex. 57 [interoffice memorandum] at 1. Counterintuitively, compliance due diligence personnel did not select the sample – this process was controlled by the business side, that is, by the trading desk and contract finance group. *See* Ex. 14 at 246:5-250:14; Ex. 59 [Due Diligence Procedures] at MS01257501 ("Due diligence samples are selected by Collateral Analysis based on proprietary modeling criteria. Diligence managers participate in periodic discussion with the Trade Desk, Transaction Management and Collateral Analysis regarding product, seller and market risk issues related to sampling."). Moreover, Morgan Stanley witnesses have acknowledged that, at times, the due diligence group might *actually look at fewer loans than called for by the adverse sample*. *See* Ex. 56 at 233:6-234:24. In sum, Morgan Stanley's sampling methodology meant that most loans were not reviewed, and even when the sample revealed significant problems, sampling policies and procedures remained unchanged.

Further, Morgan Stanley relied on appraisal review procedures that it knew to be faulty, which led directly to widespread purchases of loans with excessive loan-to-value ratios. Specifically, inflated appraisals understate the LTV ratio of a loan because they *overstate* the denominator in that ratio (the value of the property). During the class period, Morgan Stanley used a system called Hansen PRO to review the appraisals of loans it considered for purchase from New Century. *See* Ex. 13 at 41:9-11. The head of the valuation diligence department acknowledged as early as 2004 that "[t]he quality of the [Hansen] PRO product has been deteriorating and not evolving, resulting in many property/value issues and many false positives

identified."  *See* Ex. 58 at Slide 1; Ex. 13 at 193:7-194:16.  Another presentation overseen by the head of valuation diligence advocated for Morgan Stanley to "eliminate dependence on Hansen review process as to insure [sic] quality of loans purchased across business lines" in an effort to "mitigate collateral risk as it relates to potential future fraud and default."  Ex. 60 at slides 3-4. Thus, throughout the relevant time period, Morgan Stanley relied on a system for controlling the LTVs of loans it purchased that its own people described as faulty in many key respects.[7] Moreover, the chances of excessive LTV ratios being masked by inaccurate appraisals are heightened when there is fraud in the appraisal process.  Yet, during this time period, Morgan Stanley maintained no procedures specifically geared toward the detection of fraud in the appraisal process.  Ex. 13 at 462:2-10.

Although there were ostensibly specialized due diligence staff with responsibility for filtering loans with the riskiest features (*see* Ex. 13 at 25:7-26:15), Morgan Stanley empowered its trading desk and contract finance group to wield final authority on the policies governing due diligence.  *See* Ex. 13 at 312:14-24 (testifying as 30(b)(6) witness that trading desk personnel had final authority on valuation diligence procedures).  In a telling email exchange in March 2006, two senior due diligence employees discuss a decision regarding acceptable DTI limits that was "over ruled" [sic] by the contract finance department.  *See* Ex. 61 at MS01255919; Ex. 23 at 254:6-257:18.  In that same exchange, Pamela Barrow, the head of due diligence, refers to Steven Shapiro as "the boss."  Ex. 61 at MS01255918.

The trading desk systematically superseded due diligence decisions in order to facilitate Morgan Stanley's continued purchase of high volumes of New Century loans.  *See* Ex. 62 (Shapiro overriding plan for diligence to increase sample for new interest-only loan product);

---

[7] Although Morgan Stanley's valuation diligence department purportedly designed an alternative process to replace the faulty Hansen system, Morgan Stanley never put that alternative system into effect.  *See* Ex. 13 at 218:23-25.

Shapiro Ex. 23 at 223:4-225:6 (Shapiro acknowledging having no knowledge of risk characteristics of the interest-only loan product at issue); *id.* at 207:14-208:14 (Shapiro testifying to having no expertise in due diligence issues).  Even as the members of the trading desk and the contract finance group received increasingly serious indications that Morgan Stanley was purchasing New Century loans with characteristics that carried excessive risk of foreclosure, Morgan Stanley took no corrective action.  In January 2007, Steven Shapiro emailed his contacts at New Century seeking an explanation about spiking foreclosure rates in New Century loan pools.  Ex. 63.  In response, one of the top figures in New Century's capital markets division replied facetiously, "You mean besides borrowers who apparently don't have the money to make their mortgage payments?"  *Id.*  Mr. Shapiro's entire response was:  "I did not think you lent to people that did not have money to make their payments.  Hey I need a total headcount for dinner on Monday.  Let me know."  *Id.*

By way of further illustration of the known, systematic problems of the loans Morgan Stanley purchased, Morgan Stanley summarily terminated an employee's role in conducting due diligence when that employee presented the trading desk with evidence of widespread problems involving Combined-Risk Loan terms.  On November 1, 2006, a contract employee named Bernard Zahn sent an email to the trading desk presenting an analysis that showed a pattern of potentially fraudulent appraisals combined with potentially excessive DTI ratios and other risky features.  Ex. 64.  He forwarded that email to Pamela Barrow, who oversaw the diligence teams.  *Id.*  Less than an hour later, Ms. Barrow responded:

> Thank you so much for your help and willingness to think outside of the box and dive deeper - this is awesome!! You did a good job on the risk review and we all appreciate it very much - good find on the fraud :)

> Unfortunately, I don't think we will be able to utilize you or any
> other third party individual in the valuation department any longer
> due to some changes that Rudner wants to make.

*Id.* Although Ms. Barrow's email terminating Mr. Zahn from the Valuation Due Diligence group stated that she could not "utilize third parties or individuals for loan-level valuation review" other than certain vendors (*id.*), Morgan Stanley's 30(b)(6) witness acknowledged that Morgan Stanley did in fact maintain other third party valuation diligence reviewers in that role (Ex. 13 at 417:23-419:17).

Mr. Zahn thereafter attempted again to raise systematic flaws leading to large scale purchasing of loans with Combined-Risk features, including excessive LTV ratios. He sent several analyses to his supervisor in the Collateral Analytics group (where his duties had not been terminated), Kris Gilly, noting, "Here's the files I've put together showing the loans approved by the valuation team the last year with excessive MS LTV's (>100), excessive MS Variances, and a file I call problems short list . . . ." Ex. 65. He called the files "sloppy," and noted that they were missing crucial data. *Id.* Mr. Zahn went on to conclude, "[t]his should give [Steven Shapiro] an idea how regular this type of practice is. It isn't 'just a couple of typos' or 'mistakes' as it was suggested. The more we dig, the more we find. This is SOP [Standard Operating Procedure]." *Id.* At his deposition in 2014, Mr. Shapiro testified to having no recollection as to whether any actions were taken by him or anyone else in response to Mr. Zahn's concerns. Ex. 23 at 275:14-277:6.

Morgan Stanley's policies and practices of conducting only lax due diligence and allowing even that screening to be overruled by the trading desk in order to increase pull-through volume are common to class members, and led directly to increased purchase of Combined-Risk Loans. By circumventing due diligence standards, Morgan Stanley systematically ratcheted up its ability to purchase loans with high LTV or DTI ratios, as well as loans with other high-risk

features like stated income requirements or interest-only features.  *See* McCoy Report at 49-53.

III.   **THE COMBINED-RISK LOANS ISSUED AS A RESULT OF MORGAN STANLEY'S POLICIES ARE PREDATORY**

The Combined-Risk Loans at issue here placed borrowers at heightened risk of default and foreclosure.  Each feature of a Combined-Risk Loan has been shown individually to correlate with a higher risk of default.  *See* McCoy Report at 7-13.  When these risk factors are combined, such risk layering "boosted the already high risk of default even higher than the sum of its parts."  *Id*. at 14.  Accordingly, Plaintiffs' expert, Prof. McCoy, concluded that "Plaintiffs' definition of combined-risk loans is a useful and accurate proxy for the type of layered-risk loans associated with high rates of default and foreclosure."  *Id*. at 16.

IV.   **MORGAN STANLEY'S POLICIES AND PRACTICES HAD A DISPARATE IMPACT ON AFRICAN-AMERICAN BORROWERS**

Plaintiffs' expert, Dr. Ian Ayres, the William K. Townsend Professor at Yale Law School and a Professor at Yale's School of Management, found that Morgan Stanley's policies caused African-American borrowers to be more likely than whites to receive Combined-Risk Loans sold by New Century.  *See generally* Class Certification Report of Ian Ayres ("Ayres Report").  This was true whether the analysis looked, during the class period, at all New Century loans nationwide (1.231 odds ratio[8]), loans in the Detroit area (1.347 odds ratio), nationwide loans that Morgan Stanley purchased (though Morgan Stanley was responsible for all the New Century loans) (1.148 odds ratio), or Detroit loans that Morgan Stanley purchased (1.362 odds ratio).  All of these findings were "statistically significant at the 99% confidence level."  *See id.*, Table 1, ¶¶ 12, 14.  This means that, across the class period, the differences exceed the threshold of 1.96 standard deviations that courts routinely accept as probative evidence of discrimination.

---

[8] Put another way, the odds that an African-American borrower would receive a Combined-Risk Loan from New Century was 1.231 times greater than that of a similarly situated non-Hispanic white borrower nationwide.

Morgan Stanley's policies posed a distinct threat to the class members in light of the history and continued impact of racial segregation and redlining in the Detroit region. Against that backdrop, lending focused on Combined-Risk Loans led directly to racial disparities in the allocation of predatory loans. During the class period, Detroit remained starkly segregated; by one measure, Detroit's level of segregation during this time was similar to that in Johannesburg, South Africa under apartheid. Expert Report of Thomas J. Sugrue at 39 n.52 (quoting John Logan, "Interpreting a Data Set," *American Communities Project*, Spatial Structures in the Social Sciences, Brown University, http://www.s4.brown.edu/us2010/Data/Explanation.htm). This residential segregation was the direct result of a "web" of discriminatory practices, *id.* at 8, among them explicit discrimination by real estate brokers, *id.* at 23-25, violence against African Americans who moved to white neighborhoods, *id.* at 25-27, and formal redlining by the federal government of neighborhoods where any African Americans resided, *id.* at 15-21. For decades, redlining prevented African Americans from receiving mortgages, depressing rates of African-American homeownership, *id.* at 41-42, impeding wealth accumulation in African-American households, *id.* at 42-43 and creating widespread disinvestment in African-American neighborhoods, *id.* at 43-45. All of this set the stage for the discriminatory impact that harmed Plaintiffs and the proposed class. By 2004, a mortgage originator seeking to issue large volumes of loans with risky features for eventual sale on the secondary market in Detroit would inevitably look to African-American communities hungry for credit. *See id.* at 47.

## V.     <u>MORGAN STANLEY TOOK NO STEPS TO AVOID ADVERSE RACIAL IMPACT</u>

While this is not an intentional discrimination case, it is troubling and telling that Morgan Stanley had no adequate policies or practices to safeguard against discrimination in this context. When asked who was responsible for ensuring compliance over the relevant portion of the FHA,

Morgan Stanley's designee replied that he was "not sure if it was with any one individual or group" (Ex. 14 at 105:23-106:5), and that he did not "know whether or not anybody was looking at" FHA compliance in the sale or securitization of loans (*id.* at 107:6-24). He also stated he did not have knowledge of whether or not anybody at Morgan Stanley was paying attention to the impact of the securitization practices on minority borrowers, that he was unaware of whether Morgan Stanley did any adverse impact analysis of its practices on protected groups, and that he did not know if Morgan Stanley made any attempt to comply with the portion of the FHA that govern the securitization of loans. *Id.* at 108:16-109:21. In other words, "Morgan Stanley was barely cognizant of its fair lending compliance obligations and therefore made no attempt to test for adverse disparate impact and virtually no attempt to comply with state and federal fair lending laws." McCoy Report at 53.

Further, while Morgan Stanley purported to require its subprime lenders such as New Century to attest annually to fair lending compliance, Morgan Stanley apparently made no such requirement of New Century; the company is unable to either locate the original corporate diligence on New Century that related to fair lending or any annual follow-ups. *Id.* at 114:5-17 (discussing annual questionnaires that sellers were required to fill out); *see also* Ex. 67 [corporate review questionnaire for Finance America, LLC].

## ARGUMENT

## I.     STANDARD FOR CLASS CERTIFICATION

Plaintiffs seek to certify a class consisting of all African-American individuals in the nine counties composing the Detroit Consolidated Metropolitan Statistical Area[9] who received Combined-Risk Loans between 2004 and 2007. Rule 23 of the Federal Rules of Civil Procedure

---

[9] The nine counties are Genesee, Lapeer, Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne. For convenience, Plaintiffs use the term "Detroit Region" to refer to these counties.

permits a case to be maintained as a class action if the prerequisites of Rule 23(a) are satisfied and if the class meets the requirements of any of the three subsections of Rule 23(b).

A court's class certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  However, the Court's task at the Rule 23 stage is "not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). (internal brackets and quotation marks omitted).

The Second Circuit has confirmed that inquiry into the merits at class certification is only necessary in order to determine whether resolution of each legal or factual question "can be achieved through generalized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citing *Amgen*, 133 S. Ct. at 1196); *see also Goodman v. Genworth Fin. Wealth Mgmt.*, No. 09-CV-5603 (JFB) (GRB), 2014 U.S. Dist. LEXIS 52087, at *32 (E.D.N.Y. Apr. 15, 2014) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.") (citing *Amgen*, 133 S. Ct. at 1194-95).

Other Circuit Courts have affirmed that class certification is not a vehicle for adjudicating the merits.  The Ninth Circuit recently applied the standards enunciated in *Amgen* to a disparate impact class action by reversing the district court's denial of class certification.  *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107 (9th Cir. 2014).  The Ninth Circuit, citing *Amgen*, found that the defendant's challenges to the plaintiffs' statistical methodology to be an improper merits inquiry, noting that "demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies." *Id.* at 1112.  Instead, it was sufficient that the plaintiffs produced a statistical study "purportedly showing a disparate impact," and since

any challenge to the methodology would "affect every class member's claims uniformly," such battles "strengthened, not weakened, the case for certification."  *Id*. at 1115-16.

Disparate impact cases in both the employment and housing context have been found to be well-suited to class treatment where, as here, the plaintiffs challenge uniform policies and practices.  *See e.g. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012) *cert. denied,* 133 S. Ct. 338 (2012); *Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 643 (N.D. Cal. 2010); *Matyasovszky v. Hous. Auth. of Bridgeport*, 226 F.R.D. 35, 41 (D. Conn. 2005).

## II.   THE PROPOSED CLASS SATISFIES THE CONDITIONS OF RULE 23(a)

The four threshold requirements of Rule 23(a) are: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation. Fed.R.Civ.P. 23(a).  The proposed class satisfies all four conditions.

### A.   The Class Is So Numerous that Joinder Is Impracticable

Numerosity exists if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  In the Second Circuit, a proposed class of more than 40 members presumptively satisfies the numerosity requirement.  *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995).  In this case, records produced by Morgan Stanley and by the Bankruptcy Trustee for New Century indicate that there are approximately 4,633 class members.  Ayres Report, Table 9.  Joinder of thousands of individuals is clearly impracticable, if not impossible.

### B.   The Factual and Legal Elements of Class Members' Claims Are Capable of Common Resolution

The commonality requirement is satisfied if "plaintiffs' grievances share a common question of law or fact." *Marisol A. ex rel. Forbes v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997).

A common question is one in which "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (citation omitted).  However, while Rule 23 requires a showing of common questions, it does *not* require a showing "that those questions will be answered, on the merits, in favor of the class."  *Amgen* 133 S. Ct. at 1191.   Actually *answering* common questions is reserved for the merits stage.  *Id*.

        Since *Wal-Mart*, district courts in the Second Circuit have found commonality satisfied where discrimination claims derive from uniform and centrally determined policies and practices.  *See Floyd v. City of N.Y.*, 283 F.R.D. 153, 173-74 (S.D.N.Y. 2012); *United States v. City of N.Y.*, 276 F.R.D. 22, 35 (E.D.N.Y. 2011); *Easterling v. State Dep't of Corr.*, 278 F.R.D. 41, 47 (D. Conn. 2011); *see also McReynolds*, 672 F.3d at 489-90.  Plaintiffs here challenge three uniform policies and practices emanating from Morgan Stanley that are common to Plaintiffs and all class members: (1) providing the funding (through warehouse lines of credit) that enabled New Century to originate the Combined-Risk Loans; (2) requiring the loans that New Century originated for possible sale to have specific Combined-Risk Loan characteristics; and (3) purchasing through a bulk channel pools of loans that were given inadequate or, in most cases, *no* compliance review for purposes of immediate securitization.

### 1.      <u>Common Factual Questions</u>

        In order to decide the merits of Plaintiffs' claims, this Court will have to resolve numerous common factual questions regarding the impact of Morgan Stanley's policies and practices on New Century borrowers, including the extent to which the magnitude of Morgan Stanley's relationship with New Century (through loan purchases and warehouse lending) shaped New Century's overall origination practices; whether Morgan Stanley's bid term sheets led New Century to originate loans with certain risky characteristics, such as high interest rates,

adjustable rates, and prepayment penalties; and whether Morgan Stanley's deficient due diligence increased New Century's incentives to originate loans with certain characteristics, such as excessive loan-to-value or debt-to-income ratios.  Similarly, common statistical evidence, through the Ayres Report, will show that the challenged policies and practices in fact resulted in a disparity between African Americans and White borrowers in their likelihood of receiving Combined-Risk Loans.  This statistical showing governs all class members' claims and establishes commonality for disparate impact claims.  *See, e.g.*, *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 160 (2d Cir. 2001). A determination of liability here will *not* entail examination of individual lending decisions.

### 2.   Common Legal Questions

The elements of a plaintiff's cause of action constitute common questions.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  Plaintiffs contend that Morgan Stanley's policies and practices violated the FHA, which prohibits discrimination in "real-estate related transactions" including the "purchasing" of home mortgage loans.  42 U.S.C. § 3605(a)-(b).  The text of § 3605 plainly prohibits discrimination by entities purchasing loans in the secondary mortgage market.  Its implementing regulations amplify this interpretation.  24 C.F.R. § 100.125(b) ("unlawful conduct under this section includes, *but is not limited to* . . . [p]ooling or packaging loans or other debts or securities which relate to, or which are secured by, dwellings differently because of race" (emphasis added)).  The provision's legislative history also states that, when the FHA was amended in 1988, "the provisions of the Act [were] extend[ed] to the secondary mortgage market."  H.R. Rep. No. 711, 100th Cong., 2d Session 1988, at 30, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2191.  In other words, § 3605's prohibition on discrimination applies directly to Morgan Stanley's conduct in purchasing loans for mortgage-backed securities.

Applying well-established FHA principles, Plaintiffs here proceed on a disparate impact

theory.  *See Hack v. President of Yale College*, 237 F.3d 81, 88 (2d Cir. 2000); *see also 2922 Sherman Ave. Tenants' Ass'n. v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) ("[E]very one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination, but also actions having a disparate impact.").  When litigating the merits of the prima facie claim of disparate impact discrimination, Plaintiffs will have to demonstrate "that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation."  *See* Order on Mot. to Dismiss, Dkt. No. 47, at 11 (citing *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington,* 316 F.3d 357, 366 (2d Cir. 2003)); *see also Rodriguez v. Bear Stearns Cos.*, No. 07-cv-1816 (JCH), 2009 U.S. Dist. LEXIS 31525, at *20-21 (D. Conn. Apr. 14, 2009) (plaintiffs stated a disparate impact claim under the FHA by alleging that subprime mortgage securitizer's servicing practices disproportionately harmed minority homeowners).  The regulations promulgated by the Department of Housing and Urban Development to implement the FHA's disparate impact standard require essentially the same showing.  *See* 24 C.F.R. § 100.500.  Once a plaintiff makes out a prima facie case, "a defendant must present bona fide and legitimate justifications for its action," *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988), *aff'd sub nom. Town of Huntington v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988); but, if it does so, a plaintiff may still prevail if there is an alternative policy that would serve the interest with less discriminatory effect, 24 C.F.R. § 100.500.  Thus, the relevant legal determinations on the merits of Plaintiffs' claims will turn entirely on common questions: whether Morgan Stanley's facially neutral policies had a discriminatory effect; whether Morgan Stanley had bona fide and legitimate justifications; and, if so, whether it had less discriminatory means available to achieve

that goal.

In addition to the common questions that will define adjudication of the merits, determination of the proper remedy will depend on common factual and legal questions. Plaintiffs seek disgorgement of the revenues Morgan Stanley derived from its discriminatory policies.[10]  Disgorgement, unlike damages or restitution, does not compensate victims for their harm, but is instead an equitable method of forcing a defendant to surrender the ill-gotten gains by which he was unjustly enriched.  *SEC v. Fischbach Corp.*, 133 F.3d 170, 175-176 (2d Cir. 1997).  Like injunctive and declaratory relief, disgorgement is defendant-oriented and intended to deter wrongful conduct.  *See SEC v. Cavanagh*, 445 F.3d 105, 117 n.26 (2d Cir. 2006) (disgorgement forces defendants to "surrender profits irrespective of plaintiffs' actual losses"). Disgorgement serves the purpose of "depriving the wrongdoer of his ill-gotten gains and deterring violations of law." *Commodity Futures Trading Comm'n v. British Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir. 1986) (Friendly, J.).

The amount of net revenues Morgan Stanley realized, including gains from purchasing and securitizing New Century loans, selling the servicing rights of New Century loans, providing warehouse financing to New Century, and other gains such as interest earned from the New Century loans, can be calculated by using a standardized formula.  Oliver Report at 17, 20.  This formula can be applied to all 65 Morgan Stanley securitizations containing New Century loans, without alteration.  *Id.* at 4, 20.  It can also be applied to gains realized from warehouse financing

---

[10] Disgorgement is an appropriate remedy available under the FHA.  *See, e.g.*, *Steele v. GE Money Bank*, No. 08 C 1880, 2009 U.S. Dist. LEXIS 11536, at *30 (N.D. Ill. Feb. 17, 2009) ("The ECOA and the FHA . . . sanction the pursuit of both legal and equitable remedies, and do not contain any language limiting the types of equitable remedies that are available."); *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 455 (E.D.N.Y. 1995) (Defendants were unjustly enriched by participating in a mortgage subsidy program when their selection for the program violated the Fair Housing Act); *Zuch v. Hussey*, 394 F. Supp. 1028, 1055 n.13 (E.D. Mich. 1975) *aff'd* 547 F.2d 1168 (6th Cir. 1977) ("Proof of actual profits obtained from sales which are found to be in violation of the Fair Housing Act may, as an appropriate remedy, result in a court order to the defendants that they disgorge such profits.").

of New Century loans that were not ultimately purchased and securitized by Morgan Stanley, as well as gains derived from Morgan Stanley's underwriting of New Century's own securitizations of its loans. *Id.* The appropriate amount of disgorgement to apportion to class members can be calculated at a loan level based either on the gain Morgan Stanley realized per dollar of the unpaid principle balance of the loans, or by calculating the percentage of the loans in each securitization attributable to the class. *Id.* at 18-20. Because disgorgement may be calculated using a mechanical formula based on Morgan Stanley's records of its gains, certifying a class under Rule 23(b)(3) is appropriate. *See, e.g.*, *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 286 (D. Conn. 2013) (certifying class seeking disgorgement where disgorgement could be determined with "a mechanical calculation using readily available data").

### C. Plaintiffs' Claims Are Typical of Class Members' Claims

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To establish typicality, Plaintiffs must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted). "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the class representatives and the class members. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Plaintiffs' claims are typical of the class. Each Plaintiff is a resident of the Detroit region. Each Plaintiff received a loan from New Century during the class period. Ex. 68 [Adkins Mortgage, Apr. 28, 2004]; Ex. 69 [Williams 2005 Mortgage, Apr. 22, 2005]; Ex. 70 [Pettway Mortgage, May 13, 2004]; Ex. 71 [McCoy Mortgage, July 31, 2006]; Ex. 72 [Young Mortgage, Nov. 3, 2005]. Each of those loans was a Combined-Risk Loan as defined in the

Complaint.  Ms. Adkins, Ms. Pettway, Ms. McCoy and Mr. Young all received high-cost New

Century loans with a prepayment penalty and an adjustable rate.  *See* Ex. 68 at P000002; Ex. 70

at P000240; Ex. 71 at P000272; Ex. 72 at P000381.  Ms. Williams received two loans from New

Century.  Ex. 73 [Williams 2003 Mortgage, May 9, 2003]; Ex. 69 [Williams 2005 Mortgage].

The first one, issued prior to the class period, was refinanced by the second, which was

originated during the class period.  Both loans were high-cost, with adjustable rates and

prepayment penalties.  *See* Ex. 73 at P000193; Ex. 69 at P000152.  Ms. Adkins, Ms. Williams,

and Mr. Young each also received high-cost New Century loans with loan-to-value ratios of

90%.[11]  Each Plaintiff challenges the same Morgan Stanley policy that caused New Century to

market huge numbers of these toxic Combined-Risk Loans in the Detroit region and to issue

them disproportionately to African-American borrowers.

###  D.   Plaintiffs and Their Attorneys Will Adequately Represent the Interests of the Class

Rule 23(a) requires parties seeking class certification to establish that "the representative

parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see*

also Fed. R. Civ. P. 23(g) (adequacy of counsel).  The adequacy analysis is twofold.  The first

inquiry is whether the class representatives are sufficiently involved and whether they have

interests antagonistic to the interest of the other class members.  The second inquiry is whether

plaintiffs' attorneys are qualified, experienced and able to conduct the litigation.  *Flag Telecom

Holdings*, 574 F.3d at 35.  Both conditions are satisfied here.

A conflict or potential conflict must be "fundamental" in order to defeat class

---

[11] *Compare* Ex. 68 [Adkins Mortgage] at P000002 (reflecting loan amount of $104,400.00) *with* Ex. 79 [Adkins Appraisal] at NC_Adkins_MS 0000591 (reflecting $116,000 appraised value of home as of April 14, 2004); *compare* Ex. 69 [Williams 2005 Mortgage] at P000152 (reflecting loan amount of $99,900.00) *with* Ex. 80 [Williams Appraisal] at P000144 (reflecting $111,000.00 appraised value of home as of April 1, 2005); *compare* Ex. 72 [Young Mortgage] at P000381 (reflecting loan amount of $99,000.00) *with* Ex. 81 [Young Appraisal] at NC_Adkins_MS 0003942 (reflecting $110,000 appraised value of home as of September 29, 2005).

certification.  *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir. 2001).

Here, none of the Named Plaintiffs have any conflict of interest with the members of the class.

Plaintiffs and class members were subjected to the same discriminatory policies and harmed in

the same way.  They share a common interest in holding Morgan Stanley accountable for the

discriminatory effect of its practices.[12]

       The Named Plaintiffs far exceed the standard of involvement and knowledge required for

class representatives.  Each Plaintiff has demonstrated understanding of the claims in the case

and of his or her responsibilities to the other class members.  *See, e.g.*, Ex. 74 [Adkins Depo.] at

101:3-13 ("My understanding of the lawsuit is that New Century issued loans to people, African-

American people in the City of Detroit who truly did not have the ability to maintain and pay,

and that it was geared to certain areas and certain people, and that Morgan Stanley was backing

New Century and these loans. . . . That while New Century would issue the loan, the money was

coming from Morgan Stanley to New Century."); *id.* at 113:17-114:1 ("I represent the people

who cannot fit into the courtroom. . . . My responsibility is to supply the documentation that I

have related to my particular case, and to confer with my attorneys and to do the things that are

necessary to pursue – proceed with this lawsuit."); Ex. 75 [Pettway Depo.] at 145-162; Ex. 76

[McCoy Depo.] at 167:19-169:25, 175:14-17, 176:3-5; Ex. 77 [Williams Depo.] at 223:12-17,

231:19-21, 236:4-14; Ex. 78 [Young Depo.] at 35:14-18 ("I'm one of the people that's going to

speak . . . for the other six thousand people . . . . I'm one of the people that's trying to speak up,

you know, and represent everybody else."), 39:7-40:1.

---

[12] The only difference between Named Plaintiffs and the other class members is that Named Plaintiffs seek individual damages in addition to the remedy of disgorgement.  This factor does not defeat typicality (or create a conflict for purposes of adequacy) as long as Plaintiffs' remedy will not result in a reduced recovery for the passive class members.  *Brame v. Ray Bills Fin. Corp.*, 85 F.R.D. 568, 584 (N.D.N.Y. 1979); *see also Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) ("Typicality is satisfied despite differences in damages arising from a disparity in injuries among the class members.")

Each Named Plaintiff has also shown admirable willingness to do whatever is necessary to vigorously pursue the claims of the class.  This includes keeping in regular contact with counsel, conducting repeated searches for responsive documents, and willingly undergoing lengthy depositions touching on painful and highly personal subjects (including serious illness, the deaths of spouses or children, and in one case, criminal history).

As to the adequacy of class counsel, Counsel have substantial experience in successfully prosecuting complex class actions.  *See* Declaration of Dennis D. Parker in Support of Plaintiffs' Motion for Class Certification; Declaration of Stuart T. Rossman in Support of Plaintiffs' Motion for Class Certification; Declaration of Rachel Geman in Support of Plaintiffs' Motion for Class Certification.

## III.    THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(3)

The court may certify a class under Rule 23(b)(3) if it finds that: (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3) .  Plaintiffs satisfy both the "predominance" and "superiority" requirements.

### A.    Common Questions of Law and Fact Predominate Over Individual Questions

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997). Predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Amgen*, 133 S. Ct. at 1196 (emphasis in original) (citation omitted) (internal quotation marks and brackets omitted).

The common questions of fact and law that must be decided in order for this case to proceed are discussed at length in Argument Section II.B, *supra*.  Factual questions relating to

Morgan Stanley's unique leverage over New Century's lending practices, the nature and volume of the business between the two companies, and Morgan Stanley's policies and practices with regard to warehouse lines of credit, bidding, due diligence and bulk loan purchasing will be answered in common for the class as a whole.  Crucially, questions related to assessing the disparate impact of Combined-Risk Loans will be common, because they must be determined on a classwide basis with common proof of statistics, expert reports, internal documents and data, and deposition testimony.  *See, e.g.*, *Easterling*, 278 F.R.D. at 48-50; *see also Ramirez*, 268 F.R.D. at 641 ("The relevant evidence, as with most disparate impact cases, will focus on 'statistical disparities, rather than specific incidents, and on competing explanations for those disparities.'" (quoting *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 987 (1988))).

Morgan Stanley's defenses and challenges to Plaintiffs' claims will also rest on common legal and factual determinations, including whether Morgan Stanley's policies were necessary to carry out a substantial, legitimate, nondiscriminatory interest, and if so, whether a less discriminatory alternative policy exists.  Few, if any, individualized determinations are necessary.  Class membership can be determined based on examination of records maintained by Morgan Stanley and the New Century bankruptcy trust.  Because the relief sought is disgorgement of Morgan Stanley's wrongfully obtained profit, individual damages determinations will not be required.  It is possible that Morgan Stanley will assert defenses as to particular individuals, but it is well-settled law that the presence of affirmative defenses does not defeat predominance where the defenses themselves present common issues of fact or law.  *See, e.g., Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 45-46 (E.D.N.Y. 2008)*; In re Cablevision Consumer Litig.,* No. 10-CV-4992 (JS) (AKT)*,* 2014 U.S. Dist. LEXIS 44983, at

*34-35 (E.D.N.Y. Mar. 31, 2014).[13]

**B.      A Class Action is Superior to Other Methods of Adjudicating the Controversy**

Rule 23(b)(3) also requires the Court to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) . Rule 23 outlines four factors pertinent to the superiority requirement: (1) class members' interests in individually controlling separate actions; (2) the extent and nature of any related litigation already brought by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). These factors weigh in favor of certifying the proposed class.

Putative class members generally lack the awareness of relevant facts about Morgan Stanley, or sufficient resources, to pursue separate actions. Plaintiffs first learned about their claims when they spoke with their attorneys; most class members are likely *still* unaware that they have any potential claim against Morgan Stanley. Furthermore, disparate impact claims by necessity hinge on statistical and expert evidence that are cost prohibitive in the context of an individual case. Not surprisingly, given the barriers to individual actions, Plaintiffs are not aware of any related litigation already brought by class members.

Concentrating the litigation in this forum is desirable for a number of reasons. Morgan Stanley's principal place of business is in New York, Morgan Stanley's discriminatory policy

---

[13] Defendants stated at a recent status conference that they believe threshold legal rulings made by Judge Baer at the motion to dismiss stage were "incorrect," urging the Court to "revisit" them. June 19, 2014 Status Conf. Tr., Dkt. No. 121, at 34. Plaintiffs disagree with the notion that those rulings, which make up the law of the case, should be revisited. We note, however, that in taking the contrary position, Defendants are inviting the Court to "revisit" several legal questions that apply commonly to the proposed class. *See generally* July 25, 2013 Opinion and Order, Dkt. No. 47. Defendants' apparent intent to re-litigate those common legal issues should be factored into the predominance calculus.

emanated from decision makers in New York, and many of the essential witnesses in the case are still located here.  Furthermore, as a result of its proximity to Wall Street, the U.S. District Court of the Southern District of New York already has considerable expertise in cases involving complex financial instruments including mortgage securities.  This class action will be manageable because, as discussed above, common questions greatly predominate over individual questions.  There is no need for mini-trials or other resource intensive individual determinations.

The ultimate question in this case is whether a Wall Street firm can be held accountable for the harmful discriminatory effects caused by its insatiable appetite for predatory loans.  A class action is not only superior, but is likely the only means for minority borrowers to seek and receive an answer to that question.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification.


Dated: June 27, 2014                          Respectfully submitted,


                                              By: */s/  Rachel Geman*
                                                     Rachel Geman

                                              Rachel Geman (RG 0998)
                                              Jeremy Glapion
                                              LIEFF CABRASER HEIMANN & BERNSTEIN
                                              LLP
                                              250 Hudson Street, 8th Floor
                                              New York, NY 10013-1413
                                              Telephone: (212) 355-9500
                                              Facsimile: (212) 355-9592

                                              Elizabeth J. Cabraser
                                              Michael W. Sobol
                                              Nicole D. Sugnet

LIEFF CABRASER HEIMANN AND
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Laurence M. Schwartztol
Dennis D. Parker
Rachel E. Goodman
Peter W. Beauchamp
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2651

Stuart T. Rossman
Charles M. Delbaum
Arielle Cohen
THE NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02210
Telephone: (617) 542-8010
Facsimile: (617) 542-8028

Michael J. Steinberg
Brooke Tucker
AMERICAN CIVIL LIBERTIES UNION FUND
OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6814
Facsimile: (313) 578-6811

*Counsel for Plaintiffs and the Proposed Class*