# Exhibit 35:

# Previously filed under seal as Ex. 34 to

# N. Sugnet Declaration (Docket No. 129)

| | |
|---|---|
| **From:** | Mocco, Raymond (FID) <Raymond.Mocco@morganstanley.com> |
| **Sent:** | Tuesday, March 08, 2005 2:03 PM |
| **To:** | Neuberger, Andrew (FID) |
| **Cc:** | Najarian, Paul (FID); Goodman, Deborah (FID); Mocco, Raymond (FID) |
| **Subject:** | FW: SPG lending policies |
| **Attachments:** | Whse Procedures20050215-111218-12322834.pdf |

Hi,
For the SEC audits we need to take a full inventory of all of our procedures manuals. Craig has also asked me to review all of the docs. I reviewed your warehouse manual (attached), it is great, it really helped me better understand some of the things you do.

There are just a couple things I noticed

- Section 1.1- I think you need to add bullets for Manufactured Housing, Capital Commitments Facility, Investment Grade Securities. These buckets are on your warehouse report so they sb in here
- Section 1.2- The SPGCC: Is that the same as the SPG GLLC? If so just have the sentence mention that as all of the other docs the SEC has received refer to it as the "SPG GLLC"
- Section 2.1- Second sentence- "All lending requests must receive Credit Department approval. " isnt that for lines >= $50mm?
- Section 4.3- Spread to UST? Not LIBOR?

Thanks
Ray

**Raymond Mocco - Vice President**
Morgan Stanley | Fixed Income
1585 Broadway | Floor 03
New York, NY 10036
Phone: +1 212 761-2036
Fax: +1 212 507-3560
Raymond.Mocco@morganstanley.com

---

**From:** Phillips, Craig (FID)
**Sent:** Tuesday, February 15, 2005 4:03 PM
**To:** Mocco, Raymond (FID)
**Cc:** Rosenthal, Andrew (FID); Tufariello, Anthony (FID)
**Subject:** RE: SPG lending policies

thanks - want to go over inventory and eyeball documents with you. let me know of any glaring ommissions from our doc "inventory"

thanks,

craig

---

**From:** Mocco, Raymond (FID)
**Sent:** Tuesday, February 15, 2005 2:19 PM
**To:** Phillips, Craig (FID)

1



CONFIDENTIAL

MS01239789

**Cc:** Rosenthal, Andrew (FID); Tufariello, Anthony (FID)
**Subject:** RE: SPG lending policies

craig,
I have been working on this with luther for the last few days.  Understood re time is of the importance, I am up to my eyes in requests.  I'll follow up as u instructed.

Ray

**Raymond Mocco - Vice President**
Morgan Stanley | Fixed Income
| Floor 03

Phone: +1 212 761-2036
Raymond.Mocco@morganstanley.com

---

**From:** Phillips, Craig (FID)
**Sent:** Tuesday, February 15, 2005 2:12 PM
**To:** Mocco, Raymond (FID)
**Cc:** Rosenthal, Andrew (FID); Tufariello, Anthony (FID)
**Subject:** FW: SPG lending policies

Ray,

Can you help coordinate this request/response for us?  for the purposes of the spg-gllc and trying to conform local committee procedures/protocol - I am  interested in seeing what exists and where holes are.

1. think through all the lending books and include on this distribution anyone else that should be asked.

2. please get to luther and let him know that you are going to collect the documents first - that we want to check them, inventory them and verify that they are current and valid.  we don't want procedure manuals floating around without doing so.

3. determine where we have holes.  in some cases, london perhaps, a series of things might need to be put together to constitute a policy manual/procedure.  worth a little work to pull together correctly rather than not responding or submitting something that is incomplete.

Drop me a note after you speak to luther to make sure he is okay with this approach.  Let me know how inventory of manuals and flow of them develop.  I think time is of the essence given timing of SEC process.

thanks,

Craig

---

**From:** Rahbany, Russell (FID)
**Sent:** Tuesday, February 15, 2005 1:58 AM
**To:** Phillips, Craig (FID)
**Subject:** FW: SPG lending policies

craig, any thoughts on this? everyone agreed...  (who is he referring to?)

**Russell Rahbany - Managing Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 01
London, E14 4QW
Phone: +44 20 7677-9809

2

MS01239790

Mobile: +44 78815-11569
Fax: +1 212 507-4141
Russell.Rahbany@morganstanley.com

---

**From:** Peacock, Luther (CREDIT)
**Sent:** 14 February 2005 22:50
**To:** Stern, Steven (FID); Rahbany, Russell (FID); Rothberg, Rei (FID)
**Cc:** Holmes, Stephen (FID); Neuberger, Andrew (FID); Malone, Christian (FID); Godbole, Shirish (FID); Ooi, Choon-Piao (FID); Mocco, Raymond (FID); Rosenthal, Andrew (FID)
**Subject:** SPG lending policies

During the recent discussions between SPG and Credit regarding Credit approval of SPG loans, everyone agreed that the primary lending risk management tool is the various well-established SPG lending policies.  I understand, however, that these policies are not maintained centrally.

As Credit prepares for its discussions regarding SPG with the SEC later this week (with representation from SPG), I'd like to take a quick inventory of SPG's lending manuals around the globe.  Would you please send me copies of any current SPG lending manuals?


Many thanks,
Luther

3

CONFIDENTIAL                                                                                                     MS01239791

# SECURITIZED PRODUCTS GROUP -
# WAREHOUSE LENDING GROUP PROCEDURES
# MANUAL

# Morgan Stanley

CONFIDENTIAL

TABLE OF CONTENTS

**INTRODUCTION**

**SECTION 1     Program Summary**

1.1     Eligible Collateral
1.2     Process for Approving New Asset Classes

**SECTION 2     Flow of a Transaction**

2.1     Credit Procedures
2.2     Operations Due Diligence
2.3     Transaction Structuring and Term Sheet
2.4     Transaction Approval/SPG CCC Committee
2.5     Loan Agreement and Documentation

**SECTION 3     Post-Closing**

3.1     Operations

**SECTION 4     Counterparty and Collateral Monitoring**

4.1     Underwriting, Ongoing Due Diligence and Monitoring
4.2     Monitoring Process for Credit
4.3     Marking Methodology
4.4     Reporting

**SECTION 5     Wet Funding**

5.1     Wet Funding Procedures


**Appendices**

A.     Credit Review/Approval Memo
B.     Due Diligence Questionnaire
C.     Operations Review Memo
D.     Underwriting Review Memo
E.     Legal and Contractual User's Guide
F.     Third-party Due Diligence Report
G.     Commercial Conduit Loan (Marking Methodology)
H.     Commercial Non-Conduit Loan (Marking Methodology)
I.     Prime Automobile Loans
J.     Weekly Laser Reports

MS01239793

**Introduction**

The Warehouse Lending Group ("WLG") manual has been developed by the Warehouse Group, the Credit Department ("Credit"), the Legal Department ("Legal"), the SPG Operations Group ("Operations"), and the SPG trading desks in order to establish a set of procedures and guidelines to adhere to in its lending activities.  Any exceptions to these procedures must be approved by the Securitized Products Group Credit Committee ("SPGCC").

CONFIDENTIAL

# SECTION 1
# Program Summary

## 1.1    Eligible Collateral

The WLG will provide warehouse credit facilities for originators and acquirers of assets listed below as Eligible Collateral. Any exceptions to the following parameters must be approved by the SPGCC. The asset classes currently approved for financing include:

| I. On-the-Run Collateral | |
|---|---|
| Prime Residential (Residential "A") | • Residential 'A' refers to lenders who originate 'A' credit mortgage loans to 'A' credit or "prime" borrowers, and generally conforming to FNMA/FHLMC (or other industry standard) 'A' credit guidelines. These include conforming and non-conforming balance loans (jumbo loans). FICO scores for prime residential are generally greater than 640 |
| | • Residential "A" loans financed on the warehouse line: |
| |   • May not be financed on the line greater than 180 days |
| |   • May not be delinquent |
| |   • May not have a loan-to-value greater than 95% |
| |   • May not be out of the custodians possession for more than 19 days |
| |   • For whole loans, must receive information from the lender on take-out |
| |   • May have haircuts between 2% to 4% and a maximum advance rate of Par |
| |   • Wet Funding may be permitted (see Section 5) |
| Subprime Residential (Home Equity) | • Subprime lenders originate loans to subprime borrowers (not 'A' credit) or loans that have been documented in a manner that deviates from 'A' credit standards (e.g stated income documentation). Generally these are conforming balance loans. FNMA/FHLMC current conforming balance limit for single family subprime residential loans is $322,700. The weighted average FICO score for residential subprime is less than or equal to 600 (Range = 500-780 FICO) |
| | • Subprime Residential loans financed on the warehouse line: |
| |   • May not have been originated greater than 6 months prior to funding |
| |   • May not be financed on the line greater than 180 days |
| |   • May not have a loan-to-value greater than 100% |
| |   • May not be Section 32 loans or "high cost loans" as defined under applicable local law |
| |   • May not be out of the custodians possession for more than 14 days |
| |   • May not be first payment defaults |
| |   • May have small sublimits for 30, 60 and 90 day delinquent loans that is consistent with securitization standards |
| |   • May be limited to less than 5% of the outstanding balance for manufactured housing loans, non-owner occupied, and condos |
| |   • May be limited to less than 20% of the outstanding balance for 2nd Lien mortgage loans |
| |   • May have haircuts between 1.5% to 5% and a maximum advance rate of 101% |
| |   • Wet Funding may be permitted (see Section 5) |
| Conduit Commercial Mortgage | • A loan that can be securitized in a commercial conduit securitization immediately without any modifications to its terms |
| | • Commercial conduit loans financed on the warehouse line: |
| |   • May not be financed on the line greater than 270 days |
| |   • May not be delinquent |
| |   • May not have a loan-to-value greater than 80% |
| |   • May not have a debt service coverage ratio (DSCR) of less than 1.25x |
| |   • May not be out of the custodians possession for more than 14 days |
| |   • May have haircuts between 8% to 12% and a maximum advance rate of Par |
| Prime automobile loans and leases | • Prime automobile loans financed on the warehouse line: |
| |   • May not be financed on the line greater than 180 days |
| | • May have small sublimits consistent with securitization standards for balloon loans, deferred payment loans, used automobiles, non-prime auto loans and "thin" file loans |
| |   • May have haircuts between 8% to 10% and a maximum advance rate of Par |

CONFIDENTIAL

| II. Off-the-Run Collateral | |
|---|---|
| Equipment Leases | • Equipment consists of large ticket items (e.g. construction equipment, aircraft, trucks, trailers, industrial equipment, printing equipment, etc.) or small ticket items (e.g. fax machines, copy machines, etc.)<br>• Maximum advance rate of Par with subordination no less than 'BBB' |
| Healthcare Receivables | • Receivables payable by Medicare, Medicaid and in some instances, private payors, outstanding less than 180 days |
| Subscription Agreements | • Facilities collateralized by the capital commitments of real estate fund investors<br>• Advance rate is up to 90% of investment grade Included Investors |
| Secured Liquidity Facilities | • Warehouse facilities which provide back-up financing for the Issuer's commercial paper funding programs. All facilities are secured by the assets contributed into the financing vehicle<br>• Maximum advance rate of Par with subordination no less than 'A' |

| III. Subordinate Bonds and Mezzanine Collateral | |
|---|---|
| CMBS rated B, BB or BBB | • Junior claim commercial mortgage-backed bonds<br>• Collateral may remain on the line for the term of the facility<br>• Haircuts are as follows:<br>'B' - no less than 40%<br>'BB' - no less than 20%<br>'BBB' - no less than 10% |
| CMBS not rated | • Un-rated commercial mortgage-backed bonds<br>• Collateral may remain on the line for the term of the facility<br>• Haircuts may be no less than 75% |
| Commercial real estate mezzanine debt or Preferred | • Commercial Mezzanine Loans financed on the warehouse line:<br> • May not be delinquent<br> • May not have a CLTV greater than 90%<br> • May not be out of the custodians possession for more than 14 days<br> • Haircuts may be no less than 25% |
| Residential mortgage bonds rated B, BB or BBB | • Junior claim residential mortgage-backed bonds<br>• Collateral may remain on the line for the term of the facility<br>• Haircuts are as follows:<br>'B' - no less than 50%<br>'BB' - no less than 30%<br>'BBB' - no less than 10% |

CONFIDENTIAL

## 1.2    Process for Approving New Asset Classes

### A.  *SPG Credit Committee Approval Process*

Any asset class not included as eligible collateral must be approved by the SPG Credit Committee ("SPGCC"). The WLG will present a "New Asset Presentation" to the committee for its review. The presentation will contain the following:

1.  Asset liquidity analysis
2.  Capital structure analysis
3.  Size of market
4.  Major participants in asset class
5.  Size of lending market to asset class
6.  League table opportunity
7.  Firm revenue opportunity
8.  Mark to market procedures
9.  Operational Issues
10. Loan credit and underwriting procedures
11. Legal Issues, if any

### B.  *Firm Approval Process*

In addition to the SPG approval process, any asset class not included as eligible collateral must also receive Firm approval. The WLG will submit the following information to the Firm's "New Product Approval" website:

1.  A detailed description of the product/structure.
2.  Legal Entities To Be Used - An explanation of trade flows, including a diagram showing all MS entities where exposure will be booked and highlighting the structure required to make a margin loan, when a new MS entity needs to be formed and new booking, ticketing & settlement procedures.
3.  Drivers/Business Rationale - An explanation of the client motivation for doing the trade (i.e. tax or estate planning, gain exposure to particular market, hedge existing exposure), and how business will deal with customer reliance issues.
4.  Target Client Base - A description of the target client base (i.e."retail", hedge funds, insurance companies, etc.), the plan of how MS proposes to access that client base, and how suitability determinations will be handled.
5.  Benefits - An explanation of the client motivation for doing the trade (i.e. tax or estate planning, gain exposure to particular market, hedge existing exposure), and how business will deal with customer reliance issues.
6.  Non Market Risk - An explanation of any resource constraints caused by the product/ structure, how the product will be supported (i.e. manual or automated, internal v. external), cost of support and how the process will be controlled.
7.  Market Risk - A discussion of the specific hedging/trading issues raised by the product/structure, including: how various exposures will be hedged and what traders will be responsible for hedging activity.
8.  Risk System & Pricing Model Used - A description of the risk systems and valuation models used.
9.  Expected Volume - The expected trade volume, both initially and over the first 6, 12 and 18 months following the product/structure approval.
10. Financial Impact - The expected p&l, balance sheet usage, regulatory capital implications and transfer pricing issues broken out on an entity by entity basis.

CONFIDENTIAL

**SECTION 2**
**Flow of a Transaction**

## 2.1      Credit Procedures

**Initial Credit Review**

The WLG will notify a Senior Research Analyst in the Credit Department of a new lending request, amendment request or renewal.  All lending requests must receive Credit Department approval.

**Initial Credit Review Process:**
The analyst will prepare a due diligence outline covering the following topics:

- Description/history of borrower
- Strategy
- Loan origination/servicing strategy and volume
- Balance sheet/income statement analysis
- Residual valuation
- Profitability (Historical/projected)
- Cash Flow (Historical/projected)—ability to meet cash flow projections
- Liquidity Management
- Asset/Liability Management
- Funding
- Capital Plans/Needs

Credit will then meet with the senior management of the potential borrower in order to complete the credit due diligence.

Once the due diligence meeting is complete, the analyst will prepare a loan approval memorandum, addressing the company background, strategy, strengths and concerns of the borrower, transaction details and financial covenants (see Appendix A).  Within this memo, the analyst proposes an unsecured credit rating to the Americas Financial Institutions (AFI) Credit Committee.  The unsecured credit rating is based on corporate rating agency methodology and follows the same rating scale as Standard and Poor's.  The rating considers the topics discussed in the outline above as well as industry peer comparisons.

Once the rating is established, the analyst will meet with either the Financial Institutions Permissioner (for financial institutions) or the Industrials Permissioner (for corporates) to receive approval of the transaction.   Credit approval is needed for all requests, including new transactions, renewals, amendments, waivers and temporary line increases.  The Permissioner is also responsible for establishing the facility rating for each transaction.   The facility rating represents the subordination levels needed for a securitization exit, based on current haircuts and maximum advance levels for each borrower.

CONFIDENTIAL

**2.2**     **Operations Due Diligence**

### C.  *Role of Operations Department*

The role of Operations is to facilitate the lending process as agreed to in each loan agreement with our clients. Operations' main responsibility is to assure that each loan is adequately collateralized prior to funding as well as while the loan is outstanding. Prior to closing a warehouse transaction, the main areas of responsibility to assure that this is done properly are:

– Operational Due Diligence
– Data Review

### D.  *Operational Due Diligence*

Prior to closing a warehouse transaction, Operations will perform an on-site due diligence of the client's operations to assure that the client has adequate policies and procedures to support their loan business. Operations will review the following and report back to the business unit any deficiencies:

– **Originations**—Review of the policies and procedures to understand how the client sources product

– **Documentation**—Review of the policies and procedures to assure the client perfects its security interest in the asset. In addition, a review is done on the transfer of the collateral to the custodian to assure the collateral arrives timely and in good form

– **Underwriting**—A review of policies and procedures are done to understand how the client underwrites the asset and approves exceptions as well as the authority levels of underwriters

– **Appraisal Process**—A review of the policies and procedures to assure that there is an adequate process to review the appraised value of the asset

– **Management Information Systems**—A review is done to see how management reviews the loan approval process and controls exception processing

– **Collections**—A review is done to assure that the servicing area has policies and procedures consistent with industry standards to collect on delinquent loans

– **Default Management**—A review is done to assure that there are adequate policies and procedures in managing loans that are severely delinquent and that client is consistent with industry standards to accomplish this

In addition, the WLG origination/servicing review consists of a detailed corporate review of the client's business, financial situation and management, as well as the client's origination practices, underwriting guideline review, volume of originations and breakout by channel, pre-funding and post-funding QC, use of technology and loan origination/underwriting systems, appraisal review, loan closing/documentation, compliance/audit review, servicing review, collections, loss mitigation, foreclosure and REO.   The Warehouse Group will meet with the senior management team (CEO, President, CFO) as well as managers responsible for key areas such as production, operations, underwriting, credit and servicing.   See Appendix B for Operations Due Diligence Questionnaire for additional detail.

CONFIDENTIAL

**E.  *Data Review***

Prior to closing a new transaction, Operations will assure that the client is able to deliver sufficient data in order to properly mark the collateral. Operations will run a series of edit checks to assure that the data submitted is accurate and will coordinate with the appropriate trader to make sure that the information supplied is sufficient. Operations will not fund until the data is accurate.

CONFIDENTIAL

MS01239800

**2.3     Transaction Structuring and Term Sheet**



1.  **Structuring the Transaction:** After all on-site due diligence of the Counterparty is complete and the Transaction Team has decided to move forward with the proposed Counterparty, the Transaction Manager ("TM") will work with Credit, Legal and Operations to structure the transaction and develop a term sheet.  The WLG and SPG Trading will set the advance rate, and price the Transaction consistent with the Counterparty's credit and exit strategy and prevailing market rates.

2.  **Term Sheet Development and Approval:** The WLG has developed a standard term sheet that will be modified based upon the specific asset class of the Counterparty or specified terms.  The standard form of the term sheet includes the following items:

| Term of the Agreement: | On-the-Run Collateral:   One Year |
|---|---|
| | Off-the-Run Collateral:   One Year (excluding subscription agreements, which have two year terms) |
| | Subordinate Bonds:       One Year<br>Mezzanine Collateral:    Two - Three Years |
| Maximum Facility Amount: | Total facility amount will be approved by the SPGCC following discussions with the WLG, Legal and Credit. |
| Minimum Usage: | For each class of Eligible Collateral, each Counterparty may be required to maintain a minimum usage of the maximum Facility Amount. A non-usage fee will be charged if the minimum usage targets are not met. The fee will be based on the LIBOR spread charged for financing the loans on the line. The minimum usage targets are as follows:<br><br>On the Run Collateral:<br>    Prime Residential - 50%<br>    Subprime Residential - 40%<br>    Conduit Commercial - 30%<br>    Prime Autos - 50%<br><br>Off the Run Collateral:<br>    Equipment Leases - 50%<br>    Healthcare - 50%<br>    Subscription - NA<br>    Secured Liquidity - NA<br><br>Subordinate Bonds and Mezzanine Collateral:<br>    CMBS and Residential rated B, BB, BBB and Unrated - 50%<br>    Commercial Mezzanine - 30% |
| Commitment Status: | All facilities will be on a committed basis. |

CONFIDENTIAL

| Commitment Fee: | Prime Residential Loans: | 8 - 15 bps |
| | Subprime Residential Loans: | 12.5 - 50 bps |
| | Conduit Commercial Mortgage Loans: | 10 - 15 bps |
| | Prime Auto Loans: | 5 - 10 bps |
| | Subscription Agreements: | 40 - 55 bps |
| | Secured Liquidity Facilities: | 5 - 10 bps |
| | CMBS Subordinate Bonds: | 15 - 25 bps |
| | Commercial Mezzanine Debt: | 25 - 60 bps |
| | Residential Subordinate Bonds: | 15 - 25 bps |
| Pricing Matrix (based on current market; subject to change): | On the Run Collateral:<br>   A.  Prime Residential- L+30-100 bps<br>   B.  Subprime Residential- L+60-135 bps<br>   C.  Conduit Commercial- L+60-85 bps<br>   D.  Prime Automobile Loans and Leases- L+25-55<br><br>Off the Run Collateral:<br>   A.  Equipment Leases- L+50-100<br>   B.  Healthcare Receivables- L+100-150<br>   C.  Subscription Agreements- L+75-100<br>   D.  Secured Liquidity Facilities- L+30-50<br><br>Subordinate Bonds and Mezzanine Collateral:<br>   A.  CMBS and Residential mortgage bonds- BBB- L+80-100<br>                 BB- L+150-175<br>                 B- L+175-200<br>                 Unrated- L+200-250<br>   B.  Commercial Mezzanine- L+190-275 |
| Haircut Matrix: | Haircuts will generally be based on "BBB" or better subordination. Generically, by asset class, current haircuts (subject to change) are as follows:<br>On the Run Collateral:<br>   A.  Prime Residential - 2-4%<br>   B.  Subrime Residential - 1 ½- 5%<br>   C.  Conduit Commercial - 8-15%<br>   D.  Prime Automobile Loans - 9-15%<br><br>Off the Run Collateral:<br>   A.  Equipment Leases - 9-15%<br>   B.  Healthcare Receivables - 2-10%<br>   C.  Subscription Agreements - 10-20% of unfunded capital commitments of included members<br>   D.  Secured Liquidity Facilities - 5-15%<br><br>Subordinate Bonds and Mezzanine Collateral:<br>   A.  CMBS and Residentail Bonds<br>     1.  BBB- 10-20%<br>     2.  BB- 30-35%<br>     3.  B- 50-60%<br>     4.  Unrated- 75-80%<br>   B. Commercial Mezzanine- 25-50% |
| Market Value: | The market value will always be at the sole discretion of Morgan Stanley. Morgan Stanley will have the right to mark the collateral at any time. The respective trading desks are responsible for marking the loan. |
| Maximum Individual Term: | On-the-run collateral, Equipment Leases, Prime Unsecured Consumer |

|  | Loans and Healthcare Receivables can stay on the warehouse line for up to 180 days. Non-conduit Commercial Loans, Secured Liquidity Facilities, Subordinate Bonds and Mezzanine collateral can stay on the warehouse line for the term of the facility. |
|---|---|
| Margin Call: | Generally margin calls must be made within one business day |
| Conditions Precedent: | The terms and availability of the Facility for each new advance as well as the existing financed position are subject to customary conditions precedent to be set forth in the definitive loan documentation including without limitation the following parameters:<br>— Morgan Stanley's unsecured long-term debt rating is at or above A- by S & P or the equivalent rating for Moody's.<br>— Maintenance of all financial covenants and requirements. |
| Financial Covenants: | Typical financial covenants (inclusion of or addition to the covenants will vary with the credit quality of the borrower):<br>— Monthly or quarterly financial statements and officers compliance certificate<br>— Fiscal year-end audited financial statements and officers compliance certificate<br>— Maximum total indebtedness to tangible net worth<br>— Minimum tangible net worth<br>— Profitability test<br>— Rating agency downgrades trigger when applicable |
| Events of Default: | Standard provisions, including but not limited to:<br>— Failure to pay scheduled interest when due<br>— Failure to satisfy required payments of principal when due<br>— Failure to maintain Borrowing Base compliance<br>— Breach of representation, warranty or covenant<br>— Cross-default for breaches under all other lending agreements<br>— Any material adverse change as determined by MSMCI in the Company's business, operations and prospects<br>— Morgan Stanley & Co.'s corporate bond rating as determined by S&P or Moody's has been lowered to a rating below A- (S&P) or A3 (Moody's) and Borrower shall have failed to repay all outstandings under the Facility within 90 calendar days following the downgrade |

The TM has the authority to negotiate the term sheets with the Counterparty under the guidance of Andy Neuberger. All proposed term sheets are non-binding to Morgan Stanley. The proposed term sheet is reviewed by internal Legal prior to submission to the SPGCC.

CONFIDENTIAL

**2.4    Transaction Approval/SPG Credit Committee**

**1.   SPGCC Approval:** The SPGCC will review all potential new transactions and renewal of existing facilities presented by the WLG for loans greater than $50MM.   The WLG will prepare the credit committee memorandum that includes the following:

- Company Description
- Product and Origination Overview
- Collateral Eligibility Requirements, if applicable
- Historical Collateral Performance, if applicable
- Proposed Term Sheet
- Business Review Memo
- Credit Review/Approval Memo (Appendix A)
- Operations Review Memo (Appendix C)
- Property Due Diligence/Underwriting Review Memo, if applicable (Appendix D)
- Financial Summary
- Reports of any due diligence contractors (if requested)
- Legal Issues Summary (if any)

Once the data to support the proposed transaction is compiled, the TM will present the proposed transaction to the SPGCC for consideration. The SPGCC will either approve, deny or approve with restrictions or follow-up items. If the transaction is approved with restrictions, the TM will resolve the outstanding item(s) and follows up (via email) with the SPGCC for final approval prior to commencing legal documentation.

MS01239804

**2.5     Loan Agreement and Documentation**

**A.**     *Role of Legal/Negotiating Guidelines:*  The proposed Term Sheet will be provided to the Counterparty for negotiation and approval. The TM also will provide the Term Sheet to external counsel, which is responsible for preparing and distributing the appropriate form Loan Agreement using a standard form of legal document. The Loan Agreement will be based on the Term Sheet as approved by the SPGCC. To assist in this process, the WLG, in collaboration with Legal, has created a *Legal and Contractual User's Guide* ("Legal Guide") (see Appendix E) for negotiating the Loan Agreement. The Transaction Team and external counsel adhere to the Legal Guide when negotiating and drafting a Loan Agreement for a new Counterparty.  The TM and external Counsel is responsible for addressing all legal issues raised in the negotiation and must consult with Legal regarding all material departures from the form Loan Agreement or Legal Guide. Counsel prepares or collects, as appropriate, all necessary legal documents required for the closing.

**B.**     *Credit and Operations:* The TM will coordinate with Credit to draft the proposed financial covenants for the Counterparty. The draft financial covenants will be reviewed and approved by Credit prior to closing. The TM will coordinate with Operations to draft the operational guidelines, including funding, servicing and releases, described in the Loan Agreement.   Operations will review drafts of the Loan Agreement, provide comments to the TM and approve the terms, as applicable, prior to closing.  All drafts of the loan agreement shall be sent to the TM, Credit, Operations and Legal.

MS01239805

**SECTION 3**
**Post-Closing**

3.1   **Operations**

### A.  *Borrowing Base Set-Up and Compliance*

Prior to the first funding, Operations will set up a Borrowing Base in Laser. Operations will use the executed version of the Loan Agreement to set up the borrowing base. Operations will code Laser to be identical to the Loan Agreement's eligible collateral definitions, concentration limits, valuation adjustments and reps and warrants of the collateral pledged.   Daily Operations will review the borrowing base reports to ensure that the loan amount advanced does not exceed the collateral value of the assets pledged.

### B.  *Loan Funding*

Prior to sending a wire for the requested loan amount Operations will assure that:

– It has received the required necessary documentation from the borrower as agreed to in the loan agreement

– Collateral data has been received and validated

– Collateral has been valued by the appropriate trading desk

– The collateral value (market value times haircut) is sufficient for the loan amount requested

– The collateral being pledged is eligible according to the loan agreement

– Morgan Stanley has legal possession of the collateral

– The Borrower has not exceeded credit limit

– The Borrowing Base is in compliance

### C.  *Margin Call Processing*

Daily operations will issue a margin call to each client that is in  a borrowing deficit (borrowing exceeds collateral value). The margin call will be sent by e-mail to the Client and the WLG will be copied on the e-mail as well. If Operations has received information from the Client that the deficit will be cleared by Client within a short time span, but after the one business day requirement, Operations will contact the WLG to receive authorization to waive that margin call until that date. Any waiver of a margin call must be approved by Legal, Credit and Andy Neuberger and will be formally documented by outside legal counsel.   Operations will receive original copies of all waivers and file them appropriately.

Along with the Client's signature, one of the following authorized signatories from Morgan Stanley must sign all margin call waivers:  Craig Phillips, Tony Tufariello, John Westerfield, Steven Stern and Andy Neuberger

### D.  *Waivers*

Andy Neuberger, John Westerfield, or Steven Stern shall approve all waivers that are not subject to Craig Phillips' or Tony Tufariello's approval in accordance with the Negotiability Chart (see Appendix E), excluding those related to financial covenants, which shall be the responsibility of Credit. All outstanding waivers shall be reported weekly to SPG Management, Legal, and Credit by Operations. Any waiver with an original expiration date beyond 60 days, or which has been in

existence for more than 60 days due to a roll, will be approved by Craig Phillips or Tony Tufariello after consultations with Andy Neuberger, John Westerfield, or Steven Stern

### E. *Non-Material Amendments to Existing Agreements or the Standard Form Agreement*

Andy Neuberger has authority to approve all amendments to provisions that have not been defined as "material" by being set forth on the Negotiability Chart. John Westerfield or Steven Stern have authority to approve all non-material amendments if Andy Neuberger is unavailable. All pending amendments will be reported weekly to SPG management, Legal, and Credit by Andy Neuberger and Paul Najarian.

### F. *Material Amendments to Existing Agreements or Material Modifications to the Standard Form Agreement*

Andy Neuberger or Steven Stern will inform Craig Phillips or Tony Tufariello about any potential material amendment prior to finalization of the amendment.  Amendments to material provisions of existing or new agreements must be approved by Craig Phillips or Tony Tufariello after consultations with Legal and Credit.  Legal and Credit will advise Craig Phillips or Tony Tufariello of their respective recommendations regarding the amendment prior to its finalization

MS01239807

## SECTION 4
### Counterparty and Collateral Monitoring

**4.1    Underwriting, Ongoing Due Diligence and Monitoring**

### A. _Commercial Mortgage Loans_

The WLG will re-underwrite and unilaterally approve each Commercial Conduit, Non-Conduit and Mezzanine mortgage loan prior to funding.

As part of the initial due diligence process performed in considering whether to approve a Counterparty for warehouse financing, the warehouse lending group underwriting team reviews the Counterparty's underwriting guidelines. The WLG does this to ensure that the Counterparty's loans conform to market standards and can be sold either through a securitization or whole-loan exit.    The WLG then conducts a face-to-face meeting with the Counterparty's senior management, to meet the individuals responsible for originating, underwriting and approving the loans and to fully understand the Counterparty's loan production process. The underwriting team and its external counsel also review the Counterparty's standard loan documentation to ensure they comply with market standards. Finally, the team reviews a minimum of three sample loans to gain further comfort regarding the Counterparty's loan origination process and the quality of its loans.

Once a warehouse line of finance has been established, every commercial loan proposed for funding is re-underwritten by the WLG. The borrower submits an information package on each of the assets to be financed under the program. The package must be received a certain number of days in advance of the expected closing date or funding date as specified in the Loan Agreement. At a minimum, the team reviews the following information:

–   Counterparty's Internal Credit Committee Approval Report and Internal Underwriting
–   Appraisal
–   Engineering Report
–   Environmental Report, if available, and
–   Cash Flow Summary Report

The Cash Flow Summary Report is used to develop Morgan Stanley's Underwritten Cash Flow, based on standard underwriting adjustments.    To calculate such cash flow, the following information is needed in this report:

–   A current rent roll
–   Historical financial statements for the last three years
–   Explanation of significant year-to-year changes in any revenue and expense items and footnote explanation of any underwriting adjustments made to the most recent fiscal period financial statements

Debt service coverage, loan-to-value and other loan credit statistics are then calculated based on Morgan Stanley's Underwritten Cash Flow.

In addition to these required items, the team may also request any additional information it needs to complete its re-underwriting. A loan will not be approved for funding until all questions have been satisfactorily answered.

The WLG underwriting team has authority to approve for funding commercial conduit loans with an underlying principal balance ("UPB") of up to $10 million. Loans greater $10 million will be reviewed and require the approval of a Credit Committee which includes John Westerfield, Steven Stern, Tom Jackivicz, Andy Neuberger, Chris Malone and David Oliner ("PTG Credit Committee"). All non-conduit and mezzanine loans, regardless of UPB, require the approval of the PTGCC.

CONFIDENTIAL

The WLG underwriting team also monitors the warehouse collateral on an ongoing basis. The LASER system is used to maintain and store loan information used to monitor the collateral. The Counterparty's internal underwriting and Morgan Stanley re-underwriting are maintained in the LASER system and updated on an ongoing basis. Counterparties are required at a minimum to send to the team updated financial information for each loan on a semi-annual basis and on a quarterly basis when it is available, at which time the underwriting is updated. Any significant changes are discussed with the commercial loan trading desk who then may adjust the mark on the loan, if necessary. In addition, monthly meetings are held with members of the PTGCC to review the marks and discuss specific loans on the warehouse line.

### B.  *Residential Mortgage Loans*

The WLG loan underwriting due diligence for residential mortgage loans includes a review of a random and adverse sample of collateral files (usually 100 or more collateral files) and will normally be performed on-site. A third-party due diligence company such as The Clayton Group, Inc. will typically be hired to perform this collateral review. The review checks for compliance with underwriting and quality control guidelines and includes a review of legal documents, appraisals and regulatory documents. The specific objectives of the collateral review are to confirm that the loans were originated conforming to the lender's guidelines, confirm the accuracy of the Lender's credit-risk classification of loans, review appraisals, verify income, review quality of credit, review title and mortgage, and confirm FNMA predatory compliance. The third-party due diligence firm will produce a written report of its findings (See Appendix F). The WLG reviews the report and resolves any concerns raised with the due diligence firm and the client.  The review process is completed at the outset of the relationship and also on an ongoing basis.

### C.  *Prime Auto Loans*

The WLG loan underwriting due diligence for prime automobile loans includes a review of a random and adverse sample of loan files and will normally be performed on-site. A third-party due diligence company such as Lazenby and Associates will typically be hired to perform this collateral review. The review covers various areas including investor reporting, credit, funding/loan verification, risk and loan servicing. The third-party due diligence firm will produce a written report of its findings. The WLG reviews the report and resolves any concerns raised with the due diligence firm and the client. The review process is completed at the outset of the relationship and also on an ongoing basis.

CONFIDENTIAL

**4.2     Monitoring Process for Credit**

The Credit Department monitors financial covenant compliance for all warehouse borrowers through Laser Repo. A report is sent on a monthly basis to the WLG, Legal and Morgan Stanley Bank (for those facilities placed in the Bank) addressing the status of compliance for those borrowers required to report for that period. If a borrower becomes out of compliance on its reporting or financial covenant requirements, Credit determines the appropriate resolution (i.e., waiver, amendment). This decision is then discussed with both Legal and the WLG to determine the most appropriate resolution. Any waiver or amendment will be documented by outside counsel, must be signed by an authorized signatory from the Client as well as an authorized signatory from Morgan Stanley (Craig Phillips, Tony Tufariello, John Westerfield, Steven Stern and Andy Neuberger) and stored with the Operations group.

MS01239810

### 4.3      Marking Methodology

#### A.  *Commercial Mortgage Loans*

*Commercial Conduit Loans*

On a weekly basis, commercial conduit loans are marked by modeling them in a theoretical conduit securitization to determine the appropriate portfolio "break-even" spread over treasuries. The loan is then marked at an appropriate spread to reflect expenses and bid/offer, using the current treasury curve. (Appendix G)

*Commercial Non-Conduit Loans*

On a weekly basis, non-conduit commercial loans are marked on a refinancing basis in which we conservatively estimate what the loan proceeds would be if the borrower attempted to refinance the current loan. The estimate is based on Morgan Stanley's determination of net cash flow from the property, which is net operating income less any recurring reserves for capital expenditures or tenant improvement/leasing commissions. Generally, the theoretical loan proceeds are sized to a DSCR of 1.25x (this hurdle DSCR may vary depending on property type). If the refinancing proceeds are greater than or equal to the loan balance, the loan is then marked at an appropriate bid/offer spread, otherwise the loan is marked at the refinancing proceeds divided by the loan balance. (See attached Appendix H)

#### B.  *Residential Mortgage Loans*

*Subprime Loans*

On a weekly basis, loan pools are marked to a securitized exit. Pools are first split into fixed and ARM subsets. The mark is performed independently on each in an excel spreadsheet model that uses a base case capital structure and surety wrapped execution to generate an estimated funding cost for the liabilities. The excess spread is then valued using a prepayment speed-and-loss matrix that derives an excess spread multiple to estimate the premium. Servicing is valued at a 1 to 1.5 market multiple and added to the collateral mark. Marks are capped depending on the Counterparty and haircut. All loan level adjustments and deeper haircuts for delinquency are handled in the borrowing base system.

*Residential A*

All Residential-A loans are marked weekly to a whole-loan exit on a spread basis. Fixed-rate pools are spread behind the interpolated FNMA coupon that corresponds to the net coupon of the pool. Fixed pools are capped at market premiums. Servicing is valued at market multiples and added to the collateral mark. ARMs are priced using a spread to treasuries that corresponds with the average life of the pool at a market CPR. Premiums are capped and servicing is valued at market multiples and added to the collateral mark. Loan-level adjustments and deeper haircuts are applied in the borrowing base report.

#### C.  *Prime Auto Loans*

Weekly mark to market of the current warehouse portfolio is performed to review and update Morgan Stanley's exit strategy and overall execution. Structuring uses the current warehouse collateral, current market spreads, benchmarks, estimated capital structure (from most recent comparable deals, adjusting as appropriate), to create an appropriate model. Loss, prepayment and interest rate assumptions are changed as necessary to value retained investments (B-pieces, residual, etc.) at a yield appropriate for liquidity and credit risk. The all-in economics is determined net of expenses, fees and cash account funding. The intent of this mark is to

estimate all-in economic value if Morgan Stanley were to securitize the current warehouse portfolio at this point in time. Howie Hubler reviews and approves the marks, and a summary of the collateral characteristics and economics are e-mailed to the warehouse lending group and the ABS auto team. (See Appendix I)

**D.**  *CMBS Subordinate Bonds*

On a weekly basis, commercial subordinate bonds on the warehouse line are marked to market in order to determine where the bonds would trade assuming current market spreads and benchmarks. The bonds are modelled on Trepp, Intex and/or Conquest (third-party CMBS data services, which update their models every month as deals pay). The SPG trader marking the bonds will review the monthly remittance reports and, in some instances, will request information on the underlying collateral from the borrower (e.g., rent rolls, operating statements, etc.) to obtain additional information about the current performance of the bonds. The servicers for the underlying collateral may be contacted and information from Realpoint (third-party CMBS data and market research provider) may be used to help identify and investigate problem loans or any significant issues in collateral performance that should be adjusted for in marking the bonds. Default scenarios are also run on Trepp, Intex and/or Conquest and adjustments to the marks are made as necessary.

**E.**  *Commercial Mezzanine Loans*

The first step in marking any mezzanine position requires the underwriting or re-underwriting of the underlying collateral. As available, updated rent rolls, recent historical financial information, lease roll-over, market, collateral and other information should be reviewed with the objective of renewing credit underwriting characteristics of the loan, most specifically loan-to-value and debt-service coverage ratio.

Based on the asset underwriting, conclusions may be drawn about the refinancibility of the mezzanine position. As part of this analysis, a determination should be made as to the markets in which such refinancing may be obtained. Markets may include the conventional senior mortgage market, the B-note or mezzanine markets, preferred equity or the equity markets.

The existing mezzanine loan must then be marked against its refinancibility in the current market. For the valuation process the loan may be broken down into its implied capital structure components and the available yield and other terms must be compared to the market requirements for those portions of the capital structure. To the extent that the terms are adequate and the yield is sufficient (when broken into their component parts) to execute at par in the current market, the position may be marked at par (or par less an appropriate bid/offer). In circumstances where the mezzanine loan has very strong call protection and excess yield, a premium mark may be considered. To the extent that the terms or yield are insufficient vs. current market pricing/structure, the mezzanine loan will be marked at a discount to reflect an adequate yield to maturity.

In circumstances where the value of the asset is less than the par balance of the loan, components representing amounts in excess of 100% LTV will be given no value and the remaining components must be priced in a fashion to reflect the friction associated with reclaiming the asset through a contested work-out. In such circumstances, the total loan valuations (including any senior loan) should not be in excess of 95% of the underlying asset value.

**F.**  *Liquidity Facilities*

The marking methodology for valuing a liquidity commitment for an asset-backed commercial paper (ABCP) conduit attempts to capture the joint risk of ABCP failing to roll and the cost of being drawn whenever the drawn loan interest rate is below market.

MS01239812

The primary risk in the liquidity facility is that a draw occurs and there is a loss taken in transferring this risk to another counter-party.   We have evaluated this risk of loss by generating seven cases that correspond to different levels of collateral performance consistent with a B to AAA level of performance. In each of these cases, a capital structure can be constructed based on the relationship of rated classes to the expected collateral loss performance appropriate for the given case. Spreads are applied to each bond within the seven cases. The probability of each of these seven cases as well as the adjustments to expected collateral losses engendered in each of these cases is based on Moody's historical loss tables. A simulation is run with current spreads and historical spread volatility that generates transaction-weighted average spread paths. To the extent a path weighted average spread exceeds the loan spread, a loss is recognized. These losses create a case level expected loss which is then multiplied by the probability of the case occurring with the B case having a high likelihood and the AAA case having a miniscule likelihood as per the Moody's tables. The results of the cases are summed and a probability weighted loss expectation is derived.


The loss calculated above is realized only in the circumstance that the ABCP does not roll and the facility is drawn. We use a migration from the sponsor's current rating to a long-term rating that would disrupt the conduits ability to place commercial paper to size the likelihood of ABCP disruption. We use Moody's rating transition tables to determine the probability of this migration. This probability is then multiplied times the calculated option cost to derive an adjusted loss expectation.  The correlation between sponsor ratings migration and higher pool losses is expected to be low in those cases that are generating most of the expected loss (e.g. B, BB, BBB) for the current liquidity commitments. If the correlation is expected to be higher for other sponsors we will be adjusted.

At least on a quarterly basis, the expected performance, spreads, and transition rating probabilities will be revisited and the analysis rerun to generate a new expected loss calculation.

CONFIDENTIAL

*4.4*      **Reporting**

In order to monitor the warehousing risk positions, risk reports are generated from LASER on a weekly basis. Five reports are distributed to the Heads of SPG, the WLG, Operations and SPG traders responsible for marking the collateral providing a summary of the entire WLG portfolio. (See Appendix J)

The five risk reports are:

1) The Funded Balances Report Deals – Report designed to monitor current and year-to-date usage on a deal by deal basis

2) The Termination Dates Across Deals – Report designed to track when the loan agreements will be terminated

3) The Marks Comparison – Report designed to compare collateral marks. For commercial loans the marks are compared by property type. For fixed residential loans, the marks are compared by lien status and for ARM residential loans the marks are compared for loan types with multiple borrowers based on various benchmarks

4) The Servicing Delinquent Risk across Deals – Report designed to monitor any servicing updates that were not loaded into LASER by the scheduled due date as stated in the Loan Agreement.

5) The Stale Marks across Deals – Report designed to monitor the last time a position was priced in LASER. Prices are updated at a minimum of once per week

MS01239814

**SECTION 5**
**Wet Funding**

**5.1     Wet Funding Procedures**

*A.     Overview*

Wet Funding is the process through which originators of residential prime and sub-prime mortgage loans fund new production on the day of origination.  The term "wet funding" figuratively implies that the ink on the loan documents is still wet as opposed to dry. A typical loan file is processed for 2 to 5 days before it is complete enough to deliver to a third-party custodian.  The "wet period" lasts until a complete loan file is delivered to the custodian, whereupon the loan becomes dry.  Most accounts have an 8-day wet funding period from their lenders to account for delays.

Nearly all non-bank residential loan mortgage originators have wet funding lines.  Warehouse lenders typically combine wet and dry lines.  Morgan Stanley's current universe of potential wet funding clients has in excess of $2.0 billion in committed wet funding lines.  Warehouse lenders offer wet funding because wet lines serve as a feeder for warehouse lines providing higher-funded balances and revenue streams to the lender, increased warehouse balances lead to increases in principal purchase opportunities and warehouse lenders are occasionally able to require lead-managed securitizations in return for providing wet funding lines.

| Warehouse Lending Competitive Environment Lender | Provider of Wet Funding | |
|---|---|---|
| | Yes | No |
| Lehman | √ | |
| Merrill Lynch | √ | |
| Salomon | √ | |
| Greenwich Capital | √ | |
| Bear Stearns | √ | |
| CSFB | √ | |
| Deutsche Bank | √ | |
| Bank of America | √ | |
| UBS | √ | |
| JPM/Chase | √ | |
| RFC | √ | |

*B.     Legal Analysis*

*Creation of Security Interest*

Our security interest in the collateral (the underlying loan) will not be created until the underlying loan by our warehouse borrower is made to the underlying borrower. If there is a time lag between our making of a loan to the warehouse borrower and the warehouse borrower's funding to its underlying borrower, then we will be unsecured during that lag period.  If the underlying loan is never made (for whatever reason), we will have made an unsecured loan to the warehouse borrower until the time our loan proceeds are returned to us and there is no longer an outstanding loan obligation owing to us.

CONFIDENTIAL

*Perfection of Security Interest*

Once our security interest is created in the collateral (upon the making of the underlying loan by the warehouse borrower to the underlying borrower), we will be deemed to have a perfected security interest in that collateral even without our possession of the loan documents for 20 days thereafter. On or before the 20th day after the creation of our security interest, the loan documents must be delivered to us or our Custodian in full for our security interest to remain perfected. If a complete set of the loan documents is not delivered to us or our Custodian (for whatever reason) before the expiration of the 20-day period, we will lose the benefit of the safe-harbor and become unperfected. Please note that the collateral documents must be complete. To the extent that the collateral package is deficient in any way (i.e., missing documents or missing signatures), our security interest will become unperfected after the 20-day period. If our security interest becomes unperfected after the expiration of the 20-day period, we will, for all practical purposes, become an unsecured lender of that loan.

*Priority of a Perfected Security Interest*

Although we can perfect our security interest without possession of the loan document collateral for the 20-day safe harbor period, any other third party who possesses the collateral within the 20-day period can claim to have a perfected security interest, and a priority fight will ensue. In such a case, possession would be the best method of perfection.

*Bankruptcy*

If the warehouse borrower files for bankruptcy during the period when we are not yet in possession of our collateral documents, we would have to go through the bankruptcy court to retrieve our collateral (i.e., we would have to file a motion with the bankruptcy court to direct the borrower to deliver the collateral to our custodian).

**C.   Process Description**

The following is a day-by-day description of the operational procedures that will be followed for wet funding:

*The Day Prior to Funding*

- Borrower transmits complete loan data file to Morgan Stanley
- Morgan Stanley loads data transmission and scrubs data
- Morgan Stanley resolves outstanding issues with borrower
- Morgan Stanley values collateral in MAC
- Morgan Stanley analyzes loan data through the Borrowing Base Tool to analyze whether the borrower will be in compliance post closing
- Morgan Stanley informs borrower regarding proceeds available
- Borrower submits formal borrowing request

*Day 1*

- Morgan Stanley receives wet trust receipt from custodian, in electronic and physical form, confirming Morgan Stanley's interest in each loan
- Morgan Stanley confirms that the information on the trust receipt matches that information already supplied by borrower
- Morgan Stanley wires funds to a Morgan Stanley–controlled account at the borrower's custodian
- Borrower transmits closing location file to custodian
- Morgan Stanley approves closing locations
- Borrower funds separate cash account at custodian to fund haircuts
- Morgan Stanley approves custodian's wiring of funds to closing locations

CONFIDENTIAL

- Loan(s) closes
- In the event that a loan(s) does not close, Morgan Stanley requires that the closing agent immediately returns funds via wire transfer to Morgan Stanley's account at custodian
- Morgan Stanley requires our borrower to represent and warrant that closing agents are covered by Insured Closing Protection
- Closing agent ships document files to Morgan Stanley's borrower's location, at either their main office or (less often) to a field office

*Day 2 to Day 8*

- Morgan Stanley confirms verbally with borrower that all pledged wet loans have closed (Day 2)
- Borrower prepares loan files
    - Note
    - Assignment
    - Mortgage
    - Endorsements
- Copies for Servicing File
- On a daily basis borrower delivers dry loans to custodian
- On a daily basis Morgan Stanley receives custodial data file updating wet/dry status
- On a daily basis Morgan Stanley works with borrower and custodian to cure exceptions

*Day 9*

- Morgan Stanley checks with custodian to determine if any remaining wet loans have gone dry
- Morgan Stanley initiates same-day margin call if necessary for loans not checked
- Morgan Stanley terminates all new wet fundings until line is completely dry

*Day 10*

- Morgan Stanley checks with custodian to determine if any remaining wet loans have gone dry
- Morgan Stanley transmits Event of Default Notice if any Day 9+ wet loans exist

## D.    *Risks and Mitigants*

*Risks*

1. Wet funding creates an opportunity for the borrower to double pledge collateral either intentionally or by accident
    - Dual claims would exist in bankruptcy, resulting in possible losses

2. Wet funding creates an opportunity for the borrower to intentionally misdirect the lender's funds
    - The lender will not be pledged collateral

3. Wet funding creates an opportunity for the borrower to intentionally pledge fraudulent collateral
    - The lender's collateral will be worthless

4. Wet funding creates an opportunity for the borrower to be defrauded by its field agents
    - The lender's collateral may be worthless

CONFIDENTIAL

*Risk Mitigants—General*

1. There is no case law of a securitizing residential loan borrower defrauding a warehouse lender through the wet funding process, according to research conducted by Outside Counsel

2. Morgan Stanley conducts extensive due diligence reviews of all warehouse borrowers
   - Third-party consultants
   - Business Unit and Operations reviews

3. The Warehouse Lending Group makes every effort to know our borrowers on a professional and personal basis
   - Extensive coverage effort

4. Morgan Stanley's Credit conducts extensive due diligence and ensures strict adherence to financial covenants, including:
   - Net worth test
   - Ratings triggers (where applicable)
   - Bank capitalization triggers (where applicable)
   - Profitability test
   - Leverage test
   - Liquidity test

*Risk Mitigant—New Margin Call Procedures*

1. The Warehouse Lending Group proposes the following new procedures applicable to wet funding:
   - Permit no more than 8 days for wet loans to dry out
   - All margin calls resulting from wet funding will be due the same day rather than the next day, as is our policy on dry lines
   - Terminate wet funding whenever a wet margin call exists
   - Disallow any defunding while wet margin call exists

2. The Warehouse Lending Group proposes to restrict borrowers to the following wet aging schedule:*

| Time Elapsed | % Still Wet |
|---|---|
| Days 1 through 4 | 100% |
| Day 5 | 80% |
| Day 6 | 50% |
| Day 7 | 30% |
| Day 8 | 10% |

3. A margin call will be made and wet funding will terminate if a borrower fails to adhere to the wet aging schedule

*Risk Mitigant—Double Pledging*

1. Require borrowers to use a single custodian, for wet funding
2. Require custodian to electronically review 100% of funding requests to identify duplicates and anomalies
3. Require that a wet trust receipt be issued to Morgan Stanley by the custodian prior to funding
   - Note: this will not prevent double pledging, but will be used by Morgan Stanley as the evidence of ownership

CONFIDENTIAL

*Risk Mitigant—Mis-Direction of Funds*

1. Morgan Stanley will not, in most cases, wire funds to the general account of the borrower
2. Morgan Stanley will wire funds to a Morgan Stanley–controlled account at the custodian
&mdash; The custodian will wire funds to pre-approved closing locations

*Risk Mitigant—Pledge of Non-Existent Collateral*

1. Prohibit non-approved closing locations
2. Limit to $5 million cumulative total proceeds in any 8-day period sent to any single closing location
3. We believe that it is a low probability that significant losses will result from this risk due to the diversity of closing locations

*Risk Mitigant—Borrowers Defrauded by Field Agents*

1. Prohibit non-approved closing locations
2. Limit to $5 million cumulative total proceeds in any 8-day period sent to any single closing location
3. We believe that it is a low probability that significant losses will result from this risk due to the diversity of closing locations

**E.     _Monitoring and Risk Reporting_**

1. The LASER system is capable of producing all necessary risk reports
2. The Wet Aging Report will show the current balance and aging of each account's wet funding positions
&mdash; This report will be used to alert Morgan Stanley personnel and borrowers to any potential aging problems
3. Information from the Wet Aging Report will flow to the existing Borrowing Base Reports to show any deficits resulting from wet funding

**F.     _Approval Process and Position Limits_**

1. Each wet line will be approved by SStern, ANeuberger and Credit
2. Operations and Credit will conduct complete reviews prior to approval
&mdash; No borrower will be approved without a positive assessment from Operations and Credit
3. Legal will ensure that documentation adheres to the procedures outlined in this presentation
4. Gross wet funding commitments will be capped at $750 million

| Wet Funding Limits ($MM) | |
| --- | --- |
| Morgan Stanley Credit Rating | Wet Funding Limit |
| BBB or higher | $300 |
| BB | $250 |
| B | $100 |
| CCC | None |
| CC | None |
| C | None |

CONFIDENTIAL