**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY, RUBBIE MCCOY, WILLIAM YOUNG, on behalf of themselves and all others similarly situated, and MICHIGAN LEGAL SERVICES, <br><br> Plaintiffs, <br><br> v. <br><br> MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., AND MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | 1:12-CV-7667-VEC-GWG |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

STATEMENT ................................................................................................3

I.      New Century Mortgage Company ................................................................3

II.     Morgan Stanley's Purchase And Securitization Of Subprime Mortgages........................5

      A.     Morgan Stanley's Purchases From New Century......................................5

      B.     Morgan Stanley's Due Diligence.......................................................7

      C.     Warehouse Lending .....................................................................7

III.    Absence Of Control By Morgan Stanley ......................................................8

IV.    Plaintiffs' Allegations Of Discrimination ....................................................9

V.     The Named Plaintiffs ............................................................................10

ARGUMENT ................................................................................................11

I.      Standards Governing The Class Certification Inquiry.......................................11

II.     Individual Questions Predominate Over Common Questions (Rule 23(b)(3)) .................11

      A.     Individual Questions Would Predominate Over Any Common Questions On The Issue Of Causation ................................................................11

      B.     Individual Questions Predominate Over Any Common Questions As To Whether The So-Called "Combined Risk Loans" Adversely Affected Putative Class Members.................................................................22

      C.     Plaintiffs Have Not Shown Any Methodology For Proving A Common, Classwide Disparate Impact...........................................................28

      D.     Individual Questions Would Predominate Over Any Common Questions With Respect To The Statute Of Limitations Discovery Rule ...........................29

III.    None Of The Plaintiffs Is Typical Of The Proposed Class (Rule 23(a)(3)) ....................31

IV.    By Waiving Damages For The Class While Seeking Them For Themselves, Plaintiffs Show They Are Inadequate Class Representatives And Their Claims Are Not Typical (Rule 23(a)(3) & (4)) ............................................................................32

CONCLUSION................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.Q.C. ex rel. Castillo v. United States*,
  656 F.3d 135 (2d Cir. 2011)..................................................................................30

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
  269 F.R.D. 252 (S.D.N.Y. 2010) ......................................................................32, 11

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..............................................................................................11

*Andrews v. Chevy Chase Bank*,
  545 F.3d 570 (7th Cir. 2008) ................................................................................34

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000).....................................................................................31

*Barrett v. Option One Mortgage Corp.*,
  No. 08-10157, 2012 WL 4076465 (D. Mass. Sept. 18, 2012) ................................20

*Bennett v. Spear*,
  520 U.S. 154, 169 (1997) ......................................................................................*12*

*Boyd v. Interstate Brands Corp.*,
  256 F.R.D. 340 (E.D.N.Y. 2009)...........................................................................28

*Carver v. City of New York*,
  621 F.3d 221, 225-226 (2d Cir. 2010) ..................................................................12

*Christ v. Ben. Corp.*,
  547 F.3d 1292 (11th Cir. 2008) ............................................................................34

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
  615 F.3d 496 (6th Cir. 2010) ................................................................................15

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013)..........................................................................................11

*Cooper v. First Gov't Mortg. & Investors Corp.*,
  238 F. Supp. 2d 50 (D.D.C. 2002).........................................................................25

*Corcoran v. N.Y. Power Auth.*,
  202 F.3d 530 (2d Cir. 1999)..................................................................................30

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)....................................................................................12

*Crnokrak v. Evangelical Health Sys. Corp.*,
   819 F. Supp. 737 (N.D. Ill. 1993) .......................................................................27

*Drimmer v. WD-40 Co.*,
   2007 U.S. Dist. LEXIS 62582 (S.D. Cal. Aug. 24, 2007) ....................................32

*Eisert v. Town of Hempstead*,
   918 F. Supp. 601 (E.D.N.Y. 1996) ......................................................................30

*Feinstein v Firestone Tire & Rubber Co.*,
   535 F. Supp. 595, 606-07 (S.D.N.Y. 1982) .........................................................32

*FTC v. Bronson Partners, LLC*,
   654 F.3d 359 (2d Cir. 2011)............................................................................34, 35

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014).........................................................................................11

*Hargraves v. Capital City Mortg. Corp.*,
   140 F. Supp. 2d 7 (D.D.C. 2000).........................................................................23

*Hecht v. United Collection Bureau, Inc.*,
   691 F.3d 218 (2d Cir. 2012).................................................................................32

*In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*,
   708 F.3d 704 (6th Cir. 2013) ..........................................................................20, 22

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
   277 F.R.D. 586 (S.D. Cal. 2011) .........................................................................23

*In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*,
   No. 08-MD-01930, 2011 WL 3903117 (N.D. Cal. Sept. 6, 2011) ........................21

*Kelecseny v. Chevron, USA, Inc.*,
   262 F.R.D. 660 (S.D. Fla. 2009)..........................................................................32

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998).................................................................................29

*Krueger v. Wyeth, Inc.*,
   No. 03 CV 2496, 2008 U.S. Dist. LEXIS 12236 (S.D. Cal. Feb. 19, 2008)..........32

*M & T Mortgage Corp. v. White*,
   736 F. Supp. 2d 538 (E.D.N.Y. 2010) .................................................................22

*Martinelli v. Petland, Inc.*,
    274 F.R.D. 658 (D. Ariz. 2011) ....................................................................22

*Mazzei v. Money Store*,
    288 F.R.D. 45 (S.D.N.Y. 2012) ....................................................................31

*McKenna v. First Horizon Home Loan Corp.*,
    475 F.3d 418 (1st Cir. 2007) ........................................................................34

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)..........................................................................29

*Molina v. FDIC*,
    870 F. Supp. 2d 123 (D.D.C. 2012)..............................................................27

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)........................................................................11

*MP Vista, Inc. v. Motiva Enters., LLC*,
    286 F.R.D. 299 (E.D. La. 2012).....................................................................21

*Nelson v. Assocs. Fin. Servs. Co. of Indiana, Inc.*,
    659 N.W.2d 635 (Mich. Ct. App. 2002) ......................................................24

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ..................................................................29

*Owner-Operator Indep. Drivers Ass'n v. Landstar Sys., Inc.*,
    622 F.3d 1307 (11th Cir. 2010) ....................................................................33

*Pagan v. Abbott Labs., Inc.*,
    287 F.R.D. 139 (E.D.N.Y. 2012) ..................................................................28

*Power Travel Int'l, Inc. v. Am. Airlines, Inc.*,
    No. 02 Civ. 7434, 2004 U.S. Dist. LEXIS 21802 (S.D.N.Y. Oct. 29, 2004) .........................32

*Richard v. Hoechst Celanese Chem. Grp.*,
    355 F.3d 345 (5th Cir. 2003) ........................................................................33

*Rodriguez v. Nat'l City Bank*,
    726 F.3d 372 (3d Cir. 2013)..........................................................................20

*Romberio v. Unumprovident Corp.*,
    385 F. App'x 423 (6th Cir. 2009) .................................................................28

*Sergeants Benev. Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    No. 08-CV-0179 SLT RER, 2011 WL 1326365 (E.D.N.Y. Mar. 30, 2011).........................22

*Steele v. GE Money Bank*,
   No. 08 C 1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009) ..............................34

*Thompson v. Am. Tobacco Co.*,
   189 F.R.D. 544 (D. Minn. 1999) ...................................................................................33

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) .........................................................................................29

*Tsombanidis v. W. Haven Fire Dep't*,
   352 F.3d 565 (2d Cir. 2003) ...........................................................................................12

*Turcios v. Carma Labs., Inc.*,
   296 F.R.D. 638 (C.D. Cal. 2014) ..................................................................................32

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ...........................................................................................22

*United States ex rel. Taylor v. Gabelli*,
   No. 03 CIV. 8762, 2005 U.S. Dist. LEXIS 26821 (S.D.N.Y. Nov. 3, 2005) ....................34

*United States v. Carson*,
   52 F.3d 1173 (2d Cir. 1995) ...........................................................................................33

*United States v. Incorporated Village of Island Park*,
   888 F. Supp. 419 (E.D.N.Y. 1995) ...............................................................................34

*United States v. Philip Morris USA, Inc.*,
   396 F.3d 1190 (D.C. Cir. 2005) ....................................................................................33

*W. States Wholesale v. Synthetic Indus.*,
   206 F.R.D. 271 (C.D. Cal. 2002) ............................................................................32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ........................................................................................ *passim*

*Weiner v. Snapple Bev. Corp.*,
   No. 07-CV-8742, 2010 U.S. Dist. LEXIS 79647 (S.D.N.Y. Aug. 3, 2010) ....................32

*Wilson v. Home Depot USA, Inc.*,
   225 F.R.D. 198 (W.D. Tex. 2004) ................................................................................33

*Zuch v. Hussey*,
   394 F. Supp. 1028 (E.D. Mich. 1975) ..........................................................................34

**STATUTES & CODES**

28 U.S.C. § 1292(b) ...............................................................................................................12

42 U.S.C. § 3613(c)(1) ........................................................................................32, 33

Mich. Comp. Laws § 438.31c(2)(c) ...............................................................24

**OTHER AUTHORITIES**

67 Fed. Reg. 43218, 43219-20 (June 27, 2002) .........................................25

Dennis Parker & Larry Schwartztol, *An important step towards holding Wall Street accountable* (July 25, 2013) ..................................................................11

Fed. R. Civ. P. 23 ................................................................................ *passim*

**INTRODUCTION**

This lawsuit is a misguided effort to hold Morgan Stanley liable for alleged discriminatory impacts of lending undertaken by a different company—New Century.  Almost two years after filing suit, Plaintiffs still have offered no authority for their unworkable third-party-causation disparate impact theory.  But even if viable, that theory cannot proceed as a class action.  To adjudicate Plaintiffs' central premise—that Morgan Stanley "caused" New Century to enter into each of thousands of separate transactions with varying terms over a more-than-three-year period further causing a disparate impact among New Century's borrowers—the factfinder would need to consider many different potential "causes" for each transaction and proof that varies in material ways across the putative class.

During the proposed class period, New Century intentionally diversified the roster of banks to which it sold loans, selling to more than 20 financial institutions.  Morgan Stanley bought approximately 20% of New Century's loans during the period, and made no bulk loan purchases at all during a six-month period in 2005, during which one of the named Plaintiffs obtained her loan.  Morgan Stanley also affirmatively rejected many loans New Century presented for purchase, including the loans New Century made to three more of the five individual Plaintiffs.  Every New Century witness deposed in this case has rejected the idea that Morgan Stanley orchestrated, controlled, or dictated New Century's originations, whether Morgan Stanley ultimately purchased the loans or not.

Any inquiry into who or what caused New Century to originate any particular loan with any particular combination of features will unavoidably be fraught with granular questions about the loan's terms, the borrower's needs and interests, the broker's role, other offers available to the borrower in the market, New Century's interests, which entity (if any) purchased the loan, the mix of purchases in the secondary market at the time, the actions of many secondary-market

actors other than Morgan Stanley, and Morgan Stanley's approach at the time of the loan, among myriad other issues. These factors will be different for each loan. No generalized form of classwide proof could ever establish that Morgan Stanley "caused" New Century to originate every loan to the putative class. (*Infra*, Argument Part II.A.)

Class certification should be denied for several additional, equally fundamental reasons:

*First*, Plaintiffs conjured the "combined risk" loan concept for this case, yet adjudicating the theory's core premise—whether such loans negatively affect borrowers—would require the factfinder to consider different evidence pertaining to, at minimum, dozens of combinations of Plaintiffs' eight "risk" features, any two of which suffice for inclusion in Plaintiffs' definition. (*Infra*, Argument Part II.B.)

*Second*, Plaintiffs have not shown any means for proving a common, classwide disparate impact. Their expert Dr. Ayres proffers one, but remarkably even his questionable methodology produces a disparate impact only in 2004. Application of his methodology to the rest of the class period (2005 to 2007) reveals no disparate impact. In fact, it shows that among New Century Detroit loans that Morgan Stanley purchased, African Americans were *less likely* than whites to receive a "combined risk" loan. Plaintiffs' own methodology thus produces variation, not commonality, on this key question. (*Infra*, Argument Part II.C.)

*Third*, Plaintiffs' case survived a motion to dismiss only because the Court held that the statute of limitations for the Fair Housing Act turns on when a particular plaintiff discovered or should have discovered the claim. That individualized fact question depends on evidence about what each putative class member knew at what time. Courts frequently refuse to certify classes in "discovery rule" cases for this reason and this Court should too. (*Infra*, Argument Part II.D.)

*Fourth*, Plaintiffs are not typical of the putative class.  Every Plaintiff is subject to a strong, individualized defense—Morgan Stanley's causation defense that it did not buy four, and rejected three, of Plaintiffs' loans, and an individualized limitations defense as to the fifth Plaintiff.  Moreover, together, Plaintiffs' loans do not involve three of the eight "risk" factors in the class definition.  (*Infra*, Argument Part III.)

*Finally*, Plaintiffs' own actions demonstrate their inadequacy as class representatives.  They propose to waive a key remedy—actual damages—for the class while seeking it for themselves.  Yet limiting absent class members to disgorgement alone in an effort to create a certifiable class would prejudice absent class members because disgorgement is likely unavailable in private litigation under the FHA.  Courts have found similar ploys to preclude class certification and this Court should too.  (*Infra*, Argument Part IV.)

## STATEMENT

### I.  NEW CENTURY MORTGAGE COMPANY

The 2000s were a period of tremendous change in the mortgage market.  New products and borrowers proliferated.  *See* Riddiough Rpt. ¶¶ 22-24.[1]  The subprime market was highly competitive, and companies like Ameriquest, Countrywide, Lehman, and New Century all originated substantial volumes of loans.  *Id.* ¶¶ 26-28.  Like its competitors, New Century originated loans and then either securitized them itself or sold them on the secondary market in "bulk" pools often worth $1 billion or more.  *Id.* ¶¶ 31-33, 42-50.[2]  Many different banks

---

[1] All citations to deposition transcripts are cited herein as "[name] Dep." (*e.g.*, Licata Dep. 1) and are attached to the Declaration of Colin Reardon, filed herewith.  Exhibits cited herein as "Def. Ex." are also attached to that declaration.  Exhibits attached to the declarations of individual witnesses are cited as "[name] Ex." (*e.g.*, Peterson Ex. 1).  Plaintiffs' class certification brief is cited as "Br." and exhibits thereto are cited as "Pl. Ex."  The reports of Defendants' experts Timothy Riddiough, Marsha Courchane, and Stephen Ryan are cited as "Riddiough Report," "Courchane Report," and "Ryan Report," respectively.  The reports of Plaintiffs' experts Patricia McCoy and Ian Ayres are cited as "McCoy Report" and "Ayres Report," respectively.

[2] New Century occasionally sold small batches of "scratch and dent" loans, so called because of various compromising factors.  *See* Def. Ex. 2 at 66-68.  Morgan Stanley rarely bought such loans, Kaplan Dep. 142-43, and

purchased the loans. Morgan Stanley was one, but from 2004 to 2007, the vast majority of New Century loans—about 80%—were sold to other banks or securitized by New Century itself. *Id.* ¶¶ 42.

New Century obtained funding through its own substantial commercial paper facility and "warehouse" facilities from investment banks. The company had such lines with many different lenders, including Bank of America, Barclays, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, and UBS, in addition to Morgan Stanley. *See* Def. Ex. 1 at 3; Licata Dep. 83-84. Many of those lenders also bought large volumes of loans from New Century. Riddiough Rpt. ¶ 48. Morgan Stanley's warehouse line never represented more than 20% of New Century's total available credit during the class period. *Id.* ¶ 38. Because New Century never fully utilized this credit, "even if Morgan Stanley's warehouse line to New Century had *not existed* New Century would *still* have had between $1.7 billion and $7.6 billion in excess credit" at the end of each quarter from 2004 to the third quarter of 2006. *Id.* ¶ 41.

Most of New Century's loans were made through its Wholesale Division, which originated loans through a network of independent mortgage brokers. Riddiough Rpt. ¶ 33 (71% of loans in 2005). Those independent brokers worked directly with borrowers, typically shopping among various lenders' options. Finley Decl. ¶¶ 4, 9. Frequently, brokers negotiated with lenders, including New Century, to seek better terms based on a competing offer. *Id.*; McKay Dep. 99.

Individual New Century underwriters reviewed and approved every loan the company originated. McKay Dep. 123-125. Those underwriters used guidelines drafted by New Century's Credit Committee, which was made up entirely of New Century employees. *Id.* at 26,

---

Plaintiffs' argument focuses on "bulk" sales (Br. 5), so this brief's references to loan purchases refer to "bulk" purchases.

95, 175.  Those guidelines changed during the class period.  *See, e.g.*, Peterson Decl. ¶¶ 17-21 &
Ex. B (MS00573250: analyzing changes to guidelines).  New Century underwriters, moreover,
had substantial discretion to approve exceptions to the guidelines.  *See* McKay Dep. 97, 121.

## II.  MORGAN STANLEY'S PURCHASE AND SECURITIZATION OF SUBPRIME MORTGAGES

Morgan Stanley was one of many financial institutions that bought residential subprime
mortgages between 2004 and 2007.  Morgan Stanley frequently securitized those loans, pooling
them into investment vehicles that issued securities backed by the loans.  Riddiough Rpt. ¶ 50.
While many Wall Street banks sought profits by selling all the bonds in a securitization, Morgan
Stanley typically retained a major interest in its deals—the "residual."  Vanacker Decl. ¶ 12.  The
residual consisted of the lowest classes of certificates and typically received interest payments, if
any, only after more senior bondholders were paid.  *See* Vanacker Decl. ¶¶ 13-14; *see also*
Telesca Decl. ¶¶ 19-22.  Morgan Stanley's profit (or loss) typically depended on how the
residuals performed, which in turn depended on how the loans performed.  *See* Vanacker Decl.
¶ 16; Telesca Decl. ¶ 22; *see also* Ryan Rpt. ¶ 15.  Morgan Stanley thus had a straightforward
financial incentive to minimize the risk of default in the loans it securitized.  Ryan Rpt. ¶ 15.

### A.    Morgan Stanley's Purchases From New Century

The portion of New Century's loan production that Morgan Stanley bought varied
significantly over the class period.  Riddiough Rpt. ¶¶ 43, 47.  Nationwide, Morgan Stanley
purchased 33% in 2004, 10% in 2005, and 21% in 2006.  *Id.* ¶ 43.  There was intense
competition to buy New Century loans.  Shapiro Dep. 46-49; *see also* Vanacker Decl. ¶ 7.  For
example, for six months in 2005, Morgan Stanley did not make *any* bulk loan purchases from
New Century whatsoever.  Gilly Decl. ¶ 12.  In 2005—the middle of the class period—New
Century securitized more than twice as many loans as it sold to Morgan Stanley, and Morgan
Stanley was not the largest secondary-market purchaser of New Century loans.  Riddiough Rpt.

¶ 46 & fig. 6; *see also* McCoy Rpt. 27.

More than 20 entities purchased New Century loans from 2004 to 2007.  Riddiough Report ¶ 47.  Former New Century Senior Vice President and Secondary Marketing Analyst Warren Licata testified that New Century generally awarded pools to the highest bidder, but was also guided by other factors, including the percentage of loans the bidder subjected to due diligence, the percentage of loans the bidder typically rejected, and New Century's interest in "diversification of [its] investment banks" to "create more competition."  Licata Dep. 58-62.

New Century sold loans to Morgan Stanley and others in various ways.  First, New Century offered "live" pools of loans—pools of specified, existing loans.  Telesca Decl. ¶ 6; Vanacker Decl. ¶ 8.  Second, New Century invited bids on "indicative pools" through a competitive process that could involve "14 different investors."  McKay Dep. 143-44; *see also* Telesca Decl. ¶¶ 6-7.  These pools were comprised of representative loans New Century already expected to supply, based on loans in the pipeline and a projection of "what the production would look like in the future."  Licata Dep. 37-38; *see also* Telesca Decl. ¶ 6; Vanacker Decl. ¶ 9.  Third, New Century sold loans through "reverse bids"—where the bidder initiated the process by offering to buy a pool of loans consistent with another recent pool.  Licata Dep. 29; *see also* Telesca Decl. ¶ 8.

Like other banks, Morgan Stanley memorialized the terms of a winning bid in a purchase agreement attaching a set of "bid terms."  Kaplan Decl. ¶¶ 9-13; Def. Exs. 19-20 (other banks' New Century bid terms).  Bid terms sought to ensure that the features of the loans New Century delivered matched those of the "indicative pool" upon which Morgan Stanley had based its bid price.  Kaplan Decl. ¶ 13; *see also* Telesca Decl. ¶¶ 9-12; Vanacker Decl. ¶¶ 18-20.  Bid terms did not dictate the terms of New Century's originations in the field.  McKay Dep. 59, 144, 154,

157-158.

### B.  Morgan Stanley's Due Diligence

Upon purchase, New Century (like other originators) presented the purchaser with a pool of loans in satisfaction of the purchase agreement.  Morgan Stanley conducted two types of diligence on those loans.  Every loan was subjected to valuation diligence, in which loans were reviewed to analyze the appraised value and condition of the property securing each loan.  *See generally* Davis Decl. ¶¶ 3-21.  Simultaneously, Morgan Stanley subjected a specially selected subset of loans to credit and compliance diligence, analyzing them against New Century's underwriting guidelines and reviewing for compliance with pertinent requirements of local, state, and federal law.  *See generally* Peterson Decl. ¶¶ 4-23.

Pursuant to this diligence, Morgan Stanley regularly declined to purchase—"kicked out"—a number of loans presented by New Century in each trade.  The kick-out rate varied.  For example, it was 4.5% in March 2004 but almost 20% in January 2007.  *See* Gilly Decl. ¶¶ 13-18 & Exs. F to I; Riddiough Rpt. ¶ 110.  New Century frequently complained to Morgan Stanley that its kick-out rate was higher than New Century's other purchasers, presumably reflecting more demanding standards.  *See, e.g.*, Davis Dep. 237-238; Pl. Ex. 61.  Of particular relevance, Morgan Stanley rejected the loans of three Plaintiffs in this case.  *See infra* Background Part V.

### C.  Warehouse Lending

Morgan Stanley was one of many lenders that provided warehouse loans to New Century. To obtain funding, New Century posted collateral with a third-party custodian, and generally posted extant loans.  *See* Goodman Dep. 74.  As an exception to that approach, in March 2007, Morgan Stanley provided New Century with small "wet-fundings," disbursing funds as the loans were closing.  *Id.* at 220; Def. Ex. 15.  Morgan Stanley's warehouse funding to New Century varied over the class period in real dollar terms and as a proportion of all of New Century's

available credit.  For example, Morgan Stanley's lending comprised 20% of New Century's total credit in March 2004 but just 13.8% in September 2005.  *See* Riddiough Rpt. ¶ 38 & fig. 3. Throughout the class period New Century received as much or more credit from other lenders or from its own commercial paper facility.  *See id.* ¶ 39.

## III.   ABSENCE OF CONTROL BY MORGAN STANLEY

Contrary to Plaintiffs' allegations, there is no evidence—not a single document or testimony by any witness—that Morgan Stanley "orchestrat[ed]," "dictated," or otherwise "control[led]" New Century's lending or underwriting practices.  Compl. ¶¶ 3, 241; McCoy Rpt. 29.  The record is entirely to the contrary.

In agreements with Morgan Stanley, New Century expressly "represent[ed], warrant[ed], and covenant[ed]" that its "decision to originate any mortgage loan … is an independent decision based upon [its] Underwriting Guidelines, and is in no way made as a result of [Morgan Stanley's] decision to purchase, or not to purchase, or the price [Morgan Stanley] may offer to pay for, any such mortgage loan, if originated."  *See, e.g.*, Kaplan Decl. ¶ 7 & Ex. A at 19, Ex. B at 23, Ex. C at 4.

Testimony confirms the point.  Patricia Lindsay, a former New Century Vice President upon whom Plaintiffs relied in their Complaint (¶¶ 65, 76, 85), testified that Morgan Stanley did not control the types of loans that New Century originated; to the contrary, "[i]t was New Century's internal decision what loans we were going to make."  Lindsay Dep. 172-173; *see id.* at 151 (no reason to believe Morgan Stanley had anything to do with New Century lending guidelines); Licata Dep. 82 (no "one bank [had] any specific control over New Century"); McKay Dep. 154 (no reason to believe "[a]ny particular bank" dictated terms of loans New Century made).  Another New Century employee, who was based in Detroit and was the account executive for two of the Plaintiffs' loans, agreed.  *See* Finley Decl. ¶ 20.

8

New Century witnesses further testified that the "biggest driving factor" behind New Century's loan products was competition from other originators.  Lindsay Dep. 164.  Bill McKay, Senior Vice President of Mortgage Operations at New Century, explained: "if one of our competitors was able to offer something that we couldn't, then we wanted to offer that product."  McKay Dep. 29.  Thus, New Century's Credit Committee fielded requests from its internal production group for changes to underwriting guidelines "because the competition is doing it and we have to be competitive."  *Id.* at 94-95.  One such example was interest-only loans—one of Plaintiffs' eight so-called "combined risk" features.  Mr. McKay explained that New Century introduced those loans to respond to a competitor.  *See id.* at 88-89.  To the extent secondary market actors influenced New Century's originations, New Century witnesses explained that the "secondary market" included a broad group of financial institutions—including many banks, rating agencies, Fannie Mae, and Freddie Mac—all often generally referenced in combination as "Wall Street."  *Id.* at 143, 153-154; Lindsay Dep. 143, 173-174.  Although Plaintiffs assiduously sought such testimony, no New Century witness has attributed any specific influence to Morgan Stanley.  *See* McKay Dep. 154; Licata Dep. 82.

## IV.    PLAINTIFFS' ALLEGATIONS OF DISCRIMINATION

Plaintiffs do not allege that Morgan Stanley engaged in intentional discrimination.  Not a shred of evidence suggests that it did.  As to disparate impact, Defendants' expert Marsha Courchane concludes that the loan-level data for 2004 to 2007 does not support Plaintiffs' allegation that New Century's lending—whether or not "caused" by Morgan Stanley—had any disparate impact on African-American borrowers in Detroit, whether one examines all New Century loans or only those that Morgan Stanley purchased.  Courchane Rpt. 4-7, 63-64.

Plaintiffs' expert Dr. Ayres does purport to find a disparate impact in New Century's Detroit lending, but his analysis suggests dispositive differences among class members

depending on when they obtained their loans.  He demonstrates *at most* a statistically significant disparate impact in a single year, 2004.  *See* Courchane Rpt. 5, 56-57, 97-100; *compare* Ayres Rpt. 130, 138.  As Dr. Courchane explains, Dr. Ayres "improperly attributes the disparity in incidence that he identifies for 2004 alone to the entire class period."  Courchane Rpt. 5.  When Dr. Courchane analyzed 2005 to 2007 using Dr. Ayres's own model, she found that among all New Century Detroit loans there was no statistically significant disparate impact, and that among Morgan Stanley's purchases African Americans were actually *less likely* to receive "combined risk" loans than similarly situated white borrowers.  *See id.* 56-57.

## V.    THE NAMED PLAINTIFFS

Morgan Stanley *did not purchase* the loans of four of the five Plaintiffs.  New Century offered, *but Morgan Stanley rejected*, the loans of Plaintiffs Adkins, McCoy, and Young, which New Century then sold to Credit Suisse First Boston and Lehman Brothers.  *See* Gilly Decl. ¶¶ 8-10 & Exs. C to E; Riddiough Rpt. ¶ 124.  New Century made its loan to Ms. Williams in April 2005, during the six-month period in which Morgan Stanley made *no* bulk loan purchases from New Century.  *See* Gilly Decl. ¶¶ 11-12; Pl. Ex. 69.  New Century sold her loan to Carrington Capital.  Riddiough Rpt. ¶ 124.  Of the five named Plaintiffs, therefore, Morgan Stanley purchased only Ms. Pettway's loan; other large banks bought the others.  *See* Gilly Decl. ¶ 7 & Ex. B.

Plaintiffs seek to represent a class of New Century borrowers who received what Plaintiffs call a "combined risk" loan.  The category is Plaintiffs' own arbitrary creation for purposes of litigation, defined as a loan with a "high cost" APR (which they would determine by reference to a HMDA regulation) and any two of eight features they assert are associated with "risk."  Compl. ¶ 34 (listing features).  Among them, Plaintiffs' loans include only five such features—adjustable rate ("ARM"), prepayment penalty, balloon payment, stated-income, and

loan-to-value ("LTV") ratio of 90%. *See* Courchane Rpt. 35.

## ARGUMENT

### I.  STANDARDS GOVERNING THE CLASS CERTIFICATION INQUIRY

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Rather, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). Thus, a district court must make a "determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

### II.  INDIVIDUAL QUESTIONS PREDOMINATE OVER COMMON QUESTIONS (RULE 23(B)(3))

Plaintiffs seek certification under Rule 23(b)(3), so they must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and "is even more demanding than Rule 23(a)," *Comcast*, 133 S. Ct. at 1432. To assess predominance, there is "a critical need [] to determine how the case will be tried." Fed. R. Civ. P. 23, adv. comm. notes. If "certification of the class will not negate the need for a series of mini-trials," certification should be denied. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). That is the case here.

#### A.  Individual Questions Would Predominate Over Any Common Questions On The Issue Of Causation

Plaintiffs' case resembles no reported FHA case in history. They allege a disparate impact with respect to loans that *New Century* originated, but they seek to hold *Morgan Stanley* liable for that alleged discrimination. As Plaintiffs' counsel put it, this is "the first case where a

prospective class of homeowners … is suing an investment bank rather than the subprime lender who issued their mortgages."[3]   Had New Century not gone bankrupt seven years ago, no one would even contemplate pursuing an attenuated claim like this one.

To prove a disparate impact, one "must show a causal connection between the facially neutral policy and the alleged discriminatory effect."  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574-75 (2d Cir. 2003).  Here, Plaintiffs' unprecedented theory severely complicates the normal inquiry in a discrimination case because the alleged "causal connection" involves two independent actors.  The alleged causal *policies* are *Morgan Stanley's*, but their alleged disparate *impact* is in *New Century's* origination of loans with "combined risk" features.[4]  Thus, as the Court previously recognized, even to establish standing on such a theory, Plaintiffs must prove that Morgan Stanley's policies "had a 'determinative or coercive effect' on" New Century's actions.[5]   Accordingly, Plaintiffs must prove that Morgan Stanley's policies caused the "combined risk" loans—*all of them*—and caused New Century's alleged distribution of those "combined risk" features disproportionately to African Americans.

This deeply complex causation theory would require the factfinder to consider countless facts and issues regarding the reasons for each New Century origination decision, with great variation across the class.  Because causation cannot be litigated using "generalized proof … applicable to the class as a whole," Plaintiffs cannot satisfy Rule 23(b)(3).  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007).

---

[3] Dennis Parker & Larry Schwartztol, *An important step towards holding Wall Street accountable* (July 25, 2013), *available at* https://www.aclu.org/blog/racial-justice/important-step-towards-holding-wall-street-accountable  (last visited September 5, 2014).

[4] Morgan Stanley continues to believe that this causation theory fails under the Fair Housing Act, for the reasons set forth in its motions to dismiss and to certify an appeal pursuant to 28 U.S.C. § 1292(b).  *See* ECF No. 37 at 13-17; ECF No.  43 at 5-6; ECF No. 49 at 14-20.

[5] ECF No. 47 at 5 (quoting *Carver v. City of New York*, 621 F.3d 221, 225-226 (2d Cir. 2010) (in turn, quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

1.      **Plaintiffs have presented no method of proving causation on a common classwide basis.**

Plaintiffs fall short at the very first step of the Rule 23 analysis by not even attempting to show how, at any class trial, Morgan Stanley's causation of each and every New Century loan in Detroit could be proved through generalized evidence applicable to the class as a whole.

*First*, Plaintiffs present literally no evidence that directly ties Morgan Stanley policies to New Century's origination of all "combined risk" loans.  To the contrary, Plaintiffs studiously ignore the only directly relevant testimony in the record—that of New Century's own employees.  Those witnesses—the only ones with first-hand knowledge of New Century's motives—strongly refuted Plaintiffs' case.  They said that the theory that Morgan Stanley "effectively dictated the types of loans that New Century issued" is "absurd" (Lindsay Dep. 138, 144-145), and that no bank had "any specific control over New Century" (Licata Dep. 82; *see also* McKay Dep. 154).

*Second*, Plaintiffs offer no expert testimony showing that causation can be proved through evidence common to the class.  Plaintiffs' expert Patricia McCoy offers only an artfully phrased opinion that "Morgan Stanley exerted *singular influence* over New Century."  McCoy Rpt. 22 (emphasis added).  Whatever that means, she never opines that Morgan Stanley caused New Century, across the board, to originate loans with "combined risk" features.  McCoy Dep. 50 ("I don't know the exact percentage" of "combined risk" loans caused by Morgan Stanley in 2004).[6]  Remarkably, Professor McCoy admitted she cannot exclude the possibility that there were "*other* singular influences" on New Century during the class period.  *Id.* at 40-41 (emphasis added).  Her opinion is also unreliable: she failed to consider any of the New Century witnesses' testimony (*id.* at 18-22, 35, 92, 255); her report is riddled with basic factual errors (*see*

---

[6] *See also* McCoy Dep. 100 (unable to say "one way or the other" whether Morgan Stanley could ever be the "principal cause" of a loan it never purchased or held on its warehouse line); *id.* at 105-106 (acknowledging that another bank could be the "principal cause" of a loan held on Morgan Stanley's warehouse line "depend[ing] on the facts"); *id.* at 262 (acknowledging Morgan Stanley did not "dictate[] specific terms of loans to specific borrowers").

13

Riddiough Rpt. Section VIII); and her report offers no methodology whatsoever by which to analyze the causation question in this case (*id.* Section V).  Critically, when Professor McCoy finally purported to offer a "methodology"—at her deposition—she admitted she did not apply it here and that if applied it would have identified "multiple causes" for each loan.  McCoy Dep. 70-73, 96-99.  That is wholly insufficient for class certification.

Plaintiffs' other expert, Dr. Ayres, is no better.  He claims to find a disparate impact caused by Morgan Stanley's policies, but his report does not analyze causation.  He later admitted that (a) he could not link his disparate-impact findings to the "specific policies" Plaintiffs challenge (Ayres Dep. 55-56); (b) he could not exclude other potential causes of any disparate impact like "broker discretion" or "other lenders" (*id.* at 235-237, 244-245); and (c) he could not even determine "the relative influence of Morgan Stanley and New Century" (*id.* at 244-245), leaving open the possibility that New Century, and not Morgan Stanley, was primarily (or entirely) responsible for the effects he claims to identify.  These shortcomings are fatal.

For these reasons, as in *Wal-Mart*, Plaintiffs "have not identified a common" cause—whether a Morgan Stanley policy or otherwise—"that pervades" each and every New Century decision to originate a putative class member's "combined risk" loan.  *Wal-Mart*, 131 S. Ct. at 2554-55.  Nor have Plaintiffs presented any method for proving causation on a uniform, classwide basis.  Thus, they utterly fail to meet their burden under Rule 23(b)(3).

> **2.    Plaintiffs' own theories demonstrate why causation cannot be proved with generalized evidence applicable to the class as a whole.**

The causation theories that Plaintiffs do offer—which involve not one, but three distinct purported Morgan Stanley "policies"—only further illustrate why litigation of their unprecedented FHA claim unavoidably would devolve into countless individualized issues.

*Purchasing.*  Plaintiffs claim Morgan Stanley exerted influence through its "predominant

role as a purchaser … of New Century loans."  Br. 2.  The theory is that New Century originated *every* "combined risk" loan to satisfy Morgan Stanley—including loans New Century securitized itself or sold to the many other institutions with which it routinely did business.  The theory is preposterous,[7] and unsupported by any evidence.  For class certification purposes, Plaintiffs afford no basis even to suppose that the theory could be proved through generalized evidence applicable to the class as a whole.  To show Morgan Stanley "caused" any particular loan and its specific terms would require the factfinder to consider the circumstances under which each loan was made.  The facts that Plaintiffs rely upon make this point vividly.

*First*, the causation inquiry cannot be the same for (a) loans Morgan Stanley purchased, (b) loans other financial institutions purchased, and (c) loans New Century securitized itself.  Morgan Stanley purchased only 20% of New Century's loans during the class period; New Century sold 62% to other institutions and securitized 18% itself.  *See* Riddiough Rpt. ¶¶ 42, 45.  New Century specifically sought this "diversification of [its] investment banks" (Licata Dep. 62)—selling to more than 20 entities during the class period.  *See* Riddiough Rpt. ¶ 47.  As Dr. Riddiough notes, the statistics on "combined risk" loans are equally telling:  "Morgan Stanley's purchases were comprised of a substantially lower proportion (53%) of "Combined-Risk Loans" than was true for many of New Century's other loan purchasers, including Carrington (74%), HSBC (73%), Barclays (66%), and UBS (65%)."  Riddiough Rpt. ¶ 83.

Moreover, under Plaintiffs' theory that one bank's purchases could cause New Century to originate any and all loans, regardless which bank (if any) bought the loan, the factfinder would

---

[7] As the Sixth Circuit noted in affirming the dismissal of a public nuisance action against secondary market participants on proximate causation grounds, originators like New Century "that sold mortgages to home buyers decided which loans should be made and on what conditions.  … [T]hese companies ultimately made the decisions regarding where they would seek financing, which types of loans they would market and sell, and, once the mortgagee, whether to keep the mortgage or sell it to another buyer, such as one of the Defendants."  *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 504-05 (6th Cir. 2010).

have to consider—*for every class member*—the potential impact a different bank's purchasing practices had on the loan.  Even Plaintiffs' expert agrees.  *See* McCoy Dep. 87-88 (losing bidder "could have some sort of causal competitive effect").  The factfinder also would need to consider—*for every class member*—the potential impact New Century's own securitizations had on its decision to originate a loan.  All of these issues vary across the putative class.

*Second*, Plaintiffs focus on the "magnitude" (Br. 2, 25) of Morgan Stanley's purchases, which varied over time, further differentiating putative class members.  Morgan Stanley purchased only 33% of New Century's loans in 2004, 10% in 2005, and 21% in 2006.  Riddiough Rpt. ¶ 43.  Contrary to Plaintiffs' assertion (Br. 2), Morgan Stanley was not the largest purchaser of New Century loans in 2005—Carrington Capital was (Def. Ex. 1, at 61; McCoy Rpt. 27 n.118)—and New Century sold no loans to Morgan Stanley for a six-month period that year (Gilly Decl. ¶ 12).  Plaintiffs' "magnitude" theory thus fails entirely for Plaintiff Williams and putative class members who obtained their loans during that six-month span, and varies a great deal for all others.

*Third*, Plaintiffs also dwell on the *way* in which Morgan Stanley purchased New Century loans—focusing on "forward sales."  Br. 12.  The apparent theory is that New Century originated loans to meet bid terms of then-pending forward sales to Morgan Stanley.  There is no evidence to support this speculation.  *See* McKay Dep. 144 ("[W]e had no idea when [a loan] was originated who the investor was going to be.").  If Plaintiffs' theory applies only to loans presented to Morgan Stanley, allegedly to satisfy such bid terms, then it does not apply to most of the class—whose loans either were sold in a live pool, securitized by New Century itself, or sold in forward sales to other banks.  *See* Riddiough Rpt. ¶¶ 96, 102-03; Licata Dep. 24-25.  If Plaintiffs' theory is also—as it seems to be—that Morgan Stanley's bid terms can be deemed the

16

"cause" of even loans New Century *never sold* to Morgan Stanley, then the individualized issues grow more complex.  Other banks had their own bid terms (Def. Exs. 19-20), so the factfinder would need to consider—*for every class member*—whether any of these bid terms caused the origination of a particular loan and, if so, which bank's bid terms.

The bid-term-related individualized issues go deeper.  Plaintiffs claim (but offer zero evidence) that certain Morgan Stanley bid terms support their causation theory—specifically, those regarding average coupon (*i.e.*, interest rate) or requiring minimum percentages of ARMs or loans with prepayment penalties.  Br. 13-14.  Again, even if credited, the theory raises the prospect that any of several banks could have caused any single "combined risk" loan, as other banks' bid terms also regularly contained similar provisions.[8]  Moreover, Morgan Stanley's bid terms expressly *limited* many of the "risk" features Plaintiffs challenge.  Riddiough Rpt. ¶ 97 (limits on stated income, interest only, high LTV); Kaplan Decl. ¶¶ 15-17 & Exs. G to I; McCoy Dep. 255-257.  By Plaintiffs' own logic, far from "requiring" (Br. 25) New Century to issue loans with such features, the limits must have *restrained* New Century from doing so.  On this aspect of Plaintiffs' theory then, the issues vary not only loan by loan, but also "risk" feature by "risk" feature.

***Due diligence.***  Plaintiffs assert Morgan Stanley had "minimal due diligence procedures" and that this caused New Century to originate "combined risk" loans.  Br. 14.  Plaintiffs do not explain how Morgan Stanley's diligence on the 20% of New Century's loans *it bought* could have affected New Century's origination of the 80% *it did not buy*.  *See* Riddiough Rpt. ¶ 110.  Moreover, if Morgan Stanley's diligence could somehow cause the origination of loans New Century sold to other banks, then the other banks' poor due diligence must also have caused New

---

[8] *See, e.g.*, Def. Ex. 19 (Credit Suisse bid terms: 7.28% average coupon, and minimum 78% ARMs and 77% prepayment penalties); Def. Ex. 20 (Barclays bid terms: 8.00% average coupon,  minimum 77.7% ARMs and 75% prepayment penalties);.

Century's origination of loans sold to Morgan Stanley.  *See* McCoy Dep. 307-308 ("due diligence procedures of [other] large investment banks … had problems"); Def. Ex. 21 at 8 (Morgan Stanley reviewed "100%" of appraisals while most banks reviewed only "10-25%"). Which loan was affected by whose approach to due diligence is yet another question the factfinder would need to answer for every class member.

Even among loans New Century presented to Morgan Stanley, the causation inquiry will unavoidably vary by loan.  Morgan Stanley regularly rejected sizeable numbers of loans New Century presented in each trade (*see supra* Background Part II.B), which on Plaintiffs' theory should have deterred New Century from originating similar such loans.  Yet, remarkably, *Plaintiffs seek to hold Morgan Stanley responsible even for the loans it rejected*.  Indeed, three named Plaintiffs (Ms. Adkins, Ms. McCoy, Ms. Young) would have no claim otherwise.  Much of Plaintiffs' evidence about "bad loans" (Br. 15) in fact concerns loans that Morgan Stanley refused to buy; heedless, Plaintiffs seek to pin responsibility on Morgan Stanley nonetheless. *See, e.g.*, Pl. Ex. 52 (Morgan Stanley would "say no to probably all" the loans being discussed); Pl. Ex. 54 ("NC kicks"); Pl. Ex. 61 ("Lehman and others are buying loans that we won[']t."). For these reasons too, Plaintiffs' own theories produce material variations across the putative class.[9]

***Warehouse lending.***  Finally, Plaintiffs assert that Morgan Stanley's warehouse lending shaped New Century's lending (Br. 10-12), which unavoidably introduces even further variations in proof across the putative class.  Although Plaintiffs assert Morgan Stanley "was New

---

[9] Analysis of Plaintiffs' diligence theories also would differ over time and across loan features.  Morgan Stanley made changes to its diligence procedures during the class period.  *See* Davis Decl. ¶¶ 16-18; Peterson Decl. ¶¶ 17-21.  Plaintiffs themselves seize on one such variation.  Br. 15 n.6. (asserting "due diligence grading system was changed" in 2006).  Self-evidently, whatever effect that change may have had did not apply to earlier loans. Moreover, much of Plaintiffs' evidence pertains only to specific features (*e.g.*, "excessive loan-to-value ratios," Br. 16) or specific terms (*e.g.*, "interest-only loan product[s]," Br. 17-18).

Century's *most important* provider of warehouse lines" (Br. 10 (emphasis added)), in fact, Morgan Stanley's line represented only a fraction of New Century's total available funding (ranging from 13.8% to 20% during the class period).   *See* Riddiough Rpt. ¶ 38.   Other warehouse lenders provided comparable funding—at times more—and obviously must have had similar effects.   *See id.*   Yet, Professor McCoy, who opined that Morgan Stanley was New Century's "*most important* funding source" (McCoy Rpt. 23 (emphasis added)), admitted she never considered (and does not know) the amount of warehouse credit other banks provided (McCoy Dep. 240-242, 244-246).   Plaintiffs' own evidence, in any event, does not apply classwide.   *See, e.g.,* Br. 11 (citing wet funding, which occurred in 2007, and placement of specific loan types on the lines).

### 3. Additional factors further demonstrate why causation cannot be proved with generalized proof applicable to the class as a whole.

As Morgan Stanley's expert Dr. Riddiough explains, determining why New Century originated each putative class member's loan, with specific terms and features, requires consideration of a number of factors, never accounted for by Plaintiffs or their experts, that will vary across the class.   *See generally* Riddiough Rpt. Section V to VII.

*Market competition.*   New Century operated in a competitive market.   *Id.* ¶¶ 26-28, 80-88; McCoy Dep. 47-48 (acknowledging competition was "quite prevalent in the market"). Accordingly, why New Century originated any particular loans with certain terms turns heavily on the competition it was trying to match or beat.   Riddiough Rpt. ¶¶ 92-95.   New Century testimony confirms the point.   *See supra* at 8-9; Lindsay Dep. 164 (competition was "the *biggest* driving factor" in changing underwriting guidelines).   Analyzing why New Century made a loan with specific terms to an individual class member would thus require the factfinder to consider prevailing market conditions, which varied over time, and the features of any loan.   *See*

Riddiough Rpt. ¶¶ 133-35.

*The role of the broker.*  The independent brokers who originated most of New Century's loans had relationships with multiple originators, normally presented borrowers with multiple loan options, and negotiated with the originators (including New Century), often playing one off the other to obtain the best possible terms for their borrower clients.  *See* Riddiough Rpt. ¶ 127; Finley Decl. 4, 9.  Plaintiff Williams is one such example.  *See* Williams Dep. 55-57; 139-40. The brokers thus played a substantial role in causing New Century to make a loan and the terms on which it did.  Yet Plaintiffs present no evidence that brokers had any knowledge of any "demands" by secondary-market purchasers.  Analyzing causation would thus require the factfinder to consider the role a borrower's broker played, including whatever negotiations she engaged in with New Century.  *See* Riddiough Rpt. ¶¶ 119, 126-29.  Professor McCoy admits the significant role of brokers in causation, *see* McCoy Dep. 82-83, but she failed to consider it in her report.

*The role of the underwriter.*  Every loan originated by New Century was underwritten by a New Century employee.  Underwriters had substantial discretion to approve departures from New Century guidelines (*see supra* at 4-5), and there is no evidence they had any knowledge of any "demands" by secondary-market purchasers (*see* Finley Decl. ¶ 20).  Determining why New Century made a loan to an individual class member, with particular features, would require the factfinder to consider the causal role of the underwriter, including any discretion exercised in approving the loan.  *See* Riddiough Rpt. ¶ 127.

This feature independently dooms this purported class action.  The Supreme Court held in *Wal-Mart* that in a disparate-impact case, class certification is improper where employees exercise individual discretion and plaintiffs fail to "identif[y] a common mode of exercising

discretion that pervades the entire company."  131 S. Ct. at 2554-55.  Since *Wal-Mart*, courts have denied class certification in every FHA mortgage case where the originator "grant[ed] broad discretion to local agents."  *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013).[10]  As in those cases, Plaintiffs here fail to identify any "common mode" of the exercise of discretion, even while recognizing the prevalence of discretionary decision-making at New Century.  *See* Compl. ¶ 74 (exceptions to underwriting guidelines common); McCoy Dep. 81-82 (acknowledging role of exceptions).[11]

   *The role of the borrower.*  Finally, each individual borrower's own role in the transaction is highly relevant.  Borrowers frequently would prefer and thus choose the features Plaintiffs characterize as "combined risk" because they offered real benefits.  *See* Riddiough Rpt. ¶¶ 71, 130-32; Courchane Rpt. 4, 21-26.  For example, Plaintiff Williams testified that though she was presented with a fixed-rate loan, she rejected it, choosing an ARM—a "risk" feature under Plaintiffs' theory—because it freed her to pay taxes and other debts.  Williams Dep. 100-01.  Sometimes, the impact of choice and borrower conduct on the transaction was unknown even to New Century.  For example, Plaintiff Rubbie McCoy admitted to having falsely stated her income on her loan application.  R. McCoy Dep. 83-84.  A loan to a borrower like Ms. McCoy, who lied, is different than one to an honest borrower.  In each case, the individual borrower's own choices and actions may play a significant role in whether she received a loan and on what terms.  *See* Riddiough Rpt. ¶¶ 121, 130-32.  Again, Professor McCoy admits but fails to account

---

[10] *See also Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 384 (3d Cir. 2013) (affirming denial of class certification where originator allegedly "granted brokers and loan officers the discretion to increase or decrease loan prices"); *Barrett v. Option One Mortg. Corp.*, No. 08-10157, 2012 WL 4076465 (D. Mass. Sept. 18, 2012) (decertifying class following *Wal-Mart*); *In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*, No. 08-MD-01930, 2011 WL 3903117 (N.D. Cal. Sept. 6, 2011) (denying class certification following *Wal-Mart*).

[11] Plaintiffs' discussion of "FastQual" (Br. 8-9) ignores its minimal impact and that, even with that system, underwriters enjoyed substantial discretion to make exceptions.  *See* Lindsay Dep. 20-21, 133-34 (FastQual did not curtail discretion and was a "marketing tool"); McKay Dep. 127-29; Finley Decl. ¶¶ 7-12.

for this.  McCoy Dep. 84-85.[12]

The potential influence of each of these independent actors abundantly demonstrates why causation could never be adjudicated on a common, classwide basis.  This is hardly a surprising conclusion.  In the few instances where class certification has been sought on a claim implicating a third-party causation theory, courts have refused, precisely because of the extent to which "'the independent actions of third and even fourth parties'" affect the inquiry.  *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 14 (2010)).[13]

### B. Individual Questions Predominate Over Any Common Questions As To Whether The So-Called "Combined Risk Loans" Adversely Affected Putative Class Members

The premise of any disparate-impact claim is that the alleged impact was *adverse*, "*i.e.*, that the defendant's practices have a proportionally greater *negative* impact on minority populations." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (emphasis added).  Thus complaints frequently identify obviously adverse impacts, such as similarly situated persons paying more for a loan.  *See, e.g.*, *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d at 708.  Plaintiffs' theory is that African-American borrowers in Detroit received "combined risk" loans (as Plaintiffs choose to define that term) from New Century in higher proportions than similarly-situated white borrowers, and that this was invariably a *negative* impact because such loans (allegedly) correlate with a "heightened risk of

---

[12] *See MP Vista, Inc. v. Motiva Enters., LLC*, 286 F.R.D. 299, 312 (E.D. La. 2012) (denying class certification where "Plaintiffs' own expert has admitted that a variety of factors not included within his formula also may have led to the damages that he attributes solely to the" defendant's conduct).

[13] *See also Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 664 (D. Ariz. 2011) (causation could not be shown classwide where third-party franchisees' "purchasing decision[s] [were] based on a host of factors" other than the defendant's misrepresentation); *Sergeants Benev. Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, No. 08-CV-0179 SLT RER, 2011 WL 1326365, at *4 (E.D.N.Y. Mar. 30, 2011) (causation could not be shown classwide where "independent actions of prescribing physicians … br[oke] the chain of causation").

default and foreclosure." Br. 20.

This claim of negative impact is problematic, however, on the merits and for purposes of class certification:  Every loan involves a risk of default, and subprime loans of course generally involve a higher risk of default than prime loans because they go to borrowers whose histories predict greater credit risk.  But unlike loans with higher or lower interest rates, loans with so-called "combined risk" terms are not necessarily better or worse for a given borrower than loans with other terms.  For example, such a loan may be the *only* loan for which the borrower qualifies.  He or she may well *not* default and thus attain homeownership as a result of the loan.  (Plaintiffs have decidedly refused to pursue a theory that they were qualified for better loans, and thus rest on the theory that New Century should not have made *any* loan to them.  *See* ECF No. 42 at 18.)  Or a loan without the so-called "risk" factor may have had a higher interest rate or other less attractive features.  *See* Courchane Rpt. 23-24.  Thus, correlation with a "heightened" risk cannot, standing alone, render loan features inherently negative.  *See generally id.* 21-39.

In this respect, it is important to note what Plaintiffs do not say:  They do not say "combined risk" loans are *per se* bad for borrowers, as they once did (Compl. ¶ 1 ("categorically harmful"); McCoy Dep. 133-34), nor do they cite any legal authority saying so.  They also do not say the so-called "risk" features necessarily *caused* the alleged "heightened risk" of default, acknowledging the features may only be *correlated with* heightened risk.  *See id.* at 129-30, 147-48.  Yet, incongruously, they do not propose to prove that the "heightened risk" of default ever *materialized* as to any putative class member.  Instead, the theory is that anyone who received a loan with a *theoretical* heightened risk of default was somehow injured, even if that heightened risk brought material benefits.  *See id.*

Morgan Stanley is not aware of any case recognizing a disparate-impact claim based on

the presence of mere (alleged) "heightened risk" features like those here.[14]   But even if "heightened risk" were a cognizable adverse effect—it is not—then the questions for litigation are individualized and impossible to address in a class action.   Whether receipt of a "combined risk" loan is beneficial or adverse for a given borrower will depend on the specific loan, including its particular combination of so-called "risk" features; the borrower's own needs, resources, objectives, and preferences; and the alternatives.   *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 606 (S.D. Cal. 2011) (suggesting, in case alleging that mortgage loans were "toxic," that the "affordability or suitability of a product cannot be determined on a class-wide basis").

 *First*, the arguments about whether a putative class member's loan did or did not present a "heightened risk" of default (the minimum predicate of Plaintiffs' unfairness theory) will vary according to the loan's particular "risk" features.   *See* Courchane Rpt. 21-30.   Professor McCoy agrees (McCoy Dep. 182), and the literature confirms the point.   For example, one article Professor McCoy cites concludes that prepayment penalties—one of the features that qualifies the most loans for inclusion in the class definition (Courchane Rpt. 25)—"have little to no effect on defaults."[15]   Another article she cites states that Michigan's law limiting prepayment penalties provided "effective protection[]" to borrowers during the class period.[16]   (The loans Morgan Stanley purchased from New Century complied with that law.   Courchane Rpt. 25-26 & n.29.)

---

[14] Other FHA cases challenged allegedly "predatory" loans or practices that were alleged to be *per se* unfair (*e.g.*, "exorbitant interest rates," or "excessive fees" for loan servicing).   *See, e.g.*, *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20-21 (D.D.C. 2000).

[15] Def. Ex. 3 at 10 (Shane M. Sherlund, *The Past, Present, and Future of Subprime Mortgages* (Federal Res. Bd. Finance & Econ. Discussion Series Working Paper 2008-63, 2008) (cited at McCoy Rpt. 9 n.17)).

[16] Def. Ex. 4 at 7 (Wei Li & Keith S. Ernst, *The Best Value in the Subprime Market: State Predatory Lending Reforms* (2006) (cited at McCoy Rpt. 8 n.15)); *see also* Courchane Rpt. 25-26, 32-33 (discussing Michigan law); Mich. Comp. Laws § 438.31c(2)(c) (prohibiting "a prepayment fee or penalty in excess of 1% of the amount of any prepayment made within 3 years of the date of the loan, or any prepayment fee or penalty at all thereafter"); *Nelson v. Assocs. Fin. Servs. Co. of Indiana, Inc.*, 659 N.W.2d 635, 641 (Mich. Ct. App. 2002) (discussing Michigan's prohibition on "excessive prepayment penalties").

Professor McCoy did not even consider the Michigan law (McCoy Dep. 171-73), and wrongly assumed that class members received much larger penalties than they did (Courchane Rpt. 32-33).

The variations in the arguments for trial about whether a particular "risk" feature does or does not correlate with "heightened risk" of default increase exponentially here, because Plaintiffs define the affected class by a *combination* of "risk" features.  For just those loans with two—and no more than two—"risk" features, there are 28 combinations.  Yet Professor McCoy admitted that she did not study them all.  McCoy Dep. 132-33.  No classwide adjudication is possible, given that litigation about one of those combinations—say, an ARM and balloon payment—will involve different facts and issues than litigation about any of the other 27.  These combination-specific differences are real.  For example, one study Professor McCoy cites found that combining a stated-income loan with an ARM had "no significant impact" on the "probability of foreclosure" if the loan was a purchase rather than refinance.[17]  Professor McCoy also acknowledged that different "risk" features might "offset" one another, and sorting out their interaction would "depend on a variety of factors."  McCoy Dep. 181-82.  Dr. Courchane explains a number of additional variations with certain so-called "combined risk" features, showing why many would not have been harmful, either in the abstract or as to the actual loans included in Plaintiffs' proposed class definition.  *See* Courchane Rpt. 28-30, 35-39.

*Second*, the number of combinations further increases—again, exponentially—when one considers the potential variations within the "high cost" feature of Plaintiffs' class definition. That feature derives from a 2002 HMDA regulation.  *See* Compl. ¶ 31.  Critically, nothing in the regulatory history suggests that a HMDA "high cost" loan—with or without the "risk" features

---

[17] *See* Def. Ex. 5 at 24 (Morgan J. Rose, *Predatory Lending Practices and Subprime Foreclosures:  Distinguishing Impacts by Loan Category*, 60 J. Econ. & Bus. 13 (2008) (cited at McCoy Rpt. 14 n.44)).

Plaintiffs challenge—is "predatory."[18]  Indeed, at the time, federal law provided a more restricted definition of "high cost" loans that *was* targeted at predatory lending.[19]  There are many variations of HMDA high-cost loans—resulting from how much (or how little) a loan's APR exceeds the HMDA threshold—and that threshold itself changed throughout the class period. *See* Courchane Rpt. 14-15.  For example, as Dr. Courchane notes, in 2004 the HMDA threshold swept in "near prime loans"—which, given Plaintiffs' exclusive focus on subprime loans (Compl. ¶ 30), creates a significant difference among putative class members.  Courchane Rpt. 14-15.  Overlaid on the potential combinations of "risk" features, the variations in APR quickly multiply, yet the arguments for each combination will differ.

*Third*, the impact of "risk"-feature combinations on a borrower—beneficial or adverse— must be answered separately for each borrower.  As Dr. Courchane notes, "[t]here is no method of which I am aware that can determine whether class members were more or less likely to default, given their loan features, other than individualized analysis." *Id.* 23.  For example, an adjustable rate does not "necessarily indicate a higher likelihood of default"; that can depend on the "relationship between fixed and adjustable rates at a point in time." *Id.* 35.  As Dr. Courchane shows, the putative class members' experiences with ARMs—namely, whether their rates adjusted and if so, by how much—varies substantially across the class.  *See id.* 36-37 & tbl. 3.  The risk of default on an ARM, for example, can depend on a borrower's FICO, the loan

---

[18] *See* Bd. of Governors of the Fed. Reserve Sys., Home Mortgage Disclosure: Final Rule and Staff Interpretation, 67 Fed. Reg. 43218, 43219-20 (June 27, 2002) (noting that the regulation's "thresholds are intended to ensure, to the extent possible, that pricing data for higher-cost loans are collected and disclosed" and making no suggestion that "high cost" loans are "predatory" or excessively risky).

[19] That restriction was in the Home Ownership and Equity Protection Act ("HOEPA").  *See, e.g.*, *Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50, 54 (D.D.C. 2002) (explaining HOEPA definition of "high cost" and noting "Congress intended HOEPA to result in greater disclosure to borrowers involved in high cost loans and to stop certain loan terms and practices").  Plaintiffs have not alleged, and could not allege, that Morgan Stanley purchased any loans that were high cost under HOEPA (commonly known as "Section 32 loans"), as Morgan Stanley regularly excluded such loans in its bid terms.  *See* Kaplan Decl. ¶ 18 & Exs. G to I.

balance, and whether the loan is for a new purchase or refinance. *See id.* Sections VI, VII.

Even if an individual class member could prove that the combination of "risk" features she received presented a theoretical "heightened risk" of default, whether that risk level is adverse *for that borrower* will depend on her objectives, which may make the terms suitable, and more suitable than any alternative. For example, an interest-only ARM may suit a borrower who, while able to afford combined principal and interest payments, nonetheless has a goal to preserve as much short-term capital as possible. *See* Courchane Rpt. 23. This is not fanciful. Plaintiff Williams testified that she rejected a fixed-rate mortgage in favor of an ARM to receive additional cash. Williams Dep. 96-97, 100-101. Professor McCoy acknowledges that an ARM may be particularly economically "rational" for borrowers who "know that they will own the house for a relatively short period." McCoy Dep. 151-152. It is not for the named Plaintiffs, in the role of putative class representative, to ask a court to override borrowers' choices, deem them inherently adverse, and base a finding of discrimination on them.[20]

*Finally*, a loan's mere *theoretical heightened risk* of default (in the correlative sense Plaintiffs put at issue) should not be considered adverse, for purposes of making out a disparate-impact claim, unless that risk *in fact materializes*.[21] Plaintiffs did not determine default rates among the putative class, but Dr. Courchane's analysis suggests that many putative class members have never defaulted or faced foreclosure. *See* Courchane Rpt. 38-39. Such borrowers could not make out a disparate-impact claim on the theory that a merely theoretical "heightened

---

[20] Plaintiffs' expert Dr. Ayres admitted that he did not control for borrower preferences for "combined risk" terms, like Plaintiff Williams' choice of an ARM. *See* Ayres Report at 48; Ayres Dep. 225-27.

[21] *See Molina v. FDIC*, 870 F. Supp. 2d 123, 130-132 (D.D.C. 2012) (FHA plaintiff lacked standing to sue loan servicer for alleged disparate impact of practices that, *inter alia*, "increased risk [of] foreclosure" where plaintiff "fails to allege that he personally suffered any of those harms"); *Crnokrak v. Evangelical Health Sys. Corp.*, 819 F. Supp. 737, 741 (N.D. Ill. 1993) ("And *if* a plaintiff can prove that she lost her job, or certain benefits of employment, because of an employer's disability leave policy that exposes women to a greater risk of dismissal or demotion than men, *then* the plaintiff has made out a 'disparate impact' claim under Title VII." (emphasis added)).

27

risk" of default correlated with their loan features.   Even for borrowers who did default, Plaintiffs would have to show that those defaults were due to their "combined risk" loan terms, rather than to other more immediate factors, like home price declines and increases in unemployment rates, both of which strongly affected Detroit during the recession.   *Id.* 15-20. Again, these inquiries could never be resolved on the basis of generalized proof applicable to the class as a whole.

### C.   Plaintiffs Have Not Shown Any Methodology For Proving A Common, Classwide Disparate Impact

Plaintiffs proffer Dr. Ayres's methodology as the means by which they intend to prove disparate impact through "common statistical evidence."   Br. 26.   Dr. Ayres's own report, however, demonstrates—at most—a disparate impact in Detroit only in loans originated in 2004. When Dr. Ayres analyzed 2005 and 2006-2007, he did not find a statistically significant disparate impact among (1) all New Century Detroit loans, or (2) New Century Detroit loans that Morgan Stanley purchased.   *See* Courchane Rpt. 5-6, 56-57 (discussing Ayres Rpt. 130, 138; Ayres Dep. 145-146, 149-150).   Among New Century's Detroit loans that Morgan Stanley purchased, Dr. Ayres's own results indicate that in 2005 African Americans were dramatically *less likely* (odds ratio 0.37) than whites to receive "combined risk" loans.   *Id.*

The difference between Dr. Ayres's results for 2004, on one hand, and 2005 and 2006-2007, on the other, is fatal to class certification.   "What matters … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."   *Wal-Mart*, 131 S. Ct. at 2551. Class certification should be denied because, even by Plaintiffs' own analysis, "most of the members of th[e] class … have not suffered any injury at all."   *Pagan v. Abbott Labs., Inc.*, 287

F.R.D. 139, 148-49 (E.D.N.Y. 2012).[22]

Rather than address these devastating results, Dr. Ayres buries them in an appendix.  *See* Ayres Rpt. 130, 138.  As Dr. Courchane explains,  Dr. Ayres "improperly attributes the disparity in incidence that he identifies for 2004 alone to the entire class period."  Courchane Rpt. 5.  Dr. Courchane confirmed this by testing for the full 2005-2007 period using Dr. Ayres's own model. The results showed no statistically significant disparate impact among all New Century loans, and showed that among Morgan Stanley's purchases African Americans were *less likely* to receive "combined risk" loans than whites.  *See id.* 57.  No class action can be maintained on behalf of a class whose members, according to their own expert's methodology, experienced such radically different outcomes.

### D.    Individual Questions Would Predominate Over Any Common Questions With Respect To The Statute Of Limitations Discovery Rule

Where a statute-of-limitations defense turns on when a putative class member was put on notice of her claim, the need to address that fact-intensive, individualized issue precludes class certification.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2008).[23]  That is the case here.  The FHA's statute of limitations is two years, yet Plaintiffs filed this action more than five years after New Century declared bankruptcy.  Judge Baer dismissed two claims on limitations grounds.  *See* ECF No. 47 at 6-10.  He permitted the FHA claim to proceed only

---

[22] *See also Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (certification should be denied where a class "encompasses many individuals who have no claim at all to the relief requested"); *Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 343 (E.D.N.Y. 2009) (denying certification where "plaintiffs' own expert could not demonstrate statistically significant evidence of discrimination").

[23] *See also, e.g., Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 324 (4th Cir. 2006) (common issues did not predominate in race discrimination action where plaintiffs "failed to show that the statute of limitations defense can be resolved on a class-wide basis"); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) (discovery rule inquiry "preclude[d] a finding that common issues predominate[d] … on most" claims.).

because he held that the FHA includes a discovery rule,[24] and that the question of *when* Plaintiffs' claims should have been "discovered" for purposes of that rule was a "question of fact." *Id.* at 6-8. As Morgan Stanley explained, virtually every source in the Complaint was publicly available more than two years before the filing of this action, including the Massachusetts Assurance of Discontinuance and all the data used in the Complaint's disparate-impact analysis. *See* MTD Mem. 10-11 [ECF No. 37]; MTD Reply at 3-4 [ECF No. 43].

With that backdrop, even if Plaintiffs' claims could survive a summary-judgment motion on statute-of-limitations grounds, any additional knowledge by a class member relevant to this action would raise a substantial question whether that class member's claim is time-barred. *See, e.g.*, *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (discovery rule delays claim's accrual only until "plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause"). That issue is necessarily individualized, and cannot be resolved using generalized evidence applicable to the class as a whole.

Again, the facts concerning one Plaintiff—the only one whose loan Morgan Stanley purchased—illustrate the point. Ms. Pettway testified that her main objection to her loan was that it was (allegedly) based on an inflated appraisal, something she acknowledged having been on notice of since "around '05-'06." Pettway Dep. 169, 181. She also testified that she read three articles in Detroit newspapers in 2007 highlighting potential discrimination against African-American borrowers who received subprime mortgages, *and* that she specifically remembered believing, based on those articles, that she had been targeted for her New Century loan because of her race and gender. *Id.* at 178-181.[25] Ms. Pettway and her bankruptcy counsel

---

[24] Respectfully, Morgan Stanley continues to disagree with this holding, which contradicts an *en banc* decision of the Ninth Circuit and the majority position among district courts. *See* ECF No. 49 at 10-14; ECF No. 58 at 5-6.

[25] The articles were (1) a May 2007 *Detroit Free Press* article that states "minorities . . . can get stuck with bad deals on a mortgage or car loan"; (2) a July 2007 *Detroit News* article that states that an NAACP lawsuit alleged that

(*see* Def. Ex. 6 (bankruptcy dockets)) could easily have discovered Morgan Stanley's purchase of her loan. *See* Def. Ex. 27. These facts, coupled with the publicly available material cited in the Complaint, show Ms. Pettway's claim is time-barred.[26] Obviously, a number of absent putative class members, all in Detroit too, likely face their own issues.[27]

## III.   NONE OF THE PLAINTIFFS IS TYPICAL OF THE PROPOSED CLASS (RULE 23(a)(3))

Class certification should also be denied because none of the named Plaintiffs is typical. Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A plaintiff "subject to unique defenses" is not typical. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal quotation marks omitted). Certification is improper because a "danger" exists "that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." *Id.* at 60 (internal quotation marks omitted). "The unique defense does not have to be established in order to render the representative atypical; it is sufficient that the defendants show that it is meritorious enough to require the plaintiff to devote considerable time to rebut [it]." *Mazzei v. Money Store*, 288 F.R.D. 45, 58 (S.D.N.Y. 2012) (internal quotation marks omitted).

Plaintiffs are not typical for two reasons. *First*, all five Plaintiffs are subject to important, unique defenses. Three of them—Ms. Adkins, Ms. McCoy, and Mr. Young—will face a particularly strong causation defense, given that Morgan Stanley affirmatively rejected each of

---

lenders "issued higher interest home loans to blacks than whites with the same qualifications 30 percent of the time"; and (3) an October 2007 *Detroit News* article that reports statements by Reverend Jessie Jackson accusing "unscrupulous lenders of targeting Detroit minorities for subprime loans." *See* Def. Exs. 24-26.

[26] *See A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) ("A claim will accrue when the plaintiff knows, or should know, enough to protect himself by seeking legal advice." (internal quotation marks omitted)); *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 544 (2d Cir. 1999) ("A plaintiff need not know each and every relevant fact of his injury" to be on notice. (internal quotation marks omitted)); *Eisert v. Town of Hempstead*, 918 F. Supp. 601, 609 (E.D.N.Y. 1996) (refusing to open "the door … to litigation based on stale claims turning on plaintiffs' willful ignorance").

[27] Plaintiff Adkins similarly testified to being aware in 2004 that her appraisal was "too high," Adkins Dep. 130, 134, and was also represented by counsel in bankruptcy well before filing this action, *see* Def. Ex. 7.

their loans before they were purchased by other large banks.  *See supra* at 10.  Another—Ms. Williams—faces an equally powerful causation defense because New Century never presented her loan to Morgan Stanley and New Century originated it during the six-month period in 2005 when it sold no loans to Morgan Stanley.  *See supra id*.  And the last Plaintiff, Ms. Pettway, is subject to a particularly strong statute-of-limitations defense.  *See supra* at 30-31.

*Second*, although Plaintiffs seek to represent a class of borrowers who received loans with any two of eight so-called "combined risk" factors, the five Plaintiffs' cases together provide no opportunity for the factfinder to adjudicate any case involving three of those factors. *See supra* at 10.

## IV. BY WAIVING DAMAGES FOR THE CLASS WHILE SEEKING THEM FOR THEMSELVES, PLAINTIFFS SHOW THEY ARE INADEQUATE CLASS REPRESENTATIVES AND THEIR CLAIMS ARE NOT TYPICAL (RULE 23(a)(3) & (4))

Plaintiffs' Complaint is remarkable in that they *seek for themselves* a remedy (actual damages) that they would *waive for the putative class*.  *See* Br. 31 n.12.  The reason Plaintiffs would waive actual damages for absent class members is obvious—if Plaintiffs were to seek damages for the class, then individualized inquiries would predominate over any other issue in the litigation and plainly preclude class certification.  *See* Br. 2, 33 (arguing that absence of damages claims for the class supports class certification); *see also, e.g.*, *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 266 (S.D.N.Y. 2010); *Weiner v. Snapple Bev. Corp.*, No. 07-CV-8742, 2010 U.S. Dist. LEXIS 79647, at *19 (S.D.N.Y. Aug. 3, 2010).  The reason named Plaintiffs seek actual damages for themselves is also clear—there is no clear authority for a disgorgement remedy under the FHA, so if they decline to seek their own damages, they will likely end up with nothing at all.  These choices are highly improper for putative class representatives for at least two reasons.

*First*, Plaintiffs are not adequate because their choice of remedy for the putative class

32

would foreclose those absent class members from pursuing actual damages, a core remedy under the FHA.  *See* 42 U.S.C. § 3613(c)(1).  When a plaintiff fails to seek a remedy on behalf of a class, the class members' remedies are lost forever under the principle of res judicata.[28]  A "class representative is not an adequate representative when the class representative abandons particular remedies to the detriment of the class."  *W. States Wholesale v. Synthetic Indus.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) (citing *Feinstein v Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982)).[29]  In particular, a class representative seeking only "injunctive relief and disgorgement of [the defendant's] profits" but not "recovery of damages," where those damages are ordinarily recoverable, is not adequate.  *Id.*  Courts addressing similar strategic ploys have concluded that the proposed class representatives were inadequate.  *See, e.g.*, *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999) (plaintiffs who strategically did not seek "damages (to make class certification more likely)" were not adequate).

The problem is even more acute in this case because disgorgement is likely not available in a private FHA lawsuit like this one.  The FHA permits a court to award private plaintiffs *preventive* equitable remedies but not *retrospective* equitable remedies like disgorgement.  The FHA makes this clear by providing that, in addition to damages, a court may grant "*any permanent or temporary injunction, temporary restraining order, or other order* (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action

---

[28] *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012); *Power Travel Int'l, Inc. v. Am. Airlines, Inc.*, No. 02 Civ. 7434, 2004 U.S. Dist. LEXIS 21802, at *11 (S.D.N.Y. Oct. 29, 2004).

[29] *See, e.g.*, *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 648 (C.D. Cal. 2014) (representative inadequate because he only sought partial refund, less than was available to class); *Kelecseny v. Chevron, USA, Inc.*, 262 F.R.D. 660, 672 (S.D. Fla. 2009) (representative inadequate because he sought only one type of damages even though 16 different kinds of damages were available to class); *Krueger v. Wyeth, Inc.*, No. 03 CV 2496, 2008 U.S. Dist. LEXIS 12236, at *9 (S.D. Cal. Feb. 19, 2008) (representative inadequate because class was open to those who had suffered personal injuries but representative did not pursue personal injury claims); *Drimmer v. WD-40 Co.*, 2007 U.S. Dist. LEXIS 62582, *7-8 (S.D. Cal. Aug. 24, 2007) (representative inadequate because he abandoned remedies to detriment of class); *Wilson v. Home Depot USA, Inc.*, 225 F.R.D. 198, 203 (W.D. Tex. 2004) (representatives inadequate because they sought property damages but did not assert personal injury claims available to class).

33

as may be appropriate)." 42 U.S.C. § 3613(c)(1) (emphasis added). The term "other order" does not include disgorgement because that is not similar to the enumerated remedies, which are all *preventive* relief directed toward future conduct. The FHA's public-enforcement provision confirms the point. *See id.* § 3614(d)(1)(A) (in public action "court may award such *preventive relief*, including a permanent or temporary injunction, restraining order, or other order") (emphasis added). In interpreting analogous statutes with enumerated equitable remedies that are "forward looking, and calculated to prevent … violations in the future" and "do not afford broader redress," courts have held that disgorgement is not available. *United States v. Carson*, 52 F.3d 1173, 1181-82 (2d Cir. 1995) (disgorgement unavailable under RICO).[30] Critically, the Second Circuit has explained that disgorgement is not proper in private litigation. It is "a distinctly public-regarding remedy, available only to government entities." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011).

In the face of this Second Circuit authority, Plaintiffs cite no case awarding disgorgement under the FHA, and Defendants are not aware of any.[31] Class certification must be denied on

---

[30] *Accord United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("The remedies explicitly granted … are all directed toward future conduct …. Disgorgement is a very different type of remedy."); *Richard v. Hoechst Celanese Chem. Grp.*, 355 F.3d 345, 354 (5th Cir. 2003); *see also Owner-Operator Indep. Drivers Ass'n v. Landstar Sys., Inc.*, 622 F.3d 1307, 1324 (11th Cir. 2010) (disgorgement unavailable under Truth-in-Leasing Act because "disgorgement [is] not similar in nature to injunctive relief"); *United States ex rel. Taylor v. Gabelli*, No. 03 CIV. 8762, 2005 U.S. Dist. LEXIS 26821, at *49-51 (S.D.N.Y. Nov. 3, 2005) (disgorgement unavailable under False Claims Act).

[31] Plaintiffs cite (Br. 28 n.10) three opinions for the proposition that disgorgement is an appropriate remedy under the FHA, but none actually awards disgorgement or provides a persuasive basis to find that disgorgement is available. *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995), does not involve or discuss disgorgement under the FHA; it involves the federal government's common-law claim for "unjust enrichment as a claim based on a species of implied contract." *See id.* at 455 (discussing unjust enrichment cases applying New York law). Although the district court in *Zuch v. Hussey*, 394 F. Supp. 1028 (E.D. Mich. 1975), states that the court "may" order the defendant to disgorge its profits for an FHA violation, *id.* at 1055 n.13, the court does not provide any analysis supporting that conclusion, the issue does not appear to have been actually litigated in the case, and the court did not in fact award disgorgement. In *Steele v. GE Money Bank*, No. 08 C 1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009), the district court denied the defendants' motion to strike a disgorgement request after noting that "the defendants' briefs do not 'engage the language' of the [FHA] and explain how their suggested result is consistent with the statutory language." *Id.* at *30-31. But the court provided little analysis and did not, in any event, order disgorgement in resolving the motion.

that ground alone, as Plaintiffs seek no other relief for the class (their injunctive relief claims having already been properly dismissed, *see* ECF No. 47 at 5-6).[32]  If the Court were to defer decision on this merits question and certify a class, but later concludes that disgorgement is not available, then absent class members' claims all would be dismissed with prejudice, while Plaintiffs' damages claims would proceed.  Plaintiffs' strategic choice thus makes them plainly inadequate class representatives and class certification inappropriate.

*Second*, Plaintiffs' claim for disgorgement also would divide the class and require resolution of individualized issues.   Any disgorgement award must be based on a prior relationship with the defendant and must "identify specific funds" that are unjustly in the defendant's possession.  *Bronson Partners*, 654 F.3d at 372.   Those requirements foreclose recovery for the many putative class members whose loans were not purchased by or otherwise connected to Morgan Stanley (*e.g.*, through the warehouse line).  *See* Ryan Rpt. ¶ 62.  Even for loans to which Morgan Stanley did have a connection, the inquiry would be highly individualized.  The putative class member would need to trace money he or she provided—for example interest payments on their mortgages—to alleged profits by Morgan Stanley associated with those funds.  *See id.* ¶ 61; *see also id.* ¶ 51.  Determining whether Morgan Stanley profited from its relationship with a class member would require an assessment of the profitability of particular transactions with that borrower and the profitability of any securitization that included the borrower's particular loan.  *See id.* ¶¶ 58-62.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

---

[32] *See, e.g., McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 427 (1st Cir. 2007) (where Truth in Lending Act did not permit class actions for rescission, certification of Rule 23(b)(3) class of borrowers who sought rescission was improper); *accord Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577-78 (7th Cir. 2008); *Christ v. Ben. Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008).

Dated: September 11, 2014

By:   /s/ David W. Ogden

Noah A. Levine
Colin T. Reardon
WILMER CUTLER PICKERING HALE
  AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel:  (212) 230-8800
Fax:  (212) 230-8888
noah.levine@wilmerhale.com

David W. Ogden (*admitted pro hac vice*)
Brian M. Boynton (*admitted pro hac vice*)
Danielle Y. Conley (*admitted pro hac vice*)
Skye Perryman (*admitted pro hac vice*)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
david.ogden@wilmerhale.com
brian.boynton@wilmerhale.com
danielle.conley@wilmerhale.com
skye.perryman@wilmerhale.com
*Counsel for Defendants*