UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY, RUBBIE McCOY, WILLIAM YOUNG, on behalf of themselves and all others similarly situated, and MICHIGAN LEGAL SERVICES,

Plaintiffs,

v.

MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,

Defendants.

1:12-cv-7667-VEC-GWG

## DECLARATION OF BRADLEY DAVIS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, BRADLEY DAVIS, pursuant to 28 U.S.C. § 1746, hereby declare the following under penalty of perjury:

1. The facts set forth are true to the best of my knowledge and recollection. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify as set forth below.

2. In January 2004, I joined Morgan Stanley as the Director of Valuation Due Diligence for the Fixed Income Division. Around 2011, I began serving as the Executive

Director of Credit Risk Management and continue to serve in this role today. In this capacity, I oversee the Valuation Due Diligence team for the retail division and trade desk.

*Overview of the Valuation Due Diligence Process*

3. Morgan Stanley conducted valuation due diligence on all of the subprime loans it considered for purchase. The purpose of this diligence process was to ensure that the appraised value of the properties was reasonable and supported and to ensure that the properties were in good condition, without any significant health and safety issues or headline risk.

4. Morgan Stanley conducted this due diligence after a loan seller had accepted Morgan Stanley's bid to purchase loans but before the sale had closed.

5. The valuation diligence process for New Century loans typically began with a 100% Hansen Pro review of the appraisal value of each loan in the purchase pool. As part of this assessment, Hansen Pro assigned each loan a score indicating the level of risk posed by the appraisal.

6. After obtaining the Hansen Pro score, and based on those scores, Morgan Stanley requested broker price opinions ("BPOs") for certain loans. A BPO is an independent real estate broker's opinion of the value of a property based on its understanding of the local market and evaluation of comparable properties.

7. Loans that received BPOs were then evaluated by a script that Collateral Analysis ran. Loans outside of the script's parameters were slated for further diligence, called mitigation.

8. During mitigation, a member of my team conducted an individualized analysis of each loan in question, reviewing the specific property's sales history, BPO, appraisal, and listings of comparable properties in the area. The purpose of this process was to reconcile the

1

available data to determine whether the loan was acceptable for purchase or contained other value issues that warranted further consideration.

9.  After considering all of the data collected for a particular loan and property, a member of my team assigned a mitigation value to the loan and decided whether to recommend to accept it for purchase based on that value. Loans with a mitigation value that was not acceptable to Morgan Stanley (*e.g.*, with a loan-to-value ("LTV") or combined-loan-to-value ("CLTV") ratio greater than 100) were sent to tie-out for further discussion with the originator/seller.

10. The valuation diligence process concluded with the valuation tie-out, which consisted of an in-person meeting with the seller to discuss the findings of the diligence review and look at specific loans that my team recommended for removal from the purchase pool.

11. Before each tie-out discussion, our team sent the BPOs and mitigation results to the seller so that both sides to the deal could reference the same information during tie-out. Sometimes, sellers accepted Morgan Stanley's mitigation decision and declined to bring those loans into the tie-out process. In such instances, the loans were identified as being removed from the purchase pool (*i.e.*, "kicked" or "out") for valuation reasons.

12. For all other loans, members of my team sat down with the seller and conducted an individualized review of every loan identified as requiring tie-out review. As part of this individualized assessment, the member of my team would discuss the data collected for the loan with the seller and explain Morgan Stanley's rationale for recommending that the particular loan be removed from the purchase pool. If the seller provided additional information on the loan at the meeting, we would consider the data and make a final decision on whether the value of that particular loan was sufficient to warrant recommendation for inclusion in the purchase pool.

2

13. These decisions were memorialized in a final valuation tie-out report. Loans identified as acceptable for purchase during the tie-out process were annotated as "IN" in the "MS Decision" column of the report. Loans deemed unacceptable for purchase were identified as "OUT" in the "MS Decision" column of the report. As an example, a true and correct copy of the January 2006 valuation tie-out report (redacted to remove personally identifiable information) has been attached to this declaration as Exhibit A (MS00372198).

14. As a result of this valuation diligence process, Morgan Stanley regularly removed loans from the purchase pool. The number of loans that Morgan Stanley removed (*i.e.*, the "kick-out rate") varied over time for New Century and other originators, as it depended on the particular loans presented for purchase.

15. After the valuation tie-out, the final tie-out reports were sent to me, Collateral Analysis, and Contract Finance. These final reports concluded the valuation diligence process for the pool in question.

***Changes to the Valuation Diligence Review***

16. Certain aspects of the valuation diligence process evolved in light of changes in the market or in the sellers' processes.

17. For example, until late-2005, New Century ordered Hansen Pro reports for its loans and submitted them to Morgan Stanley for review. During this time period, Morgan Stanley ordered separate Hansen Pro reports on a 5% sample of loans, and analyzed the reports received from New Century as the basis of its Hansen Pro review. When New Century stopped ordering its own Hansen Pro reports, Morgan Stanley began ordering the reports on all of the New Century loans it considered for purchase.

3

18. Over time, Morgan Stanley also varied its methodology for selecting the sample of loans for which it requested BPOs. Initially, Morgan Stanley made this selection randomly. However, by late-2005, it began selecting loan samples based on certain characteristics, such as location in a high-risk city, loan-to-value ratio, and loan amount.

***Kick-Out Rates and Interactions with the Mortgage Finance Desk***

19. At no point during my time as a member of the diligence team at Morgan Stanley did I feel pressure from other Morgan Stanley employees, including the other individuals working on the purchase and securitization of subprime loans, such as the mortgage finance team, to reduce the number of loans recommended for decline and/or to increase the number of loans recommended for purchase from a pool.

20. Although loan sellers occasionally complained about Morgan Stanley's kick-out rates, I was never told—explicitly or implicitly—that my team needed to increase the number of loans recommended for purchase from a pool. To the contrary, my team was instructed to maintain our standards in the valuation review process.

21. To the extent that my team engaged in additional or deeper analysis of loans, it was done to facilitate communication with sellers regarding what they could do to ensure the loans they presented for purchase met Morgan Stanley's diligence criteria; or to ensure that loans identified for individualized review or removal from the pool were, in fact, loans with potential valuation issues.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10th, 2014.

*Bradley Davis*
Bradley Davis

4