UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BEVERLY ADKINS, CHARMAINE WILLIAMS, REBECCA PETTWAY, RUBBIE McCOY, WILLIAM YOUNG, on behalf of themselves and all others similarly situated, and MICHIGAN LEGAL SERVICES,

Plaintiffs,

v.

MORGAN STANLEY, MORGAN STANLEY & CO. LLC, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY MORTGAGE CAPITAL INC., and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,

Defendants.

1:12-cv-7667-VEC-GWG

---

## DECLARATION OF FRANCIS TELESCA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, FRANCIS TELESCA, pursuant to 28 U.S.C. § 1746, hereby declare the following under penalty of perjury:

1. I have been an employee of Morgan Stanley since 2002. The facts set forth are true to the best of my knowledge and recollection. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify as set forth below.

2. During the period from 2004 through 2007, I was involved in Morgan Stanley's efforts to purchase and securitize bulk pools of subprime residential mortgages. In 2004, I worked as a vice president on the mortgage finance team responsible for managing the subprime loan securitization process within Morgan Stanley's Securitized Products Group ("SPG"). In April 2006, I began working in Morgan Stanley's Global Proprietary Credit Group ("GPCG"),

1

which Morgan Stanley formed in April 2006, as an executive director. I retained largely the same responsibilities in my role in GPCG as I had in SPG.

3.     Regarding securitizations of loans, my responsibilities included composing pools of loans for securitization; coordinating with counsel, rating agencies, and accountants; and assisting with estimates of potential capital structures for use in purchasing loan pools.

4.     From 2004 through 2007, the Morgan Stanley employees involved with purchasing and securitizing subprime loans worked within SPG, a sub-unit within Morgan Stanley's Fixed Income Division. Employees in SPG were involved in a wide variety of business activities including trading in residential mortgage-backed, commercial-backed, collateralized debt obligations, and other asset-backed securities; acquiring commercial and residential mortgages; securitizing mortgages; and advising clients on and underwriting securitizations.

***Purchasing Bulk Pools of Subprime Residential Mortgages for Securitization***

5.     As part of the mortgage finance team, I assisted with Morgan Stanley's determinations to bid on bulk pools of residential mortgages by providing feedback about the current securitization markets and an estimate of the capital structure for a potential securitization of the loans. A securitization's capital structure refers to the rating agencies' determination of the percentages of a securitization that fall within given rating categories.

6.     Subprime loan sellers, like the New Century Mortgage Corporation ("New Century"), solicited bids on pools of loans by sending bid memos, which detailed the bidding process and sometimes described the loan pool, and files called "loan tapes," which provided loan-level details, to potential purchasers. Sometimes, the originators sent a tape with the actual loans for sale. These tapes were said to describe "live loans." At other times, sellers solicited

2

bids on sample tapes of "indicative loans," which the loan seller intended to represent the characteristics of the loans ultimately for sale.

7. The attached email and memorandum are an example of a solicitation by New Century for bids on a pool of subprime residential mortgage loans. The memorandum is an example of a "bid memo" from New Century. Exhibit A (MS00467876) (e-mail); Exhibit B (MS00467883) (memorandum).

8. In some instances, Morgan Stanley initiated the bidding process by submitting a bid directly to a loan seller for a pool of loans, usually with the same or similar characteristics of the pool that the seller had recently shown or sold to Morgan Stanley. These instances were sometimes referred to as "reverse bids."

9. After Morgan Stanley won a bid to purchase a pool of loans, Morgan Stanley's contract finance team worked with external counsel and others at Morgan Stanley, including the mortgage finance team, to prepare stipulations, known as "bid terms" or "bid stips," for use in a purchase agreement with the originator.

10. Those agreements, known as Purchase Price and Terms Agreements, included the bid terms. Members of the mortgage finance team, including myself, assisted the contract finance team with certain of the provisions of the bid terms related to the loans' credit characteristics, including credit scores, loan-to-value ratios, and loan documentation status.

11. Changes in a loan pool's credit characteristics could potentially affect the rating agencies' capital structure for a given securitization. Accordingly, those changes would affect any securitization of the loan pool by Morgan Stanley. Because Morgan Stanley used estimates of securitization structures and cash flows to value bulk pools of loans for purchase, it was important that the characteristics of the pools ultimately delivered to Morgan Stanley were as

consistent with the characteristics of the pools upon which Morgan Stanley bid on as possible. The bid terms were intended to ensure those characteristics were consistent.

12. For example, Morgan Stanley typically sought to limit the number of stated-income loans in any pool through the bid terms. The attached sample bid terms from a May 8, 2006 agreement with New Century, Exhibit C (MS01884962), states that "[n]o more than 48.56%" of the loans in the pool could be stated-income loans.

13. Morgan Stanley also conducted due diligence on the loans, which focused on the borrower's credit, the mortgage's compliance with applicable law, and the property's valuation. Morgan Stanley conducted credit due diligence on a sample of loans within any given pool.

14. In late 2006, in response to increased numbers of early stage delinquencies of loans in recent securitizations, Morgan Stanley undertook a review of the loans in several securitizations. Together with employees in collateral analysis and due diligence, I reviewed loan performance in several securitizations to identify characteristics of loans associated with early stage delinquency. As a result of this analysis, the collateral analysis group altered several of the criteria used to select a sample of loans for due diligence. These changes were applied to loans from New Century and other originators.

15. Morgan Stanley's due diligence team identified specific loans within pools that it recommended not be purchased (*i.e.*, loans that would be "kicked out" of the pool). The end result was that Morgan Stanley did not purchase every loan delivered in the initial pool.

*Securitizations of Subprime Residential Mortgage Loans*

16. Generally, Morgan Stanley securitized mortgages about three months after it purchased them.

4

17. Based on market conditions, investor feedback, and Morgan Stanley's inventory of loans, the mortgage finance team would select loan characteristics to create a pool of loans for securitization out of Morgan Stanley's entire subprime loan inventory. Depending on these factors, Morgan Stanley sometimes securitized loans from only one originator for securitization, and at other times, included loans from multiple originators into securitizations.

18. As a member of the mortgage finance team, I considered the securitizations' expected capital structure and sought to design pools with collateral characteristics to fit within that expected structure.

19. As an example of a representative securitization, Morgan Stanley created a pool from residential mortgage loans it had acquired from New Century and transferred the loans to the securitization's issuing trust (here, Morgan Stanley ABS Capital I Inc. Trust 2006-NC2). The trust issued notes (sometimes referred to as certificates or bonds) with the loans as collateral and provided the notes to Morgan Stanley in exchange for the loans. Morgan Stanley typically sold the rated notes (the notes the rating agencies had assigned credit ratings on) and retained other non-rated notes (known as the "residual") as its own investment in the deal.

20. The trust typically issued several additional classes of certificates that were not rated. First, the Class X certificates represented the right to receive (1) interest owed by the mortgage borrowers in excess of that owed to the bonds in the securitization deal and (2) the difference between the mortgage loans' initial principal balance and the notes' initial balance (known as the overcollateralization), to the extent that the deal performed as expected. Second, the Class P certificate had the right to receive any prepayment premiums paid by the loans. Finally, the Class R certificates were entitled to any remaining distributions.

21. Morgan Stanley would often securitize the Class X and Class P bonds to create a Net Interest Margin ("NIM") security. Cash flows from the Class X and Class P bonds that were still available after full repayment of the NIM were typically referred to as the "Post-NIM."

22. Morgan Stanley's practice was to retain an economic interest in its subprime securitizations via the non-rated "residual" interest. The performance of these residual interests was dependent on the performance of the loan collateral supporting the securitizations.

*Flow of Funds For Securitizations*

23. On the day the securitization closed, the mortgage finance team would create a "Flow of Funds" document. This document would detail the proceeds received from selling the bonds to investors and the initial, estimated value of Morgan Stanley's residual holding in the securitization as well as expenses and other outflows of cash. An example of a Flow of Funds document for the Morgan Stanley ABS Capital I 2005-NC2 securitization is attached as Exhibit D (MS02696849) to this declaration.

24. In this exhibit, the line on the Flow of Funds document that shows the value that Morgan Stanley estimated for the residual it retained was labeled "Gross Proceeds on Post NIM." Although the label mentions the "Post-NIM," the value given was for the entirety of Morgan Stanley's residual holding—including its X, P, and R bonds—not just some remainder of the residual following the creation of a NIM (at that time no NIM had been structured for this securitization).

25. Expenses not required to be paid at closing often were paid in subsequent months. The line on the Flow of Funds called "Non-deal expenses" refers to such expenses.

*Collateral Shortfall*

26. At times, the unpaid principal balance of mortgages being placed into trust in connection with a securitization was insufficient to meet the collateral requirements for the deal as sized. When that happened, there was a "collateral shortfall" and Morgan Stanley was required either to cover the shortfall by paying money into the trust or to reduce the size of the bond offering. For example, the Flow of Funds document at Exhibit D (MS02696849) shows a collateral shortfall of $12,291,018.00. This meant that Morgan Stanley paid that amount into the trust as part of the securitization at issue.

27. The reason for a collateral shortfall could vary from deal to deal. Common reasons for a shortfall included the removal or substitution of loans from the securitization or early payment of principal by borrowers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2014.

_____
Francis Telesca