UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY ADKINS, CHARMAINE WILLIAMS,
REBECCA PETTWAY, RUBBIE McCOY,
WILLIAM YOUNG, on behalf of themselves and all
others similarly situated, and MICHIGAN LEGAL
SERVICES,

                   Plaintiffs,

v.                                                                                              1:12-cv-7667-VEC-GWG

MORGAN STANLEY, MORGAN STANLEY &
CO. LLC, MORGAN STANLEY ABS CAPITAL I
INC., MORGAN STANLEY MORTGAGE
CAPITAL INC., and MORGAN STANLEY
MORTGAGE CAPITAL HOLDINGS LLC,

                   Defendants.

## DECLARATION OF ANTON PETERSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, ANTON PETERSON, pursuant to 28 U.S.C. § 1746, hereby declare the following under penalty of perjury:

1. I have personal knowledge of the facts set forth in this declaration. The facts set forth are true to the best of my knowledge and recollection. If called as a witness, I could and would testify as set forth below.

2. In February 2002, I began performing contract underwriting for Clayton Holdings and, six months later, became a lead underwriter for Clayton. In June 2003, I was hired by Morgan Stanley as a contract employee, and was later hired by Morgan Stanley as a full-time employee for the position of Due Diligence Manger in June 2004. In late 2005, I was promoted

to Vice President of Bulk Due Diligence, a position in which I was responsible for overseeing a team of due diligence managers. In 2008, I moved to Saxon Mortgage Services, which had been previously acquired by Morgan Stanley.

3. In my role as Vice President, I managed Morgan Stanley's bulk credit and compliance diligence, which was one aspect of the due diligence performed by Morgan Stanley in connection with its purchase of bulk pools of subprime residential mortgage loans.

*Overview of The Credit and Compliance Due Diligence Process*

4. After a loan seller had accepted Morgan Stanley's bid on a pool of subprime loans, Morgan Stanley conducted due diligence on the loans in the pool before the sale closed.

5. Morgan Stanley's credit and compliance diligence consisted of a loan-level examination of a percentage of loans in the pool offered for purchase.

6. Morgan Stanley conducted credit and compliance diligence to identify loans within the selected diligence sample that did not fit Morgan Stanley's diligence criteria or risk profile and to confirm that individual loans in the sample conformed to the bid stipulations relevant to the pool presented for purchase. My team provided the diligence results to the contract finance group, who in turn provided information on those results to the finance team— or trading desk. The trading desk used this information to make purchase decisions; while my team made recommendations whether to purchase or not purchase a particular loan, we knew that the final purchasing decisions resided with the trade desk. Accordingly, the purpose of credit and compliance diligence was to understand the risk of the loan pool under consideration for purchase and to provide information on the risk or potential risk of that pool to the traders.

7. The process began when the diligence team received a trade announcement from Morgan Stanley's contract finance team—an indication that Morgan Stanley was the winning

bidder on a loan pool. The trade announcement contained, among other things, details about the settlement date and bid stipulations. Based on the information in the trade announcement, one of the due diligence managers on my team would usually draft a deal calendar to assist both my team and the seller in facilitating the trade. *See, e.g.*, Exhibit A (MS01266638 – 01266639).

8. Morgan Stanley's collateral analysis team then selected a sample of the loans for credit and compliance diligence and sent information on the loans in the sample to the diligence team and the seller. Credit and compliance due diligence samples were selected based on proprietary modeling criteria: compliance criteria, adverse criteria that was designed to identify certain types of credit features within the product mix offered for sale, and random criteria. Diligence managers on my team and I occasionally participated in discussions with my supervisor, Pamela Barrow, the trade desk, contract finance, and collateral analysis regarding product and risk issues related to sampling; these discussions sometimes led to changes in the criteria used to build the diligence sample.

9. After my team received the credit and compliance diligence sample, the loans in the sample were assessed, on a loan-by-loan basis, for regulatory compliance and credit risk.

10. Over the course of the credit and compliance review of a particular pool, the diligence managers were responsible for providing periodic reports to me, Ms. Barrow, and relevant teams within the Morgan Stanley business unit, as well as to the loan seller.

11. The diligence process concluded with the tie-out, which consisted of a diligence manager meeting with the seller to generally discuss findings of the diligence review and to review specific loans that my team had identified as recommended declines from the purchase pool. The discussion of specific loans was important because sometimes loans were recommended for decline due to an easily curable criterion, such as a missing document, which

3

we would typically give the seller an opportunity to cure. If the seller provided further information on those loans at the meeting, the Morgan Stanley diligence manager would look at those files and make a final decision on those particular loans. (The credit and compliance tie-out differed from and preceded the deal tie-out, which occurred when the traders and the seller agreed on what population of loans were actually going to be purchased.)

12. After credit and compliance tie-out, final reports on the sample under examination were sent to me, and the collateral analysis and contract finance teams. These final reports concluded the credit and compliance diligence for the pool in question.

***Specifics of the Credit Re-Underwrite and Compliance Review***

13. Morgan Stanley used a third-party vendor to conduct an in-depth review of the loans—often referred to as a loan-level analysis—in the sample. During my time as Vice President of Bulk Due Diligence, Morgan Stanley used Clayton Holdings as its vendor to identify risk issues in subprime loans related to credit underwriting and to perform compliance testing against applicable laws and regulations.

14. The credit review involved Clayton obtaining from the seller all of the loan files for the loans in the sample and performing a re-underwrite of the loan based on the seller's underwriting guidelines. Because the seller guidelines permitted exceptions to the guidelines, a significant part of the diligence re-underwrite was an assessment of whether sufficient compensating factors existed in the loan file to merit the exception to the seller's guidelines. A compensating factor could, for example, be a characteristic better than a minimum guidelines requirement or that demonstrates good stability of the borrower. Analyzing for compensating factors required Clayton reviewers to make subjective determinations regarding risk. Additionally, Morgan Stanley provided Clayton reviewers instruction on certain elements that,

4

while permissible under the seller's guidelines, would, in the aggregate, result in a risk level Morgan Stanley wanted to review directly. Morgan Stanley granted the Clayton reviewers limited authority to make judgments regarding loans with minor exceptions to the underwriting guidelines.

15. The compliance review was conducted on the same loans and used the same loan files obtained from the seller. The compliance review involved looking at many documents, collecting a lot of data, and running calculations to verify compliance with a wide variety of laws and regulations. Clayton had its own compliance test, and Morgan Stanley had an internal compliance coordinator who maintained a compliance profile and worked with my team to ensure that Clayton's compliance system and reporting was accurate.

16. As Clayton completed both its credit and its compliance reviews on each of the loans, it would assign a credit grade and a compliance grade. My team then reviewed all of the loans that Clayton graded for further review (excluding loans that received that grade solely due to an issue that had objective cure criteria such as a missing document), and performed quality control on a subset of the loans with other grades. Clayton was required to grade loans for further review by my team for multiple reasons, including some unrelated to underwriting guidelines, such as mortgages with loan amounts above certain levels or mortgages secured by manufactured housing. On the basis of the information before them, diligence managers on my team then made a subjective determination regarding the particular loan. There were some characteristics that consistently resulted in loans being recommended for decline, for example a FICO score below 500 or a debt-to-income ratio over 60%. However, my team of diligence managers generally had discretion to assign client grades that differed from Clayton's grades based on their subjective assessment of the loans and their professional experience and judgment.

5

### *Changes to the Credit and Compliance Review*

17. Some aspects of steps in the process outlined above changed over the course of my time as Vice President of Bulk Due Diligence.

18. For example, lenders were periodically altering their underwriting guidelines against which the credit re-underwrite was performed. My team thus reviewed changes to seller guidelines and shared information about those changes with the business team. *See, e.g.*, Exhibit B (MS00573250 – 00573317). Because the credit aspect of Morgan Stanley's due diligence was an evaluation of particular loans against sellers' guidelines, changes in the guidelines impacted our assessment of the loans under examination and our recommendations for certain loans.

19. Additionally, the adverse criteria used to compile the diligence sample was altered as deemed appropriate. While there was certain criteria that I understand the collateral analysis group used on a regular basis, I know there was also room to adjust the adverse criteria used in constructing the sample to more effectively evaluate the pool under examination at any given time.

20. Similarly, over the course of my time as Vice President, we observed trends that resulted in other changes to the sampling criteria. For example, in late 2006, there was an additional set of criteria run that focused on characteristics that were believed to be most closely associated with early stage delinquencies.

21. Another change to credit and compliance diligence occurred in early 2006. In late 2005 and early 2006, my team had seen an increase in the number of loans we recommended for decline. In an effort to provide better information to the business unit (trade desk, contract finance, and collateral analysis), we took a deeper look at the reasons for loans being recommended for decline and developed a system to categorize those reasons. Those categories

6

were a further loan-level individualized assessment of particular loans. After the credit and compliance tie-out, a due diligence manager assigned a further grade to all loans recommended for decline—essentially a second level of loan grading—based on the issue or issues that had caused the loan to be recommended for decline.

### *Due Diligence Decisions*

22. Throughout my time at Morgan Stanley, I instructed my team to take a conservative approach to risk because I knew that Morgan Stanley desired to manage and minimize risk in the loan pools. I received a similar instruction to take a conservative line on risk from my superiors, as well as others in the business unit.

23. At no point during my time as a member of the diligence team at Morgan Stanley did I feel pressure to reduce the number of loans recommended for decline and/or to increase the number of loans purchased from a pool. I was never told—explicitly or implicitly—that my team needed to increase pull-through rates (i.e., the number of loans purchased from a pool). To the extent that my team engaged in additional or deeper analysis of loans, it was done to provide greater clarity to our business group about the diligence findings, and to facilitate communication with sellers regarding what they could do to ensure the loans they presented for purchase met Morgan Stanley's diligence criteria.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September __11__, 2014.

_____
Anton Peterson